UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AKEEM OLIVER,<br><br>       Plaintiff,<br><br>  v.<br><br>CITY OF NEW YORK, DERMOT F. SHEA *in his official capacity as Commissioner of the New York City Police Department*, JOHN L. O'CONNELL *in his official capacity as Commanding Officer of the Ninth Precinct of the New York City Police Department*, JOSEP GONZALEZ *in his personal and official capacity as a Sergeant of the New York City Police Department*, KENNETH J. TAYLOR *in his personal and official capacity as an Officer of the New York City Police Department*, FIVE UNKNOWN OFFICERS OF THE NEW YORK CITY POLICE DEPARTMENT *in their personal and official capacities*, BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, TOMPKINS SQUARE MIDDLE SCHOOL, RICHARD CARRANZA *in his official capacity as Chancellor of the New York City Department of Education*, CARRY CHAN *in her official capacity as Superintendent of School District 1*, KRISTINE MUSTILLO *in her official capacity as Deputy Community Superintendent of School District 1* and SONHANDO ESTWICK *in his personal and official capacity as principal of Tompkins Square Middle School*,<br><br>       Defendants. | **Civil Action No.:** _____<br><br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff AKEEM OLIVER, by and through his attorneys, Morvillo Abramowitz Grand Iason & Anello P.C., for his complaint, alleges as follows:

## INTRODUCTION

1.     Plaintiff Akeem Oliver is a 36-year old Black male teacher at Defendant Tompkins Square Middle School ("TSMS") in New York City.  Mr. Oliver has dedicated his

professional life to teaching and working with special needs students, one of the most vulnerable groups of students in the City's school system.

2.      For years, Mr. Oliver's efforts to educate and develop New York City's youth have been impugned and thwarted by a malicious, long-standing campaign of unlawful racial discrimination, retaliation, and harassment—a campaign, which has been spearheaded by TSMS's principal, Defendant Sonhando Estwick, assisted by TSMS staff and employees of Defendant Board of Education of the City School District of New York ("DOE"), and condoned by Defendant DOE and its policymakers.  Over the past seven years, Mr. Oliver has endured a series of attacks and vicious false rumors on his character, professional reputation, and standing as a teacher at Defendant TSMS.  Such attacks have resulted in (1) Mr. Oliver being prohibited from working in extracurricular activities, and (2) Mr. Oliver being assigned to the Reassignment Room—also known pejoratively as the "Rubber Room"—for alleged, improper conduct which he did not commit and for which he was ultimately cleared—both situations stemming from negative stereotypes about Black men.

3.      As Glenna Goldis wrote in the Observer, the "Rubber Room" is so named, because it is a place that "makes you lose your mind."[1]  The Rubber Room is a room where teachers under investigation due to allegations of wrongdoing—regardless of whether these allegations are substantiated—must report and simply sit and idle away the hours while they anxiously await a conclusion to the investigation as to whether they have done anything wrong.  No timetable is provided for how long teachers assigned to the Rubber Room will need to nervously and mindlessly idle there.  Reassignment to the Rubber Room is viewed as a

---

[1] Glenna Goldis, *Teachers Against Bloomberg: Notes From the Rubber Room*, OBSERVER (Oct. 28, 2008), https://observer.com/2008/10/teachers-against-bloomberg-notes-from-the-rubber-room/.

punishment; thus teachers reassigned to the Rubber Room face the stigma of wrongdoing, even if they ultimately are exonerated.

4.      In the Rubber Room, Mr. Oliver was forced to sit and idle, and then was subject to the reprobation from the DOE employees who worked in the same building as the Rubber Room, who treated Mr. Oliver with distain due to the stigma associated with being in the Rubber Room.

5.      Mr. Oliver also has been subjected to this relentless harassment campaign in retaliation for his rightful challenges to clear his name and to stand up against Defendants DOE and Estwick's discriminatory and unconstitutional conduct.  In 2014, Mr. Oliver brought—and won—an arbitration proceeding against Defendant Estwick, seeking relief from a negative teaching evaluation that was a result of Defendant Estwick's negative attitude towards Mr. Oliver because Mr. Oliver was a Black man (the "Arbitration Proceeding").  In the same year, Mr. Oliver filed a complaint against Defendant Estwick with the DOE Office of Equal Opportunity ("OEO") for racial discrimination in the workplace (the "OEO Complaint").  Thereafter, the campaign of discrimination and punishment, including repeated lengthy forced assignments to the Rubber Room, only escalated in response to Mr. Oliver's efforts to protect himself.  After years of suffering, in 2017, Mr. Oliver filed an action for employment and related complaints (the "Previous Action").  In 2018, Mr. Oliver also filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") against Defendant Estwick and others (the "EEOC Complaint").

6.      After the Previous Action was resolved, Mr. Oliver attempted to return to a normal existence and pursued his passion for teaching.  Notwithstanding Mr. Oliver's efforts to return to normal after the resolution of the Previous Action, Defendant Estwick and DOE

3

employees continued to spread rumors and false accusations about Mr. Oliver. These false rumors spread throughout the TSMS community, including TSMS students and parents.

7.      Ultimately, the vicious rumors spread by Defendants Estwick and DOE caused one of TSMS's students, G.C., to make an uncorroborated and false allegation about Mr. Oliver, and resulted in Mr. Oliver being marched out of Defendant TSMS by Defendant Estwick on the morning of March 22, 2019 to a waiting throng of police officers who, without probable cause, threw Mr. Oliver against the wall, handcuffed him and "perp" walked him out of the building in front of students, teachers, TSMS staff and parents, destroying his reputation and career.

8.      On the morning of March 22, 2019, Defendant Estwick—without any warning and acting in conjunction with New York City Police Department ("NYPD")—removed Mr. Oliver from his morning class under the false pretense that the superintendent wanted to see Mr. Oliver. Instead of being taken to the superintendent's office, Defendant Estwick led Mr. Oliver to the entrance of Defendant TSMS where six unannounced NYPD Officers (the "Arresting Officers") were waiting for Mr. Oliver. Upon information and belief, the Arresting Officers included Defendant Taylor and the Five Unknown NYPD Officers; Mr. Oliver is uncertain whether the Five Unknown NYPD Officers included Defendant Gonzalez.

9.      The Arresting Officers had Mr. Oliver stand on the street in view of everyone walking to or from Defendant TSMS before placing him in a patrol car. Fearing that he could be killed by one or more of these hostile six Arresting Officers, Mr. Oliver made no attempt to resist.

10.      The Arresting Officers did not inform Mr. Oliver why he was being placed under arrest or why the NYPD were even called to the school.

4

11.     Only once Mr. Oliver was in the back seat of a police car did one of the Arresting Officers inform him that he was being "charged" with "endangering a child."

12.     The Arresting Officers brought Mr. Oliver to a local precinct. While he was in handcuffs and being processed, Mr. Oliver observed one of the Arresting Officers pull out a hidden firearm—a "drop gun"—from the top of another Officer's pants. This "drop gun" was of a different make and caliber than the regulation firearm in the Officer's holster.

13.     Upon seeing this "drop gun," Mr. Oliver's fears immediately escalated. Mr. Oliver's thoughts turned to incidents in which police officers killed unarmed suspects and falsely identified the "drop gun" as the suspect's firearm as pretext for describing the killing as "self-defense." Mr. Oliver was terrified that he was about to become the next victim of a wrongful police shooting.

14.     Mr. Oliver was subsequently detained in a cell for over three hours. At no point during this time did anyone from the NYPD or Defendant TSMS inform Mr. Oliver's emergency contacts that he had been arrested, nor did the NYPD allow Mr. Oliver to call anyone to inform them that he had been wrongly arrested.

15.     Having seen the Arresting Officers pull out a "drop gun," and understanding the disturbing track record the NYPD had with killing unarmed black men, Mr. Oliver sat in the cell for hours wondering whether he would leave the precinct alive.

16.     Thankfully, Mr. Oliver's worst fears did not come to pass, especially because even the NYPD eventually realized that the allegations against him were false. Indeed, the Arresting Officers ultimately informed Mr. Oliver that the two purported witnesses to G. C's allegations failed to corroborate G.C.'s account.

17.     After suffering through more than three hours waiting in a cell terrified for his life and his future, the Arresting Officers released Mr. Oliver.  No criminal charges were ever brought against him.

18.     One of the Arresting Officers admitted to Mr. Oliver that, given the allegations at issue, the NYPD's arrest of Mr. Oliver was highly "unusual."  Mr. Oliver's arrest was indeed unusual, as the Arresting Officers lacked any probable cause to believe that he had committed a crime, even if G.C.'s account were true.

19.     Immediately after being released from the precinct, Mr. Oliver was removed from Defendant TSMS and once again placed in the Rubber Room where he was forced to sit and idle there for over two months.   Mr. Oliver was placed in the Rubber Room while Defendant DOE purportedly conducted an "investigation" into this alleged accusation by G.C.—the same accusation that the NYPD found to be not credible.

20.     After Mr. Oliver was, once again, reassigned to the Rubber Room, Defendant Estwick sent an email to the parents and guardians of all TSMS students, broadcasting that Mr. Oliver had been "reassigned from the school pending the results of an investigation."  Defendant Estwick's decision to send an email to parents informing them that Mr. Oliver had been "reassigned" and explaining that it was the result of an "investigation" was highly unusual and improper.  Indeed, Defendant Estwick sent this email regarding Mr. Oliver's reassignment even though principals in the DOE system are not required to inform the parents of the students of the school that a teacher is being reassigned to the Rubber Room and, indeed, should not reveal confidential information concerning a teacher's employment status in this manner and to parents in particular.  No legitimate basis existed for Defendant Estwick to send such a note to the parents; he did so to undermine Mr. Oliver, destroy his credibility as a teacher and a person, and

retaliate against Mr. Oliver for the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment.

21.     Notwithstanding the fact that the NYPD quickly had determined that G.C.'s false account was not corroborated, over two months after Mr. Oliver had been reassigned, Defendant Kristine Mustillo, an assistant superintendent for Defendant DOE, placed a disciplinary letter in Mr. Oliver's file.  Apparently, the assistant superintendent, who was an educator and not a trained investigator, purported she found credible the same allegations the NYPD, an organization trained to uncover wrongdoing, found to not be substantiated.  Based on her supposed "investigation," in an apparent effort to justify Defendants' unlawful and improper treatment of Mr. Oliver (including their participation in his false arrest, public humiliation, and unjustified forced tenure in the Rubber Room), Defendant Mustillo allowed the letter, riddled with false statements, to be placed in Mr. Oliver's personnel file.

22.     Defendant DOE's treatment of Mr. Oliver stands in stark contrast with the way it treated White male TSMS teachers who faced comparable accusations, including one White male teacher against whom G.C. had made allegations almost identical to the allegations made against Mr. Oliver.  Upon information and belief, none of these White teachers were removed from the classroom or reassigned to the Rubber Room—nor were the White teachers subject to a harrowing unlawful arrest involving physical assaults by NYPD officers, a perp walk, or hours-long detention in a cell where they feared for their lives.  Indeed, based on the information available to Mr. Oliver, he was the only teacher marched out of his workplace in handcuffs by six NYPD officers and subjected to hours of detention without being advised of his rights because of an uncorroborated allegation that did not give rise to probable cause.

23.     Mr. Oliver now brings this proceeding to assert claims of constitutional violations, discrimination, bias-based profiling, negligent training and supervision, and false arrest against Defendants City of New York, Shea, O'Connell, Gonzalez, Taylor, and the Five Unknown NYPD Officers in violation of his rights, privileges and immunities secured by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of New York.

24.     In addition, Mr. Oliver is asserting claims of racial discrimination, harassment, and retaliation against Defendants DOE, TSMS, Carranza, Chan, and Estwick in violation of his rights, privileges and immunities secured by 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and the Constitution and laws of the State of New York.

25.     Mr. Oliver seeks compensatory and punitive damages in an amount to be determined at trial totaling no less than $10,000,000, attorneys' fees, and equitable relief, including declaratory judgment, the correction of his employment record, and a permanent injunction barring future unlawful actions against him.

### JURISDICTION AND VENUE

26.     This Court has jurisdiction over Mr. Oliver's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343.

27.     This Court has supplemental jurisdiction over Mr. Oliver's state and local law claims pursuant to 28 U.S.C. § 1367.

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claims in this lawsuit arose in this district.

## ADMINISTRATIVE PREREQUISITES

29.     On June 14, 2019, Mr. Oliver served a Notice of Claim upon the New York City

Comptroller and DOE, giving notice of his intentions to pursue the claims alleged in this

Complaint.

30.     Mr. Oliver appeared for a hearing pursuant to Section 50-h of the New York City

General Municipal Law on August 2, 2019.

31.     Mr. Oliver has filed a charge of discrimination with the EEOC alleging violations

of Title VII of the Civil Rights Act of 1964 §§ 2000e *et seq.* ("Title VII").  When Mr. Oliver

receives his Notice of Right to Sue from the EEOC, he will amend the Complaint to add claims

under Title VII.

## PARTIES

32.     Plaintiff Akeem Oliver is a 36-year-old Black male resident of New York City

who teaches students with special needs at Defendant TSMS.   Mr. Oliver obtained his

Bachelor's Degree from Binghamton University in 2005 and a Master's degree in General and

Special Education in 2008 from the Bank Street College of Education.  Since 2011, Mr. Oliver

has been employed as a tenured teacher at Defendant TSMS.  At all relevant times, Mr. Oliver

was an "employee" of DOE as defined by the New York Human Rights Law ("NYHRL"), the

New York City Human Rights Law ("NYCHRL"), and the New York Civil Service Law.

33.     Defendant City of New York (the "City") is a municipal corporation duly

organized and existing by virtue of the laws of the State of New York.  Defendant City is

authorized under the laws of the State of New York to maintain a police department, and is

named here as a Defendant due to the role of its police department, NYPD, in the facts at issue.

34.     Defendant Dermot F. Shea is the Commissioner of the NYPD.  On December 1, 2019, Defendant Shea replaced James P. O'Neill as the Commissioner of the NYPD.  Defendant Shea is named here as a Defendant because he has taken on the responsibilities and liabilities of Mr. O'Neill.  Defendant Shea is, and Mr. O'Neill was at all relevant times in connection with the relevant facts, responsible for and the chief architect of the policies, practices and/or customs of the NYPD.  Defendant Shea is, and Mr. O'Neill was at all relevant times in connection with the relevant facts, responsible for supervising the hiring, screening, training, retention, supervision, discipline, counseling and control of police officers under his command who are employed by the NYPD, including Defendants named herein.

35.     Defendant John L. O'Connell is and at all relevant times was the Commanding Officer of the Ninth Precinct of the NYPD.  In this capacity, Defendant O'Connell was responsible for overseeing the implementation of the policies, practices, and or customs of the NYPD within the Ninth Precinct.  Together with Mr. O'Neill, Defendant O'Connell was, at all relevant times responsible for administering hiring, screening, training, retention, supervision, discipline, counseling and control of police offices within the Ninth Precinct, including Defendants named herein.

36.     Defendant Josep Gonzales is a Sergeant in the Ninth Precinct of the NYPD.  At all relevant times, Defendant Gonzales has acted under color of state law in the course and scope of his duties and functions as an agent, employee, and officer of the City in engaging in the conduct described herein.

37.     Defendant Kenneth J. Taylor is an Officer in the Ninth Precinct of the NYPD.  At all relevant times, Defendant Taylor has acted under color of state law in the course and scope of

his duties and functions as an agent, employee, and officer of the City in engaging in the conduct described herein.

38.     Defendants Five Unknown Officers of the NYPD (the "Five Unknown Officers") are and/or were at all relevant times duly-appointed police officers, detectives, sergeants, supervisors, or commanders employed by the NYPD and have acted under color of state law in the course and scope of their duties, and functioned as agents, employees, and officers of the City in engaging in the conduct described herein.

39.     Defendant DOE is a municipal corporation under the laws of the State of New York, which operates all public schools in the City of New York and is in charge, among other things, of setting the terms and conditions of employment for all teachers, principals, superintendents, clerks, and other employees. Defendant DOE's headquarters is located at 52 Chambers Street, New York, New York 10007. At all relevant times in connection with the relevant facts, Defendant DOE was an "employer" as defined by the NYHRL, the NYCHRL, and the New York Civil Service Law.

40.     Defendant Richard Carranza is and has been the Chancellor of Defendant DOE since 2018. Upon information and belief, Defendant Carranza oversees the implementation and enforcement of the policies, procedures, and practices governing the schools in New York City, including DOE employee issues and training.

41.     Defendant TSMS is a middle school located at 600 E. 6th Street, New York, New York 10009. Defendant TSMS is a public school operated by Defendant DOE. At all relevant times in connection with the relevant facts, Mr. Oliver was a teacher at Defendant TSMS.

42.     Defendant Carry Chan is the Superintendent of District 1 schools, which are operated by Defendant DOE. As Superintendent of District 1 schools, Defendant Chan has

responsibility for Defendant TSMS, which is a District 1 public school.  Upon information and

belief, as Superintendent, Defendant Chan oversees hiring, supervising, and development of

principals, as well as teacher promotion decisions for District 1 schools.  Defendant Chan also is

responsible for implementing policies, practices and trainings related to teacher conduct and

student treatment within District 1 and oversees District 1's response to any reports of suspected

abuse of District 1 students.  Upon information and belief, Defendant Chan is a citizen of the

State of New York.

43.     Defendant Kristine Mustillo is the Deputy Community Superintendent of District

1 Schools, which are operated by Defendant DOE.  Defendant Mustillo oversees the admissions

plan for District 1 and is responsible for ensuring diversity in District 1 classrooms.  In addition,

upon information and belief, Defendant Mustillo also is responsible for assisting Defendant Chan

in implementing policies, practices and trainings related to teacher conduct and student treatment

within District 1, and overseeing District 1's response to any reports of suspected abuse of

District 1 students.  Upon information and belief, Defendant Mustillo is a citizen of the State of

New York.

44.     Defendant Sonhando Estwick is, and at all times relevant to this Complaint was,

the principal of Defendant TSMS.  As principal, Defendant Estwick is responsible for all aspects

of running Defendant TSMS, including overseeing instruction, curriculum, and the evaluation

and professional development of teaching staff.  Upon information and belief, Defendant

Estwick is a citizen of the State of New York.

## FACTUAL ALLEGATIONS

45.     Mr. Oliver is a twelve-year veteran educator in the DOE system and has dedicated

his teaching career to helping the most vulnerable students in New York City—students with

special needs.  Mr. Oliver's commitment to helping New York City's special needs children stems from his time in the foster care system and his own periods of homelessness as a youth. Mr. Oliver overcame the serious challenges he faced in his childhood, working hard enough through high school to get accepted to the State University of Binghamton from where he graduated with a degree in Political Science followed shortly by a Master's degree in special education from the Bank Street College of Education.  In addition to his Master's degree in special education, Mr. Oliver has participated in numerous trainings, courses, or certifications related to teaching and, in particular, working with special needs students.

46.     Before teaching at Defendant TSMS, Mr. Oliver taught at PS 241: The Family Academy where he taught students with autism, cerebral palsy, developmental delays, emotional disturbances, and other learning disabilities.  In 2011, PS 241: The Family Academy was closed due to consolidation by Defendant DOE in June 2011.  Mr. Oliver began teaching at Defendant TSMS during the 2011-2012 academic year.  Over the years, Mr. Oliver has taught science, history, and humanities to special education students in sixth, seventh, and eighth grade.

47.     From early in his teaching career, Mr. Oliver was a promising young teacher, who repeatedly met the standards of DOE performance review and was well-liked by his students and peers.

48.     Having survived his own challenging childhood, Mr. Oliver naturally identified with and gravitated towards students with special needs, emotional issues, or challenging family lives.  Mr. Oliver sought to be a compassionate and understanding mentor who encouraged and supported a young and vulnerable population.  Mr. Oliver always has strived to develop meaningful and long-standing professional relationships with students and parents.

49.     Students, in turn, responded to Mr. Oliver's empathetic approach towards teaching and his genuine, caring manner.  Specifically, at Defendant TSMS, students who felt uncomfortable eating in the lunch room would eat lunch in a classroom supervised by Mr. Oliver and another teacher, because they felt that the classroom was a "safe space."

50.     Unfortunately, Mr. Oliver's promising career as a special education teacher now has been destroyed due to a years-long campaign of unlawful discrimination, harassment, and retaliation against Mr. Oliver led by Defendant Estwick and supported by Defendant DOE and its administrators.  This unlawful campaign ultimately caused one of TSMS's students, G.C., to make a false allegation against Mr. Oliver in March 2019, which gave rise to the significant harm and resulting damages that are the basis for Mr. Oliver's present complaint.

### Defendants DOE and Estwick's Historical Racially-Motivated Harassment Campaign Against Mr. Oliver

51.     In early 2012, Mr. Oliver asked Defendant Estwick during a staff meeting whether Black History Month was celebrated at Defendant TSMS.  Defendant Estwick told Mr. Oliver that Defendant TSMS had no plans to do anything in recognition of Black History Month.

52.     Later that day, Defendant Estwick—apparently disturbed about being called out in front of his staff about the lack of recognition of Black history—complained directly to Mr. Oliver about Mr. Oliver's question by making disparaging remarks about Mr. Oliver such as calling him an "affirmative action hire," informing Mr. Oliver that his "radical views were not welcome at the school," and stating that he wanted Mr. Oliver to leave Defendant TSMS.

53.     These comments were just the beginning of a pattern of harassment and discrimination to which Defendant Estwick subjected Mr. Oliver in the ensuing years, including by preventing Mr. Oliver from serving in after-school coaching capacities without reason and unjustly giving Mr. Oliver a negative teaching evaluation for the 2013-2014 school year.

14

54. In 2014, Mr. Oliver sought relief from Defendant Estwick's discriminatory treatment by: (i) pursuing the grievance process with the teacher's union and bringing—and winning—the Arbitration Proceeding against Defendant Estwick, alleging a pattern of discrimination and harassment and seeking to change his negative teaching evaluation; and (ii) filing the OEO Complaint against Defendant Estwick for racial discrimination in the workplace.

55. Thereafter, Defendant Estwick and other DOE employees continued to discriminate and harass Mr. Oliver and began to retaliate against him for challenging his discriminatory treatment by having filed the Arbitration Proceeding and the OEO Complaint. Defendants Estwick and DOE's discriminatory and retaliatory actions included issuing disciplinary letters to be placed in Mr. Oliver's file riddled with false statements, and removing Mr. Oliver from the classroom and reassigning him to the Rubber Room between April 19, 2017 and September 25, 2017, among other adverse actions. As noted above, reassignment to the Rubber Room stigmatizes teachers even when those teachers ultimately are cleared of any wrongdoing.

56. Part of Defendants Estwick and DOE's pattern of discrimination, harassment and retaliation against Mr. Oliver was their dissemination, facilitation, and/or condoning of fabricated rumors that Mr. Oliver harbored "predatory" intentions toward TSMS students, consistent with the racial stereotyping of Black men as predators.[2]

57. For instance, on November 14, 2012, Defendant Estwick addressed a "Counseling Letter" to Mr. Oliver's file, in which Defendant Estwick expressed purported "concerns about the personal nature of [Mr. Oliver's] interactions with some of [Mr. Oliver's] students." The

---

[2] *See, e.g.*, Kelly Welch, *Black Criminal Stereotypes and Racial Profiling*, 23 J. CONTEMP. CRIM. JUSTICE 276 (2016), https://journals.sagepub.com/doi/abs/10.1177/1043986207306870?journalCode=ccja ("The stereotyping of Blacks as criminals is so pervasive throughout society that 'criminal predator' is used as a euphemism for 'young Black male.'")

letter expressed Defendant Estwick's "belief" that "some of" Mr. Oliver's interactions with students "dealt with personal matters such as peer and family relationships." Despite this, the letter did not cite any specific interactions between Mr. Oliver and students that Defendant Estwick believed were inappropriate, and in fact conceded that "nothing ha[d] led [Defendant Estwick] to believe that there have been any improper physical relations with students."

58.     Moreover, when one of Mr. Oliver's students at Defendant TSMS, T.S., began exhibiting signs of depression and abuse in late 2016, Defendant Estwick and other DOE employees seized the opportunity to further stoke racist rumors that Mr. Oliver had inappropriate relationships with students (despite the fact that the relationship between Mr. Oliver and T.S. was entirely appropriate).

59.     Specifically, in or around January 2017, another TSMS teacher (and DOE employee) told T.S., within earshot of other students, that he was "concerned" about Mr. Oliver's relationship with T.S. and told T.S. that she should stop reaching out to Mr. Oliver for support.

60.     Similarly, on or around January 18, 2017, TSMS's then-guidance counselor falsely told a foster care agency worker that Mr. Oliver harbored "predatory" intentions toward T.S. and suggested that Mr. Oliver had made improper advances toward T.S.

61.     Upon information and belief, DOE employees made these baseless accusations about Mr. Oliver in an effort to support Defendant Estwick's campaign of retaliation and harassment.

62.     Although Mr. Oliver repeatedly asked for Defendant Estwick's assistance in dispelling these false and racialized rumors, Defendant Estwick refused to help and instead defended the other DOE employees responsible for spreading the rumors. For instance, on or

16

around April 7, 2017, Mr. Oliver, accompanied by a union representative, met with Defendant

Estwick. During the meeting, Defendant Estwick stated that he did not believe Mr. Oliver had

an inappropriate relationship with T.S. but abdicated responsibility by stating that he could not

control what others said about Mr. Oliver, despite his position of authority as principal of

Defendant TSMS.

63.     Defendant Estwick refused to correct the vicious rumors concerning Mr. Oliver

because of the animus he felt toward Mr. Oliver, and he continued to mistreat Mr. Oliver because

Mr. Oliver is Black and because Mr. Oliver had complained in the past about Defendant

Estwick's discriminatory conduct.

64.     On or around mid-April 2017, Mr. Oliver was reassigned to the Rubber Room.

Due to his reassignment, Mr. Oliver was unable to participate in per session activities and teach

Summer School, resulting in a loss of additional income that Mr. Oliver would have received and

on which he relied.

65.     The letter reassigning Mr. Oliver to the Rubber Room stated that he had been

removed from the classroom due to an investigation into his conduct. The investigation was

commenced as the result of the baseless and false complaint that Mr. Oliver had an inappropriate

relationship with T.S., which Defendant Estwick, as principal of Defendant TSMS, allowed to

spread throughout the school.

66.     While in the Rubber Room, Mr. Oliver was forced to complete secretarial tasks

and on one occasion, was relegated to working in the mail room of the DOE office building. He

also was treated poorly by the DOE staff assigned to the building where the Rubber Room was

located.

67.    Thereafter, Mr. Oliver filed a complaint with the EEOC against Defendants DOE, Estwick and others.  Mr. Oliver also filed the Previous Action, which was ultimately settled.

68.    Throughout the pendency of the Previous Action, Mr. Oliver continued to teach at Defendant TSMS; the pendency of the action made the situation very uncomfortable.  After the resolution of the Previous Action, Mr. Oliver was anxious to move forward with his life and teaching career and was hopeful that his life could regain some normalcy in which he would be treated fairly and not subject to discrimination.

### Mr. Oliver Endured a Harrowing, Unconstitutional Arrest At the Hands of NYPD Officers and Defendant Estwick

69.    Notwithstanding Mr. Oliver's desire to move on, simply do his job and not be treated unfairly, Defendant Estwick and other DOE employees escalated their discrimination against Mr. Oliver based on race, continued to subject Mr. Oliver to a hostile work environment, and retaliated against Mr. Oliver for filing the Previous Action.

70.    Moreover, even though Defendants DOE, Carranza, Chan, and Mustillo were aware of the discrimination which Mr. Oliver suffered, they did nothing to prevent Defendant Estwick or the rest of the TSMS and District 1 staff from again engaging in instances of discrimination and retaliation against Mr. Oliver.

71.    Upon information and belief, on or about Thursday, March 21, 2019, one of TSMS's students, G.C., reported to Defendant Estwick and TSMS Guidance Counselor Paola Melendez that Mr. Oliver allegedly had caressed G.C.'s arm and said something to G.C. along the lines of "I know you love me, or you know you love me," which purportedly made her uncomfortable (the "Alleged Incident").

72.    G.C.'s false allegation against Mr. Oliver was the culmination and direct result of Defendants Estwick, TSMS, and DOE's years-long pattern of planting, spreading, and

encouraging vicious, false, and racialized rumors with respect to Mr. Oliver's intentions toward students, which eventually spread widely amongst TSMS staff, parents, and students.

73.     The false rumors about Mr. Oliver spread by Defendants Estwick, TSMS, and DOE were part and parcel of their years-long campaign of racial discrimination, retaliation, and harassment against Mr. Oliver.

74.     Upon information and belief, rather than speaking to Mr. Oliver directly about G.C.'s account or speaking to other students who would have been present in the classroom during the Alleged Incident, Defendant Estwick, together with other TSMS staff and DOE employees, continued their campaign of discriminatory and retaliatory treatment of Mr. Oliver by immediately reporting the Alleged Incident to G.C.'s parents and/or the NYPD, encouraging G.C. and her parents to report the Alleged Incident to the NYPD, and/or by encouraging the NYPD to arrest Mr. Oliver without first undertaking any investigation of the Alleged Incident.

75.     As a direct result of the continued campaign of discriminatory and retaliatory treatment by Defendant Estwick, together with other TSMS staff and DOE employees, the NYPD came to Defendant TSMS with the intent to arrest Mr. Oliver.

76.     On the morning of March 22, 2019, Defendants Chan and Estwick, other TSMS staff and one of G.C.'s parents met at Defendant TSMS. Without investigating the incident, the NYPD, with Defendants DOE, Chan and Estwick's encouragement, decided to arrest Mr. Oliver.

77.     Thereafter, Defendant Estwick interrupted Mr. Oliver's classroom lesson and removed him from the classroom under the false pretense that Defendant Superintendent Chan wanted to see Mr. Oliver in her office. Defendant Estwick then led Mr. Oliver to the entrance of Defendant TSMS, where six Arresting Officers were waiting for Mr. Oliver with the intent to

arrest him.  Upon arriving at the entrance, Defendant Estwick said to the Arresting Officers,

"Here he is."

78.      Despite the fact that Mr. Oliver exhibited no intent to harm or otherwise resist the

Arresting Officers, the Arresting Officers told Mr. Oliver that he was under arrest and

immediately thrust Mr. Oliver's body into the wall of the building.  The Arresting Officers

forced Mr. Oliver's hands behind his back, handcuffed him, and conducted a pat down search of

Mr. Oliver, all in public.

79.      Mr. Oliver immediately thought about situations in which innocent Black men

were injured by police officers on the basis of resisting arrest.  Shocked and terrified with the six

armed Arresting Officers restraining him, Mr. Oliver made no effort to resist.

80.      Although the Arresting Officers were clearly arresting Mr. Oliver, none of them

informed Mr. Oliver why he was under arrest or why they were even called to the school.

81.      The Arresting Officers then proceeded to perp walk Mr. Oliver from Defendant

TSMS through a large group of TSMS parents, staff, and students and out to the street,

mortifying Mr. Oliver in front of colleagues, parents, and students.  On the street, the Arresting

Officers forced Mr. Oliver to stand in view of everyone walking by or entering the school while

the Arresting Officers debated in which car to place him.

82.      Only once Mr. Oliver was seated in the back of the police car did one of the

Arresting Officers inform Mr. Oliver that he was being "charged" with "endangering a child."

83.      Upon information and belief, none of the Arresting Officers attempted to speak to

Mr. Oliver or any of the other TSMS students or staff known to be potential witnesses to the

Alleged Incident before arresting Mr. Oliver.

84.     After arresting Mr. Oliver, the Arresting Officers drove Mr. Oliver to the Ninth Precinct.  While Mr. Oliver was in handcuffs being processed at the precinct, he observed one of the Arresting Officers ("Officer Number 1") approach another one of the Arresting Officers ("Officer Number 2"), reach around Officer Number 2's back, and pull a firearm from the top of Officer Number 2's pants.  This firearm was a different make and caliber than the firearm Officer Number 2 had in his holster.  Indeed, all the other Arresting Officers appeared to have the same make and caliber weapon in their holsters as the gun Officer Number 2 had in his holster.  None of the holstered weapons were the make and caliber of the gun that had been hidden in Officer Number 2's back belt.  Mr. Oliver immediately identified the firearm in Officer Number 2's belt as a "drop gun."

85.     Upon seeing this "drop gun," Mr. Oliver's fear that he would never see the outside of the precinct ever again increased dramatically.  Mr. Oliver had read and heard about incidents where police officers, who had killed an unarmed suspect, had "dropped a gun," falsely alleging that the gun belonged to the suspect and the police had killed the suspect in self-defense. Mr. Oliver was petrified that the Arresting Officers similarly would harm him and then use the "drop gun" as a part of a ruse of self-defense.

86.     Mr. Oliver was detained in a cell at the Ninth Precinct for approximately three and a half hours.  He was not provided the opportunity to call anyone nor had anyone from Defendant TSMS called Mr. Oliver's emergency contacts to inform them that he had been arrested.

87.     He was a young Black man alone in a cell at a NYPD precinct.  Mr. Oliver was terrified that no one knew where he was or that he had been arrested.

88.     Particularly in light of having seen the "drop gun," Mr. Oliver was terrified that he might not leave the cell alive.

89.     Although Mr. Oliver does not know what G.C. told any of the Defendants regarding the Alleged Incident, the NYPD report of Mr. Oliver's arrest ("Arrest Report"), which upon information and belief was authored by Defendant Taylor, states that the only information purportedly supporting Mr. Oliver's arrest was a child's allegation "that her teacher rubbed on her arm and stated 'I know that you love me' w/o permission or authority to do so."

90.     The Arrest Report also states that Defendant Gonzalez, who was acting in a supervisory capacity as a Sergeant of the NYPD, "approv[ed]" Mr. Oliver's arrest for a violation of Penal Law 260.10 (Endangering the Welfare of a Child).

91.     Upon arresting Mr. Oliver, Defendant Gonzalez and the Arresting Officers did not have probable cause to believe that Mr. Oliver had committed any crime because a reasonable officer in Defendant Gonzalez and the Arresting Officers' position, applying clearly-established law, would have known that they did not have sufficient grounds to arrest Mr. Oliver for a violation of Penal Law 260.10.

92.     Penal Law 260.10 requires that a person "knowingly" act in a manner "likely to be injurious to the physical, mental or moral welfare of a child" to be found to have endangered the welfare of a child.  G.C.'s allegation at the time of the arrest, which amounted to an uncorroborated, vague statement that Mr. Oliver briefly touched her and stated that he knew she loved him, could not have provided a valid basis to arrest Mr. Oliver for the endangerment of a child.  Thus, even if G.C.'s false allegation were true, it would not have amounted to sufficient factual grounds to arrest Mr. Oliver for a violation of Penal Law 260.10.

22

93.     Ultimately, in the early afternoon of March 22, 2019, one of the Arresting Officers (the "Unknown Officer") informed Mr. Oliver that he was being released. The Unknown Officer also told Mr. Oliver that the NYPD had been holding Mr. Oliver at the Ninth Precinct while it completed its investigation of the Alleged Incident. The Unknown Officer informed Mr. Oliver that the NYPD had spoken to two students who had been identified as witnesses to the Alleged Incident and that neither of these witnesses corroborated the complaining student's account.

94.     As Mr. Oliver was leaving the Ninth Precinct, one of the Arresting Officers (or another NYPD officer) admitted to Mr. Oliver that, given the allegations at issue, the NYPD's arrest of Mr. Oliver was "unusual," and that similar cases were not "typically" handled in the same way.

95.     By the time the Unknown Officer told Mr. Oliver that the police had been unable to corroborate G.C.'s allegations, Mr. Oliver had been sitting in a cell for approximately three and a half hours, petrified that he may never walk out of the cell alive.

**Mr. Oliver's Unlawful Arrest Resulted from Defendant City and the NYPD's Systemic Failure to Prevent, Investigate and Address Bias-Based Policing**

96.     The NYPD's unlawful and "unusual" arrest of Mr. Oliver is consistent with—and the result of—the NYPD's long history of profiling, harassing, and abusing people of color, and in particular Black males. Upon information and belief, Defendant City is aware of the NYPD's long history of profiling and abuse of Black males, which it has condoned and supported for years.

97.     On June 26, 2019, the New York City Department of Investigation Office of the Inspector General for the New York City Police Department ("OIG-NYPD") issued a report detailing the NYPD's gross failures to adequately prevent, investigate, and respond to incidents

of racial profiling and bias-based policing.[3]  Specifically, OIG-NYPD found that although the

NYPD received 2,495 citizen complaints of bias-based policing between 2014 and 2018 (65% of

which were brought by Black complainants), it failed to adequately and properly investigate

many of those complaints, and ultimately failed to substantiate any of them.

98.     OIG-NYPD further reported that the NYPD provided significantly fewer hours of

training for new recruits regarding bias-based policing and cultural competency than its peer

police departments in other large U.S. cities.  Additionally, during the NYPD training sessions

for new recruits which were observed by OIG-NYPD, the NYPD instructors and other

supervising officers made comments that reinforced negative stereotypes about Black people,

such as responding to a question from a recruit about approaching a group of Black people by

commenting that "biases can help us sometimes to keep us safe," and suggesting that recruits

may perceive White people to be "peaceful" and Black people to be "violent."

99.     Upon information and belief, because the NYPD has never substantiated a single

claim of bias-based policing, it has also never subjected any officers to discipline for having

engaged in bias-based policing.

100.    In their respective roles as the NYPD Commissioner and Commanding Officer of

the Ninth Precinct, Defendants Shea and O'Connell devised, implemented, enforced,

encouraged, and sanctioned the above-described practices and customs, and failed to properly

train, supervise, and discipline officers employed by the NYPD Ninth Precinct.

101.    Defendants Shea, O'Connell, and the City each knew or should have known that

the constitutional rights of individuals including Mr. Oliver would be violated as a direct and

proximate result of the above-described practices and customs.  Despite this knowledge, and

---

[3] OIG-NYPD's report is available at https://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf.

with deliberate indifference to and reckless disregard for the constitutional rights of such individuals, Defendants Shea, O'Connell, and the City implemented, enforced, encouraged, sanctioned and failed to rectify these practices and customs.

### Defendant DOE Reassigned Mr. Oliver to the Rubber Room and Imposed Disciplinary Actions based on Trumped-Up Allegations

102.    Upon his release from the precinct, Mr. Oliver immediately was marched into the Rubber Room once again.

103.    In the afternoon of March 22, 2019, when Mr. Oliver returned to Defendant TSMS after hours of imprisonment at the precinct, Mr. Oliver was refused entrance into a faculty meeting about his arrest and immediately escorted out of his classroom by school safety officers. Defendant Estwick then met with Mr. Oliver and told him that his arrest had been the result of his "very negative reputation." Defendant Estwick made this statement even though Mr. Oliver had been released from custody without any criminal charges brought against him.

104.    During the same meeting, Defendant Estwick handed Mr. Oliver a letter from Defendant DOE informing him that he had been reassigned to the Rubber Room (the "Reassignment Letter"). The letter stated that, due to his reassignment, Mr. Oliver would be unable to participate in per session activities and teach in Summer School, resulting in a loss of additional income that Mr. Oliver would have received and on which he relied.

105.    According to the Reassignment Letter, Mr. Oliver was removed from the classroom because the New York City Special Commissioner of Investigations ("SCI") had opened an investigation into him. Upon information and belief, the investigation was commenced because of G.C.'s baseless and false complaint, which had been caused by the false rumors regarding Mr. Oliver's intentions toward students knowingly planted and perpetuated throughout the years by Defendant Estwick and other DOE employees.

25

106.    While in the Rubber Room, Mr. Oliver was not permitted to use his education and training to teach but rather was forced to sit and idle there.  Mr. Oliver also was treated poorly by the DOE staff at the building where the Rubber Room was located, who, upon information and belief, believe that individuals assigned to the Rubber Room have, in fact, engaged in inappropriate conduct.

107.    Upon information and belief, other TSMS teachers, parents and staff inappropriately learned that Mr. Oliver had been reassigned to the Rubber Room.  Indeed, on or about the day Mr. Oliver was reassigned to the Rubber Room, Defendant Estwick sent an email to the parents of TSMS students informing them that "[Mr.] Oliver ha[d] been reassigned away from the school pending the results of an investigation" (the "Rubber Room Email").

108.    Defendant Estwick sent the Rubber Room Email in further retaliation against Mr. Oliver.  Emails broadcasting a teacher's reassignment to the Rubber Room are not common and unnecessary.  Indeed, in this case Defendant Estwick had no valid reason to inform the parents that Mr. Oliver had been "reassigned"—a code word for removed to the Rubber Room—and no legitimate reason to reference any investigation.  Defendant Estwick's email was the result of his own animus toward Mr. Oliver, violated Mr. Oliver's right to confidentiality concerning the conditions of his employment, and was undertaken to retaliate against Mr. Oliver for his previous complaints about discrimination and retaliation.

109.    Rumors also continued to spread throughout the TSMS community that Mr. Oliver's reassignment and absence from his classes was related to allegations concerning his conduct toward students.  These rumors, however, failed to report that the allegations were false and that the NYPD had found them to be uncorroborated.

110.    While Mr. Oliver was placed in the Rubber Room, he was unable to apply for additional teaching and coaching responsibilities at Defendant TSMS, which would have provided Mr. Oliver supplemental income.  Mr. Oliver also was ineligible to seek a transfer to another school.

111.    On or about June 6, 2019, Mr. Oliver received a letter from Defendant DOE that he had been authorized by DOE's Office of Personnel Investigation to return to his position at Defendant TSMS.

112.    Mr. Oliver returned to teaching at Defendant TSMS on or about Monday, June 10, 2019.  Upon Mr. Oliver's return to Defendant TSMS, Defendant Estwick apologized to Mr. Oliver for having "turned [him] over" to the police on March 22, and commented that he "felt like [he] was walking [Mr. Oliver] to [his] death sentence."

113.    On or about Friday, June 7, 2019, just a few days prior to returning to Defendant TSMS, Mr. Oliver received a letter from Defendant District 1 Deputy Community Superintendent Kristine Mustillo (the "Mustillo Letter") asking to make himself available for a meeting with Defendant Mustillo the following Tuesday, June 11, "to discuss an allegation of professional misconduct."

114.    As requested by the Mustillo Letter, Mr. Oliver met with Defendant Mustillo on the morning of June 11, 2019.  During the meeting, Defendant Mustillo provided Mr. Oliver with a copy of an investigation report dated June 10, 2019 (the "Investigative Report"), reflecting that the investigation into Mr. Oliver had been referred by OEO to the District 1 Office on June 3, 2019.

115.    Upon information and belief, Defendant DOE, its agents and employees did nothing to investigate G.C.'s false accusation against Mr. Oliver prior to assigning the matter to

the District 1 Office on June 3, 2019—more than two months after G.C. reported the Alleged

Incident, and after rumors regarding Mr. Oliver's intentions toward G.C. and other students had

been permitted by Defendant DOE to fester for months.

116.    Upon information and belief, Defendant DOE's failure to take any action to try to

halt the spread of false rumors about the Alleged Incident was due to Defendant DOE and its

employees' racial animus against Mr. Oliver and was in retaliation for the actions Mr. Oliver

took to protect himself from Defendants Estwick and DOE's discriminatory treatment.

117.    The Investigative Report was littered with false statements purportedly made by

anonymous TSMS students against Mr. Oliver.

118.    Although the Investigative Report included these false accusations, it failed to

include any evidence corroborating these false allegations.

119.    Upon reviewing the Investigative Report, Mr. Oliver denied the allegations in the

Investigative Report to DOE representative Defendant Mustillo.

120.    Nevertheless, Defendant Mustillo found these bare allegations to be credible,

despite the fact that the Arresting Officers did not find G.C.'s allegation to be credible.

121.    Upon information and belief, Defendant Mustillo conducted an "investigation" in

name only and rather than interview each student individually without displaying any bias,

"interviewed" the students at one time, undermining the validity of the students' accounts.

122.    Upon information and belief, Defendant DOE, its agents, and its employees

issued the Investigative Report with trumped-up allegations due to their racialized assumptions

about Mr. Oliver as a Black man, in retaliation for the actions Mr. Oliver took to protect himself

from Defendants Estwick and DOE's discriminatory treatment, and based on a concern that Mr.

Oliver may once again seek relief from a court by pursuing a lawsuit against them.

123.     On or about June 17, 2019, Mr. Oliver received a disciplinary letter from DOE representative Defendant Mustillo (the "Disciplinary Letter") rejecting Mr. Oliver's account of events, and adopting the false allegations in the Investigative Report.  The Disciplinary Letter further stated that the allegations in the Investigative Report "may lead to further disciplinary action, including charges that can lead to your termination."

124.     Defendant Mustillo's determination that the allegations were credible was based on a racist view of Black men and was in retaliation for Mr. Oliver's pursuit of the Previous Action as well as an attempt at a preemptive strike in case Mr. Oliver pursued the current lawsuit.

125.     Although Mr. Oliver has since attempted to apply for a hardship transfer in order to begin teaching at a different DOE school, DOE staff have informed Mr. Oliver that, because of the Disciplinary Letter, he was not eligible for a hardship transfer.

### Mr. Oliver's White Counterparts Never Faced False Arrests or Rubber Room Reassignments

126.     Defendant DOE's treatment of Mr. Oliver following his wrongful arrest stands in stark contrast to the way White TSMS teacher have been treated in the wake of similar accusations.

127.     Specifically, upon information and belief, in or around October 2016, Mr. Oliver learned that a TSMS parent had reported to Defendant Estwick that another teacher at Defendant TSMS, who is a White male ("White Teacher No. 1") was making inappropriate and racially-charged remarks in the classroom, such as by referencing the "Muslim Ban" as the "[Muslim student's name] ban" in front of several other students.  White Teacher No. 1 also once asked in the presence of Mr. Oliver and other TSMS students why he "always got the suicidal and depressed kids."  Upon information and belief, a parent of a TSMS student informed Defendant

Estwick of the various ways in which White Teacher No. 1 violated New York State's Dignity for All Students Act, a law that prohibits intimidation, harassment, and bullying on school property.

128.    Upon information and belief, other complaints to Defendant DOE and its representatives against White Teacher No. 1 included allegations that he forcefully grabbed children by the arms and commented on at least one female student's skin and another student's weight.

129.    Upon information and belief, complaints were filed regarding White Teacher No. 1 with DOE's Office of Special Investigation ("OSI"), which investigates allegations of improper and unlawful behavior including corporal punishment and verbal abuse against students.  Even while this investigation was pending, however, White Teacher No. 1 was not removed to the Rubber Room or subjected to disciplinary action but instead continued teaching at Defendant TSMS.

130.    Upon information and belief, Mr. Oliver was subject to disparate treatment compared to White Teacher No. 1 due to racial discrimination and in retaliation for the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment.

131.    Upon information and belief, during the 2017-2018 academic year, the year before G.C. made false accusations about Mr. Oliver, G.C. made almost the exact same allegation about another White, male teacher at Defendant TSMS ("White Teacher No. 2") who was G.C.'s advisor.  Specifically, upon information and belief, G.C. claimed that White Teacher No. 2 inappropriately rubbed against her.  G.C. subsequently complained to Defendant TSMS, requesting that White Teacher No. 2 no longer serve as her advisor.

132.     Upon information and belief, Defendant TSMS never conducted an investigation into White Teacher No. 2 for inappropriately touching a student, nor did Defendants TSMS or DOE ever subject White Teacher No. 2 to disciplinary action.  G.C. was simply assigned to a new advisor.

133.     Upon information and belief, Mr. Oliver was subject to disparate treatment compared to White Teacher No. 2 due to racial discrimination and in retaliation for the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment.

134.     Upon information and belief, another TSMS student complained that a third White, male teacher at Defendant TSMS ("White Teacher No. 3") inappropriately touched the student and made the student feel uncomfortable.  Upon information and belief, White Teacher No. 3 never faced any disciplinary action from Defendants TSMS or DOE.

135.     Upon information and belief, Mr. Oliver was subject to disparate treatment compared to White Teacher No. 3 due to racial discrimination and in retaliation for the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment.

136.     Upon information and belief, Defendants DOE, TSMS, Carranza, and Chan failed to train Defendant Estwick and other DOE employees in their obligations under the federal, state and city employment and civil rights laws.

137.     Moreover, even though they were on notice by virtue of the Previous Action that Defendant Estwick had racially discriminated and retaliated against Mr. Oliver, Defendants DOE, TSMS, Carranza, and Chan failed to monitor what they knew was an already problematic

situation and failed to protect Mr. Oliver from ongoing racial harassment, hostile treatment, and retaliation at the hands of Defendant Estwick and other DOE employees.

## Mr. Oliver No Longer Has a Career as an Educator

138.    Mr. Oliver no longer has any future as a successful special education teacher.

139.    As mentioned above, over the past several years, Mr. Oliver has suffered from an ongoing campaign of racial discrimination, harassment, and retaliation at Defendant TSMS stemming from vicious and false rumors about him that Defendant DOE and its agents, including Defendants Estwick and Mustillo, circulated and supported.

140.    Although Mr. Oliver endeavored to salvage what remained of his reputation and career as a teacher, the unlawful, humiliating public arrest of Mr. Oliver and Mr. Oliver's return to the Rubber Room extinguished any possibility of a future as a teacher or any other career involving children.

141.    Mr. Oliver no longer is a beloved teacher.  Students no longer seek Mr. Oliver for mentorship, advice, or comfort.  Instead, students steer clear of Mr. Oliver when he walks in the hallways.

142.    Additionally, because of Defendant DOE's "investigative report," which is filled with falsehoods, and the subsequent Disciplinary Letter, Mr. Oliver was not eligible to seek a hardship transfer, so he is unable to transfer out of Defendant TSMS to another school in the DOE system.

143.    Even if Mr. Oliver could transfer schools, he could never rehabilitate his reputation.

144.    As a result of the unlawful arrest, Mr. Oliver is now known by the TSMS and

DOE community as the Black male teacher who was arrested, notwithstanding the fact that the

allegation was uncorroborated and no criminal charges were brought.

145.    Similarly, as referenced above, teachers reassigned to the Rubber Room are

designated with a Scarlet Letter due to the stigma attached to the Rubber Room. Mr. Oliver now

has the amplified stigma of a teacher who not only has been in the Rubber Room once, but twice

in the span of a couple of years.

146.    In addition to the reputational and professional damage, Mr. Oliver continues to

feel the psychological and emotional stress of his ordeal. Mr. Oliver was humiliated by being

handcuffed and perp-walked on the day of his unlawful arrest. He was put in fear for his life

while in NYPD custody. He was humiliated again by being immediately marched into the

Rubber Room upon his return to Defendant TSMS following his release from the precinct, and

he was further humiliated on a daily basis when he sat idly in the Rubber Room. Moreover, Mr.

Oliver relives his unlawful arrest, perp walk and handcuffing on a daily basis as he walks

through the halls of Defendant TSMS when students refuse to come near him.

147.    The humiliation to which Mr. Oliver was subjected did not stop even after he was

released from the Rubber Room in June 2019. Indeed, after returning to Defendant TSMS for

one day and having to deal with the students' and faculty's reactions, Mr. Oliver was then

immediately subjected to the humiliation of having to meet with Defendant Mustillo and be

asked to respond to incomprehensible and false allegations she apparently had gathered in a

faulty and pretextual investigation. The DOE Defendants' conduct was too demeaning for Mr.

Oliver to bear; thereafter, he did not return to a TSMS classroom until September 2019 when the

2019-2020 academic year began. As a result of the unlawful arrest, second reassignment to the

Rubber Room, and continued humiliation while teaching at Defendant TSMS, Mr. Oliver

suffered severe emotional distress that has manifested itself in difficulty sleeping and other

medical problems for which Mr. Oliver has sought treatment from medical professionals.

## PLAINTIFF'S CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

ARREST WITHOUT PROBABLE CAUSE IN VIOLATION OF
42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION

Against Defendants Shea, O'Connell,
Gonzalez, Taylor, and Five Unknown NYPD Officers

148.     Mr. Oliver repeats and realleges paragraphs 1-147 as if fully set forth herein.

149.     Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD

Officers acted under color of state law to deprive Mr. Oliver of his right to be free from

unreasonable searches and seizures and arrests without reasonable suspicion or probable cause as

required by the Fourth and Fourteenth Amendments, and in violation of 42 U.S.C. § 1983.

150.     In wrongfully arresting Mr. Oliver, Defendants Shea, O'Connell, Gonzalez,

Taylor, and Five Unknown NYPD Officers did not have probable cause to believe that Mr.

Oliver had committed any crime because a reasonable officer in their position, applying clearly-

established law, would have known that sufficient grounds did not exist to arrest Mr. Oliver for a

violation of Penal Law 260.10.

151.     The conduct and actions of Defendants Shea, O'Connell, Gonzalez, Taylor, and

Five Unknown NYPD Officers, while acting under color of state law, in arresting and detaining

or causing the arrest and detention of Mr. Oliver without probable cause was done intentionally,

maliciously, and with deliberate indifference and reckless disregard for the natural and probable

consequences of their acts.

152.     As a direct and proximate result of their constitutional abuses, Mr. Oliver has

suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his

rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational,

and emotional damages as a direct and proximate result of the Defendants' illegal and

unconstitutional conduct.

### SECOND CLAIM FOR RELIEF

EXCESSIVE FORCE IN VIOLATION OF
42 U.S.C. § 1983 AND THE FOURTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION

Against Defendants Shea, O'Connell,
Gonzalez, Taylor, and Five Unknown NYPD Officers

153.     Mr. Oliver repeats and realleges paragraphs 1-152 as if fully set forth herein.

154.     Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD

Officers acted under color of state law to deprive Mr. Oliver of his right to be free from

excessive force in the course of an arrest as required by the Fourth and Fourteenth Amendments

to the United States Constitution, and in violation of 42 U.S.C. § 1983.

155.     In wrongfully arresting Mr. Oliver, Defendants Shea, O'Connell, Gonzalez,

Taylor, and Five Unknown NYPD Officers did not have probable cause to believe that Mr.

Oliver had committed any crime because a reasonable officer in their position, applying clearly-

established law, would have known that sufficient grounds did not exist to arrest Mr. Oliver for a

violation of Penal Law 260.10.

156.     The conduct and actions of Defendants Shea, O'Connell, Gonzalez, Taylor, and

Five Unknown NYPD Officers in physically assaulting Mr. Oliver, forcefully pushing Mr.

Oliver's head against a wall, restraining him, handcuffing him, arresting him, "perp walking"

him through a large group of TSMS parents, staff, and students, and in wielding a firearm that

caused Mr. Oliver to fear for his life was done intentionally, maliciously and with deliberate indifference and with a reckless disregard for Mr. Oliver's rights, and were designed to (and did) cause specific and serious bodily harm, pain and suffering to Mr. Oliver in violation of his Constitutional rights.

157.    As a direct and proximate result of those constitutional abuses, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

### THIRD CLAIM FOR RELIEF

FALSE ARREST

Against Defendants Shea, O'Connell,
Gonzalez, Taylor, and Five Unknown NYPD Officers

158.    Mr. Oliver repeats and realleges paragraphs 1-157 as if fully set forth herein.

159.    In wrongfully arresting Mr. Oliver, Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers did not have probable cause to believe that Mr. Oliver had committed any crime because a reasonable officer in their position, applying clearly-established law, would have known that sufficient grounds did not exist to arrest Mr. Oliver for a violation of Penal Law 260.10.

160.    The conduct and actions of Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers in arresting and detaining or causing the arrest and detention of Mr. Oliver without probable cause was done intentionally.

161.    Mr. Oliver was conscious of and did not consent to his arrest and detention.

162.     As a direct and proximate result of his wrongful arrest, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal conduct.

## FOURTH CLAIM FOR RELIEF

### ASSAULT

Against Defendants Shea, O'Connell,
Gonzalez, Taylor, and Five Unknown NYPD Officers

163.     Mr. Oliver repeats and realleges paragraphs 1-162 as if fully set forth herein.

164.     In wrongfully arresting Mr. Oliver, Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers did not have probable cause to believe that Mr. Oliver had committed any crime because a reasonable officer in their position, applying clearly-established law, would have known that sufficient grounds did not exist to arrest Mr. Oliver for a violation of Penal Law 260.10.

165.     The conduct and actions of Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers during and after Mr. Oliver's arrest of forcefully pushing Mr. Oliver's head against a wall, restraining him, handcuffing him, "perp walking" him through a large group of TSMS parents, staff, and students, and in wielding a firearm caused Mr. Oliver to reasonably fear for his life.

166.     As a direct and proximate result of the Defendants' conduct and actions during and after Mr. Oliver's wrongful arrest, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal conduct.

## FIFTH CLAIM FOR RELIEF

### BATTERY

#### Against Defendants Shea, O'Connell,
#### Gonzalez, Taylor, and Five Unknown NYPD Officers

167.    Mr. Oliver repeats and realleges paragraphs 1-166 as if fully set forth herein.

168.    In wrongfully arresting Mr. Oliver, Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers did not have probable cause to believe that Mr. Oliver had committed any crime because a reasonable officer in their position, applying clearly-established law, would have known that sufficient grounds did not exist to arrest Mr. Oliver for a violation of Penal Law 260.10.

169.    During Mr. Oliver's arrest, Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers forcefully pushed Mr. Oliver's head against a wall, restrained him, and handcuffed him without his consent.

170.    As a direct and proximate result of the Defendants' conduct and actions during Mr. Oliver's wrongful arrest, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal conduct.

## SIXTH CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

#### Against Defendants Shea, O'Connell,
#### Gonzalez, Taylor, and Five Unknown NYPD Officers

171.    Mr. Oliver repeats and realleges paragraphs 1-170 as if fully set forth herein.

172.    During and after Mr. Oliver's arrest, Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers owed a duty of care to Mr. Oliver to ensure that he was kept safe and was not subject to physical, emotional or psychological harm while in their custody.

173.    Defendants Shea, O'Connell, Gonzalez, Taylor, and Five Unknown NYPD Officers breached their duty of care to Mr. Oliver by wielding a "drop gun" in his presence while he was in handcuffs at the Ninth Precinct.

174.    As a direct and proximate result of the Defendants' extreme and outrageous conduct and actions, Mr. Oliver has suffered, is now suffering, and will continue to suffer severe emotional damages.

## SEVENTH CLAIM FOR RELIEF

### *MONELL* LIABILITY

### Against Defendant City

175.    Mr. Oliver repeats and realleges paragraphs 1-174 as if fully set forth herein.

176.    At all relevant times herein, Defendant City, acting through the NYPD, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and customs exhibiting deliberate indifference to Mr. Oliver's constitutional rights, and which caused Mr. Oliver's constitutional rights to be violated.

177.    The constitutional violations by NYPD officers as detailed herein were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by Defendant City, including by failing to: (a) adequately train NYPD officers and agents in bias-based policing; (b) adequately investigate and substantiate citizen complaints of bias-based policing by NYPD officers; and (c) discipline any NYPD officers involved in bias-based policing. Ultimately, Defendant City and NYPD failed to

adequately discourage further constitutional violations on the part of NYPD officers and instead sanctioned a culture in which acts of bias-based policing were widespread and tolerated.

178.    Defendant City's unlawful actions were done willfully, knowingly, and with the specific intent to deprive Mr. Oliver of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

179.    As a direct and proximate result of his wrongful arrest, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## EIGHTH CLAIM FOR RELIEF

### SUPERVISORY LIABILITY

Against Defendants Shea, O'Connell, and Gonzalez

180.    Mr. Oliver repeats and realleges paragraphs 1-179 as if fully set forth herein.

181.    Defendants NYPD Commissioner Shea, Ninth Precinct Commanding Officer O'Connell, and Ninth Precinct Sergeant Gonzalez, acting under color of state law and in the course and scope of their official duties and functions, devised, implemented, enforced, encouraged, and sanctioned policies, practices and customs that were a direct and proximate cause of constitutional violations suffered by Mr. Oliver, including by failing to: (a) adequately train officers under their command in bias-based policing; (b) adequately investigate and substantiate citizen complaints of bias-based policing by officers under their command; and (c) discipline any officers under their command involved in bias-based policing.

182.    In addition, Defendants Shea, O'Connell, and Gonzalez, acting under color of state law and in the course and scope of their respective official duties and functions, were

grossly negligent in their supervision of the six Arresting Officers, which was a direct and proximate cause of the constitutional violations suffered by Mr. Oliver.

183.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## NINTH CLAIM FOR RELIEF

### VIOLATION OF EQUAL PROTECTION GUARANTEED BY ARTICLE I, SECTION 11 OF THE NEW YORK STATE CONSTITUTION

Against Defendants City, Shea, O'Connell,
Gonzalez, Taylor, and Five Unknown NYPD Officers

184.    Mr. Oliver repeats and realleges paragraphs 1-183 as if fully set forth herein.

185.    The acts of Defendants City, Shea, O'Connell, Gonzalez, Taylor, and the Five Unknown NYPD Officers, acting under color of state law, in falsely arresting Mr. Oliver and physically assaulting him, were racially motivated and were done without lawful justification, in violation of Mr. Oliver's constitutional rights to equal protection as guaranteed by Article I, Section 11 of the New York State Constitution.

186.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## TENTH CLAIM FOR RELIEF

### VIOLATION OF SECURITY AGAINST UNREASONABLE SEARCHES, SEIZURES AND INTERCEPTIONS GUARANTEED BY ARTICLE I, SECTION 12 OF THE NEW YORK STATE CONSTITUTION

Against Defendants City, Shea, O'Connell,
Gonzalez, Taylor, and Five Unknown NYPD Officers

187.    Mr. Oliver repeats and realleges paragraphs 1-186 as if fully set forth herein.

188.    The acts of Defendants City, Shea, O'Connell, Gonzalez, Taylor, and Five

Unknown NYPD Officers, acting under color of state law, in subjecting Mr. Oliver to unlawful

search and seizure, arrest and excessive force by physically assaulting him, were done without

reasonable suspicion or probable cause, in violation of his constitutional rights to security against

unreasonable searches, seizures and interceptions as guaranteed by Article I, Section 12 of the

New York State Constitution.

189.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is

now suffering, and will continue to suffer irreparable harm from the violation of his rights; in

addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and

emotional damages as a direct and proximate result of the Defendants' illegal and

unconstitutional conduct.

## ELEVENTH CLAIM FOR RELIEF

### RESPONDEAT SUPERIOR

Against Defendant City

190.    Mr. Oliver repeats and realleges paragraphs 1-189 as if fully set forth herein.

191.    The conduct of Defendants Shea, O'Connell, Gonzalez, Taylor, and the Five

Unknown NYPD Officers occurred while they were on duty and in uniform, in and during the

42

course and scope of their duties and functions as NYPD Officers and while they were acting as agents of employees of Defendant City.

192.    Defendant City is thus liable to Mr. Oliver under the common law doctrine of respondeat superior.

### TWELFTH CLAIM FOR RELIEF

RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

193.    Mr. Oliver repeats and realleges paragraphs 1-192 as if fully set forth herein.

194.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick, acting under color of state law, continued to subject Mr. Oliver to a pattern of vicious discrimination due to the fact that Mr. Oliver is a Black man, which led to numerous adverse employment actions in violation of 42 U.S.C. § 1981.

195.    The discriminatory acts of Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick were sufficiently serious and pervasive to alter the conditions of Mr. Oliver's employment, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) irreparable reputational damage.

196.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and

emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## THIRTEENTH CLAIM FOR RELIEF

HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

197.    Mr. Oliver repeats and realleges paragraphs 1-196 as if fully set forth herein.

198.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick, acting under color of state law, continued to subject Mr. Oliver to a hostile work environment due to the fact that Mr. Oliver is a Black man, which led to numerous adverse employment actions in violation of 42 U.S.C. § 1981.

199.    This pattern of harassment was sufficiently serious and pervasive to alter the conditions of Mr. Oliver's employment, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable reputational damage.

200.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## FOURTEENTH CLAIM FOR RELIEF

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

201.    Mr. Oliver repeats and realleges paragraphs 1-200 as if fully set forth herein.

202.    Mr. Oliver engaged in protected activity by bringing the Arbitration Proceeding,
by filing the OEO Complaint, by bringing the Previous Action, and by filing the EEOC
Complaint.

203.    Upon information and belief, Defendants Carranza, Chan, and Mustillo were
made aware of the Arbitration Proceeding, the OEO Complaint, the Previous Action, and the
EEOC Complaint.

204.    Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick, acting under
color of state law, subjected Mr. Oliver to retaliation for his objections to unlawful
discrimination, retaliation and creation of a hostile work environment due to Mr. Oliver's race
and his previous engagement in protected activity, which led to adverse employment actions and
disparate treatment in violation of 42 U.S.C. § 1981.

205.    This retaliation was sufficiently serious and pervasive to alter the conditions of
Mr. Oliver's employment, including but not limited to: (1) suffering an unlawful and humiliating
public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3)
being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019;
(4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5)
subjecting him to irreparable reputational damage.

206.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is
now suffering, and will continue to suffer irreparable harm from the violation of his rights; in

addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## FIFTEENTH CLAIM FOR RELIEF

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1983

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

207.     Mr. Oliver repeats and realleges paragraphs 1-206 as if fully set forth herein.

208.     Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick, acting under color of state law, continued to subject Mr. Oliver to a pattern of vicious discrimination due to the fact that Mr. Oliver is a Black man, which led to numerous adverse employment actions in violation of 42 U.S.C. § 1983.

209.     The discriminatory acts of Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick were sufficiently serious and pervasive to alter the conditions of Mr. Oliver's employment, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable reputational damage.

210.     As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and

emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## SIXTEENTH CLAIM FOR RELIEF

### HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1983

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

211.    Mr. Oliver repeats and realleges paragraphs 1-210 as if fully set forth herein.

212.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick, acting under color of state law, continued to subject Mr. Oliver to a hostile work environment due to the fact that Mr. Oliver is a Black man, which led to numerous adverse employment actions in violation of 42 U.S.C. § 1983.

213.    This pattern of harassment was sufficiently serious and pervasive to alter the conditions of Mr. Oliver's employment, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable reputational damage.

214.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## SEVENTEENTH CLAIM FOR RELIEF

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1983

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

215.     Mr. Oliver repeats and realleges paragraphs 1-214 as if fully set forth herein.

216.     Mr. Oliver engaged in protected activity by bringing the Arbitration Proceeding, by filing the OEO Complaint, by bringing the Previous Action, and by filing the EEOC Complaint.

217.     Upon information and belief, Defendants Carranza, Chan, and Mustillo were made aware of the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, including by bringing the Arbitration Proceeding, by filing the OEO Complaint, by bringing the Previous Action, and by filing the EEOC Complaint.

218.     Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick, acting under color of state law, subjected Mr. Oliver to retaliation for his objections to unlawful discrimination, retaliation and creation of a hostile work environment due to Mr. Oliver's race and his previous engagement in protected activity, which led to adverse employment actions and disparate treatment in violation of 42 U.S.C. § 1983.

219.     This retaliation was sufficiently serious and pervasive to alter the conditions of Mr. Oliver's employment, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable reputational damage.

48

220. As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## EIGHTEENTH CLAIM FOR RELIEF

### *MONELL* LIABILITY

### Against Defendant DOE

221. Mr. Oliver repeats and realleges paragraphs 1-220 as if fully set forth herein.

222. At all relevant times herein, Defendant DOE developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and customs exhibiting deliberate indifference to Mr. Oliver's constitutional rights, and which caused Mr. Oliver's constitutional rights to be violated.

223. The constitutional violations by DOE employees as detailed herein were and are directly and proximately caused by policies, practices and/or customs developed, implemented, enforced, encouraged and sanctioned by Defendant DOE, including by failing to adequately train TSMS and District 1 staff in racial bias and discrimination and failing to discipline the TSMS and District 1 staff involved in previous instances of discrimination and retaliation against Mr. Oliver, which were the subject of the Arbitration Proceeding, OEO Complaint, Previous Action, and EEOC Complaint. Instead, Defendant DOE cultivated and sanctioned a culture in which acts of racial discrimination and retaliation against Mr. Oliver were tolerated.

224. Defendant DOE's unlawful actions were done willfully, knowingly, and with the specific intent to deprive Mr. Oliver of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

225.     As a direct and proximate result of Defendant DOE's de facto policies, practices, and customs, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## NINETEENTH CLAIM FOR RELIEF

### SUPERVISORY LIABILITY

Against Defendants Carranza, Chan, Mustillo, and Estwick

226.     Mr. Oliver repeats and realleges paragraphs 1-225 as if fully set forth herein.

227.     Defendants DOE Commissioner Carranza, District 1 Superintendent Chan, District 1 Deputy Community Superintendent Mustillo, and TSMS Principal Estwick, acting under color of state law and in the course and scope of their official duties and functions, devised, implemented, enforced, encouraged, and sanctioned policies, practices and customs that were a direct and proximate cause of constitutional violations suffered by Mr. Oliver, including by failing to adequately train TSMS and District 1 staff in racial bias and discrimination and failing to discipline the TSMS and District 1 staff involved in previous instances of discrimination and retaliation against Mr. Oliver, which were the subject of the Arbitration Proceeding, OEO Complaint, Previous Action, and EEOC Complaint.

228.     In addition, Defendants Carranza, Chan, Mustillo, and Estwick, acting under color of state law and in the course and scope of their respective official duties and functions, were grossly negligent in their supervision of other District 1 and TSMS staff, which was a direct and proximate cause of the constitutional violations suffered by Mr. Oliver.

229.     As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in

50

addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## TWENTIETH CLAIM FOR RELIEF

### RACIAL DISCRIMINATION IN VIOLATION OF NEW YORK HUMAN RIGHTS LAW § 296

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

230.  Mr. Oliver repeats and realleges paragraphs 1-229 as if fully set forth herein.

231.  Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick subjected Mr. Oliver to a pattern of harassment due to the fact that Mr. Oliver is Black, which led to adverse employment actions in violation of NYHRL § 296.

232.  This pattern of harassment due to Mr. Oliver's race constituted an unlawful discriminatory practice.  Mr. Oliver was subjected to inferior terms, conditions, or privileges of his employment due to his membership in a protected class, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable reputational damage. Particularly in light of the historical pattern of discrimination, as alleged above, Defendants' conduct constituted a serious and pervasive, but at the least, unlawful discriminatory practice that significantly harmed Mr. Oliver in the terms, conditions, or privileges of his employment.

233.  Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are liable as "employers" under the NYHRL.

234.     To the extent Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are not "employers" under the NYHRL, they are liable as aiders and abettors of racial discrimination against Mr. Oliver.

235.     As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

### TWENTY-FIRST CLAIM FOR RELIEF

#### HOSTILE WORK ENVIRONMENT IN VIOLATION OF NEW YORK HUMAN RIGHTS LAW § 296

##### Against Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick

236.     Mr. Oliver repeats and realleges paragraphs 1-235 as if fully set forth herein.

237.     Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick subjected Mr. Oliver to a hostile work environment, which led to adverse employment actions, due to the fact that Mr. Oliver is Black in violation of NYHRL § 296.

238.     The conduct of Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick constituted harassment, which is an unlawful discriminatory practice. Mr. Oliver was subjected to inferior terms, conditions, or privileges of his employment due to Mr. Oliver's membership in a protected class, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5)

subjecting him to irreparable reputational damage.  Particularly in light of the historical pattern

of discrimination, as alleged above, Defendants' conduct constituted a serious and pervasive, but

at the least, unlawful discriminatory practice that significantly harmed Mr. Oliver in the terms,

conditions, or privileges of his employment.

239.    Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are liable as

"employers" under the NYHRL.

240.    To the extent Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are

not "employers" under the NYHRL, they are liable as aiders and abettors of the creation of a

hostile work environment against Mr. Oliver.

241.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is

now suffering, and will continue to suffer irreparable harm from the violation of his rights; in

addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and

emotional damages as a direct and proximate result of the Defendants' illegal and

unconstitutional conduct.

## TWENTY-SECOND CLAIM FOR RELIEF

### RETALIATION IN VIOLATION OF
### NEW YORK HUMAN RIGHTS LAW § 296

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

242.    Mr. Oliver repeats and realleges paragraphs 1-241 as if fully set forth herein.

243.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick

and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and

Estwick subjected Mr. Oliver to a pattern of retaliatory actions due to Mr. Oliver's opposition to

unlawful employment practices in violation of the NYRHL.

244.     The retaliatory conduct of Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick constituted harassment, which is an unlawful discriminatory practice.  Mr. Oliver was subjected to inferior terms, conditions, or privileges of his employment due to his opposition to unlawful employment practices, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable reputational damage.  Particularly in light of the historical pattern of discrimination, as alleged above, Defendants' conduct constituted a serious and pervasive, but at the least unlawful, discriminatory practice that significantly harmed Mr. Oliver in the terms, conditions, or privileges of his employment.

245.     Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are liable as "employers" under the NYHRL.

246.     To the extent Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are not "employers" under the NYHRL, they are liable as aiders and abettors of the creation of a hostile work environment against Mr. Oliver.

247.     As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## TWENTY-THIRD CLAIM FOR RELIEF

RACIAL DISCRIMINATION IN VIOLATION OF
NEW YORK CITY HUMAN RIGHTS LAW § 8-107

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

248.    Mr. Oliver repeats and realleges paragraphs 1-247 as if fully set forth herein.

249.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick

and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and

Estwick subjected Mr. Oliver to a pattern of discrimination due to the fact that Mr. Oliver is

Black, which led to adverse employment actions in violation of NYCHRL § 8-107.

250.    The conduct of Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick

constituted an unlawful discriminatory practice. Mr. Oliver was subject to inferior terms,

conditions, or privileges of his employment due to Mr. Oliver's membership in a protected class,

including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant

TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber

Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to

TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable

reputational damage. Particularly in light of the historical pattern of discrimination, as alleged

above, Defendants' conduct constituted a serious and pervasive, but at the least, unlawful

discriminatory practice that significantly harmed Mr. Oliver in the terms, conditions, or

privileges of his employment.

251.    Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are liable as

"employers" under the NYCHRL.

252.    To the extent Defendants DOE, TSMS, Carranza, Chan and Estwick are not "employers" under the NYCHRL, they are liable as aiders and abettors of racial discrimination against Mr. Oliver.

253.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## TWENTY-FOURTH CLAIM FOR RELIEF

### HOSTILE WORK ENVIRONMENT IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107

### Against Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick

254.    Mr. Oliver repeats and realleges paragraphs 1-253 as if fully set forth herein.

255.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick subjected Mr. Oliver to a hostile work environment due to the fact that Mr. Oliver is Black, which led to adverse employment actions in violation of NYCHRL § 8-107.

256.    The conduct of Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick constituted an unlawful discriminatory practice.   Mr. Oliver was subject to inferior terms, conditions, or privileges of his employment due to Mr. Oliver's membership in a protected class, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable

reputational damage. Particularly in light of the historical pattern of discrimination, as alleged above, Defendants' conduct constituted a serious and pervasive, but at the least, unlawful discriminatory practice that significantly harmed Mr. Oliver in the terms, conditions, or privileges of his employment.

257.    Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are liable as "employers" under the NYCHRL.

258.    To the extent Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are not "employers" under the NYCHRL, they are liable as aiders and abettors of the creation of a hostile work environment against Mr. Oliver.

259.    As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

**TWENTY-FIFTH CLAIM FOR RELIEF**

RETALIATION IN VIOLATION OF
NEW YORK CITY HUMAN RIGHTS LAW § 8-107

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

260.    Mr. Oliver repeats and realleges paragraphs 1-259 as if fully set forth herein.

261.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick subjected Mr. Oliver to a pattern of retaliatory actions due to Mr. Oliver's opposition to unlawful employment practices in violation of the NYCRHL.

262.     The conduct of Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick constituted an unlawful discriminatory practice.  Mr. Oliver was subject to inferior terms, conditions, or privileges of his employment due to Mr. Oliver's opposition to unlawful employment practices, including but not limited to: (1) suffering an unlawful and humiliating public arrest at Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to irreparable reputational damage.  Particularly in light of the historical pattern of discrimination, as alleged above, Defendants' conduct constituted a serious and pervasive, but at the least, unlawful discriminatory practice that significantly harmed Mr. Oliver in the terms, conditions, or privileges of his employment.

263.     Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are liable as "employers" under the NYHRL.

264.     To the extent Defendants DOE, TSMS, Carranza, Chan, Mustillo, and Estwick are not "employers" under the NYHRL, they are liable as aiders and abettors of the creation of a hostile work environment against Mr. Oliver.

265.     As a direct and proximate cause of the foregoing acts, Mr. Oliver has suffered, is now suffering, and will continue to suffer irreparable harm from the violation of his rights; in addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## TWENTY-SIXTH CLAIM FOR RELIEF

RETALIATION BY PUBLIC EMPLOYERS IN VIOLATION OF
NEW YORK CIVIL SERVICE LAW § 75-B

Against Defendants DOE,
TSMS, Carranza, Chan, Mustillo, and Estwick

266.    Mr. Oliver repeats and realleges paragraphs 1-265 as if fully set forth herein.

267.    Following the actions Mr. Oliver took to protect himself from Defendants Estwick
and DOE's discriminatory treatment, Defendants DOE, TSMS, Carranza, Chan, Mustillo, and
Estwick subjected Mr. Oliver to a pattern of retaliation and adverse employment actions due to
Mr. Oliver's opposition to unlawful employment practices in violation of the New York Civil
Service Law.

268.    The retaliatory conduct of Defendants DOE, TSMS, Carranza, Chan, Mustillo,
and Estwick was serious and pervasive, but at the least, adversely altered the terms, conditions,
or privileges of Mr. Oliver's employment due to his opposition to unlawful employment
practices, including but not limited to: (1) suffering an unlawful and humiliating public arrest at
Defendant TSMS; (2) being the subject of an unwarranted investigation; (3) being reassigned to
the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) having an email
sent to TSMS parents regarding reassignment to the Rubber Room; and (5) subjecting him to
irreparable reputational damage.

269.    Defendant DOE is liable as a "public employer" under the New York Civil
Service Law.

270.    Defendants TSMS, Carranza, Chan, Mustillo, and Estwick are liable under the
New York Civil Service Law as aiders and abettors of unlawful retaliation against Mr. Oliver.

271.    As a result of the conduct described above, Mr. Oliver has suffered, is now
suffering, and will continue to suffer irreparable harm from the violation of his rights; in

addition, Mr. Oliver has incurred and will continue to incur consequential, reputational, and emotional damages as a direct and proximate result of the Defendants' illegal and unconstitutional conduct.

## TWENTY-SEVENTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### Against Defendant Estwick

272.    Mr. Oliver repeats and realleges paragraphs 1-271 as if fully set forth herein.

273.    Upon information and belief, the conduct and actions of Defendant Estwick in reporting the Alleged Incident to G.C.'s parents and/or the NYPD, encouraging G.C. and her parents to report the Alleged Incident to the NYPD, and/or encouraging the NYPD to arrest Mr. Oliver without first undertaking any investigation of the Alleged Incident was extreme and outrageous.

274.    Defendant Estwick's conduct in reporting or encouraging the reporting of the Alleged Incident to the NYPD and/or encouraging the NYPD to arrest Mr. Oliver was done with the intent to cause or with disregard of a substantial probability of causing Mr. Oliver severe emotional distress.

275.    As a direct and proximate cause of Defendant Estwick's conduct, Mr. Oliver has suffered, is now suffering, and will continue to suffer severe emotional damages.

## TWENTY-EIGHTH CLAIM FOR RELIEF

### RESPONDEAT SUPERIOR

### Against Defendant DOE

276.    Mr. Oliver repeats and realleges paragraphs 1-275 as if fully set forth herein.

277.    The conduct of Defendants Carranza, Chan, and Estwick occurred in and during the course and scope of their duties and functions as DOE employees and while they were acting as agents of employees of Defendant DOE.

278.    Defendant DOE is thus liable to Mr. Oliver under the common law doctrine of respondeat superior.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Oliver demands judgment in his favor and against Defendants as follows:

(a)    a declaration that acts and practices complained of herein are in violation of federal and state law;

(b)    an order requiring that the June 2019 DOE investigation and June 17, 2019 disciplinary letter be expunged from Mr. Oliver's record;

(c)    an order permanently enjoining all Defendants from discriminating against Mr. Oliver on the basis of race; from retaliating against Mr. Oliver on the basis of having challenged his discriminatory and retaliatory treatment; and from engaging in negative, misleading, or disparaging conduct with respect to Mr. Oliver;

(d)     an award of damages for reputational injury, emotional distress, humiliation, and

pain and suffering, as well as punitive damages, totaling no less than $10,000,000;

(e)     an award of such interest as is allowed by law;

(f)     an award of reasonable attorneys' fees and costs; and

(g)     such other relief as the Court deems appropriate.

## JURY DEMAND

Mr. Oliver demands a trial by jury in this action.

Dated: New York, New York
       December 6, 2019

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.

By: _Robert J. Anello /cmf_

Robert J. Anello
Catherine M. Foti
Katherine J. Drooyan
565 Fifth Avenue
New York, NY 10017
Telephone: (212) 856-9600
Fax: (212) 856-9494
ranello@maglaw.com
cfoti@maglaw.com
kdrooyan@maglaw.com

*Attorneys for Plaintiff Akeem Oliver*