UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AKEEM OLIVER,

Plaintiff,

- against -

CITY OF NEW YORK, JOSEPH GONZALEZ, in his personal and official capacity as a Sergeant of the New York City Police Department, KENNETH J. TAYLOR in his personal and official capacity as an Officer of the New York City Police Department, KEVIN MCLEOD, in his personal and official capacity as an Officer of the New York City Police Department, TONG JIANG, in his personal and official capacity as an Officer of the New York City Police Department, BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK, CARRY CHAN, in her personal and official capacity as Superintendent of School District 1, KRISTINE MUSTILLO, in her personal and official capacity as Deputy Community Superintendent of School District 1 and SONHANDO ESTWICK, in his personal and official capacity as principal of Tompkins Square Middle School,

Defendants.

**MEMORANDUM**
**OPINION & ORDER**

19 Civ. 11219 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Akeem Oliver – a New York City public school teacher – brings claims against officers of the New York City Police Department (the "NYPD") for false arrest in violation of 42 U.S.C. § 1983 and New York law. (Fourth Am. Complaint ("FAC") (Dkt. No. 195) ¶¶ 169-74, 179-84) He also asserts claims for discrimination, hostile work environment, retaliation, and violation of his due process rights against the New York City Department of Education (the "DOE") and certain of its employees. (Id. ¶¶ 175-78, 190-282)

The parties have cross-moved for summary judgment. Oliver seeks summary judgment on his false arrest claims (FAC (Dkt. No. 195) Counts One and Three), and his

retaliation claims (id., Counts Seven, Ten, Eleven, Sixteen, Nineteen, Twenty, and Twenty-One). (Pltf. Mot. (Dkt. No. 241)) Defendants seek summary judgment on all of Oliver's claims. (Def. Mot. (Dkt. No. 235)) For the reasons stated below, Oliver's motion for summary judgment will be denied, and Defendants' motion for summary judgment will be granted as to Oliver's (1) due process claim (Count Two); (2) discrimination claims (Counts Five, Eight, Fourteen, and Seventeen); (3) hostile work environment claims (Counts Six, Nine, Fifteen, and Eighteen); (4) claims against Defendants Chan and Mustillo (Counts Eleven, Thirteen, and Twenty); (5) Monell claim against the DOE (Count Twelve); (6) compensatory damages claims to the extent they are premised on lost per-session wages; and (7) punitive damages claims as against the DOE, Chan, and Mustillo, and any punitive damages claim against Estwick under Title VII. Defendants' motion will otherwise be denied.

## BACKGROUND

### I. THE PARTIES

Plaintiff Oliver is a Black, male, special education teacher at Tompkins Square Middle School ("Tompkins" or the "School"), where he began teaching in 2011. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 1; Def. R. 56.1 Resp. (Dkt. No. 252) ¶¶ 109, 111)[1]

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

Where a party disputes a movant's characterization of cited evidence and has presented an evidentiary basis for doing so, the Court relies on the non-movant's characterization of the evidence for purposes of resolving the motion. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed or deemed undisputed for the reasons discussed above.

Defendant DOE is a municipal corporation organized under the laws of the State of New York.[2] The DOE operates all public schools in New York City. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 4)[3]

Defendant Joseph Gonzalez is a sergeant in the NYPD (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 51; see Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 92), while Defendants Kenneth J. Taylor, Kevin McLeod, and Tong Jiang are all NYPD officers. (See Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 92)

Defendant Carry Chan is the Superintendent of DOE District 1 public schools, including Tompkins (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 6), while Defendant Kristine Mustillo is the Deputy Community Superintendent of District 1 schools. (Id. ¶ 8) Defendant Sonhando Estwick is Tompkins' principal. (Id. ¶ 11)

## II. FACTS

### A. Pre-Arrest Events

Oliver began his teaching career at DOE in 2007 (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 1), and he joined the faculty at Tompkins in 2011. (Id. ¶ 16) That same year, the DOE awarded Oliver tenure. (Id. ¶ 15)

Oliver has brought multiple legal proceedings against Principal Estwick and the DOE. In 2014, he filed a complaint with the DOE's Office of Equal Opportunity against Estwick, alleging racial discrimination. (Id. ¶ 23) The record does not disclose whether or how that complaint was resolved.

---

2 Although the FAC names the City of New York as a defendant, it does not assert any claims against the City. Accordingly, the City is dismissed as a defendant in this action.

3 Except for deposition transcripts, the page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system. Deposition page numbers refer to the pagination assigned by the court reporter.

In 2014, Oliver brought an arbitration proceeding against the DOE concerning an "ineffective" rating he received from Estwick for the 2013-14 academic year at Tompkins. (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 24; Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 8) In 2015, the arbitrators concluded that Oliver's ineffective rating was the result of "harassment or other reasons not related to job performance."[4] (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 25)

In 2017, Oliver was "temporarily administratively reassigned" from the classroom. (Id. ¶ 30) Oliver challenged the 2017 reassignment in a discrimination lawsuit filed in this District (the "2017 Discrimination Lawsuit"). (Id. ¶ 32) Oliver's complaint names Estwick and other DOE employees as defendants, and alleges discrimination, hostile work environment, and retaliation. (Id.) The 2017 Discrimination Lawsuit was settled on December 27, 2018. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 33) In connection with the settlement, Oliver signed a "General Release" in which he

> release[s] and forever discharge[s] the [the City, the DOE, Estwick, and the other defendants] from any and all claims, liabilities, and/or causes of action which I have or may have against any or all of the Released Parties based on any act, omission, event or occurrence of any kind whatsoever occurring from the beginning of the world up though and including the date of the execution of this release, including, without limitation, any and all claims which were or could have been alleged by me in the action arising out of the events alleged in the Complaint, including all claims for attorneys' fees and costs.

(Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 12 (citing Arko Decl., Ex. E (General Release) (Dkt. No. 236-5) at 1))

---

[4] In his Rule 56.1 Statement, Oliver cites the arbitrators' decision as evidence that he suffered harassment and unfair treatment at Tompkins. (See Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶¶ 18, 20, 22, 24, 25, 26) Defendants argue that the arbitration decision constitutes inadmissible hearsay. (Def. Sum. J. Br. (Dkt. No. 238) at 27 (citing, inter alia, Park W Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 329-30 (S.D.N.Y. 2009) (excluding arbitration decision as hearsay and as inadmissible under F.R.E. 403))) Oliver has not responded to Defendants' hearsay argument. Accordingly, this Court will not rely on the arbitration decision as evidence that Oliver suffered harassment or other unfair treatment at Tompkins prior to 2014.

**B. The March 22, 2019 Arrest**

During the 2018-19 school year, Oliver and his co-teacher, Ramona Demme, taught a seventh-grade humanities class at Tompkins. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 37) "G.C." was a 13-year-old female student in Oliver's class. (Id. ¶ 36) On March 21, 2019, G.C. reported to the School's guidance counselor, Paola Melendez, that Oliver touched G.C.'s arm and said to her, "you know you love me." (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 34-35)

Later that day, G.C. completed a "Dean's Office Statement" that describes the alleged incident as follows:

> In Humanities everyone was in the meeting area and I was sitting at my table because that's where I sit. And [Oliver] came out of no where saying "I know you love me" and I was confused and I looked at Erica and she was looking confused. And he kept on rubbing my shoulder and I told him "can you please stop touching me?" and he walked away[.]

(Foti Decl., Ex. 11 (Dean's Office Statement) (Dkt. No. 244-11); see Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 40)

That same day, Defendant Estwick and other staff members informed Superintendent Chan of G.C.'s allegations. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 43) At Chan's direction, Guidance Counselor Melendez reported G.C.'s allegations to New York City's Office of the Special Commissioner of Investigations ("SCI").[5] (Id. ¶ 44) Defendants did not inform Oliver of G.C.'s allegations at that time. (Id. ¶ 46)

---

[5] SCI generated a report summarizing the call with Melendez. (See Foti Decl., Ex. 13 (Dkt. No. 244-13)) The SCI report states that Melendez said that Oliver had touched G.C. on her head. (Id.) According to Melendez, however, G.C. did not state that Oliver touched her on her head, and Melendez does not recall reporting any such allegation to SCI. (Arko Decl., Ex. J (Melendez Dep.) (Dkt. No. 253-10) at 47:14-21) The SCI report also says that Oliver told G.C., "I know you love me" (Id. at 47-48), whereas Melendez says that she told SCI that G.C. had stated that Oliver said, "you know you love me." (Id.)

On March 22, 2019 – the day after G.C. reported the incident to Melendez – Principal Estwick spoke to Olga Urena, G.C.'s mother. (Id. ¶ 49) After her conversation with Estwick, Urena called 911 to report her daughter's allegations. (Id. ¶ 53) Urena testified that she contacted the NYPD because she "felt like the school was not doing what they were supposed to do." (Foti Decl., Ex. 14 (Urena Dep.) (Dkt. No. 244-14) at 74)

After Urena's call to 911, Defendant NYPD officers Gonzalez, Taylor, Jiang, and McLeod (the "Arresting Officers") arrived at Tompkins. (See Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 92; Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 55) "[T]he Arresting Officers interviewed G.C. at [Tompkins] in the presence of Urena, Estwick, and a representative of the Superintendent's Office." (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 56)

During the interview, Officer McLeod asked G.C. to describe the incident. Using her right hand, G.C. showed how Oliver had stroked her left arm from the top of her shoulder to her elbow three times. (See Foti Decl., Ex. 21 (McLeod-G.C. Interview Video Part 1) (Dkt. No. 244-21)) While stroking her arm, Oliver said, "I know you love me." (Id.) G.C. told Oliver to stop touching her, and he walked away. (Id.) When Officer Gonzalez asked G.C. whether Oliver's actions had made her feel uncomfortable, G.C. nodded yes. (Id.) G.C. further stated that she had tried to report the incident to Guidance Counselor Melendez "for like a whole week straight," but Melendez was always busy with other students. (Id.) After G.C. reported the incident to Melendez on March 21, 2019, Melendez instructed G.C. to write a statement describing the incident. (Id.)

The Arresting Officers also interviewed Olga Urena, G.C.'s mother. (Id.) Urena said that at about 4:10 p.m. on March 21, 2019, she received a text message from her nineteen-year old daughter – G.C.'s older sister – regarding an incident involving G.C. at the School.

(Id.) In a subsequent phone call, the older sister told Urena that "something happened to [G.C] in school with a teacher." (Id.) At about the same time, Urena's husband arrived at the School to pick up the couple's eleven-year-old daughter – G.C.'s younger sister. (Id.) The School's assistant principal told Urena's husband that "something happened with [G.C.] in school with a teacher," but did not provide any further information. (Id.) After communicating with her oldest daughter and husband, Urena drove to the School and spoke with the assistant principal and an after-school teacher, both of whom said they were not aware of the details of any incident involving G.C. and a teacher. (Id.) Urena then spoke with Principal Estwick by telephone, and the two agreed to meet the following morning at the School. (Id.)

In speaking with the Arresting Officers, Urena repeatedly expressed irritation that School officials had not contacted her about the Oliver/G.C. incident. (Id.) Urena also stated that her youngest daughter had heard rumors about Oliver "touching kids" at the School. (Id.)

The Arresting Officers also interviewed Principal Estwick. Estwick told the officers that on March 21, 2019, at the end of the school day, Melendez had reported G.C.'s complaint to the assistant principal, and the assistant principal relayed G.C.'s allegations to Estwick. (See Foti Decl., Ex. 17 (McLeod-G.C. Interview Video Part 2) (Dkt. No. 244-17)) Later that afternoon, Estwick informed Superintendent Chan of the incident. (Id.) The Superintendent instructed Estwick to report G.C.'s allegations to SCI. (Id.) Accordingly, Melendez – with Estwick on the phone – called SCI to submit a formal complaint. (Id.) Estwick did not call 911 to report G.C.'s allegations. (Id.)[6]

---

[6] The Court relies on the March 22, 2019 statements of G.C., Urena, and Estwick not for the truth of the matters asserted, but for the effect the statements had on the state of mind and actions of the Arresting Officers.

At the conclusion of the Estwick interview, the Arresting Officers "told Estwick they wanted him to get [Oliver]." (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 98) Accordingly, Estwick went to Oliver's classroom, told Oliver that Superintendent Chan wanted to see him, and led Oliver to the School's entrance, where he was arrested at approximately 10:12 a.m. (Id. ¶¶ 99-102; Foti Decl., Ex. 23 (Taylor Logbook) (Dkt. No. 244-23) at 3; id., Ex. 27 (Taylor Dep.) (Dkt. No. 244-27) at 74) Oliver "was handcuffed, placed in the back of a police car, and transported to the Ninth Precinct." (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 65)

After placing Oliver in a cell at the Ninth Precinct, the Arresting Officers returned to the School to interview students who were in the classroom when the alleged incident involving Oliver and G.C. took place. (Id. ¶ 66)

After these student interviews, the NYPD voided Oliver's arrest, and at approximately 12:30 p.m. on March 22, 2019, Oliver was released from custody. (Id. ¶ 68)[7]

### C. Post-Arrest Events

After his release from custody, Oliver returned to the School. (Id. ¶ 69) That afternoon, Defendant Estwick sent an email to the parents of Tompkins students stating that "'Oliver ha[d] been reassigned away from the school pending the results of an investigation.'" (Id. ¶ 70 (quoting Foti Decl., Ex. 28 (Reassignment Email) (Dkt. No. 244-28))

Later that day, "Defendant Estwick held an all-staff meeting." (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 71) When Oliver appeared for the meeting, Estwick instructed him to leave. (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 72; Arko Decl., Ex. H (Estwick Dep.) (Dkt. No. 253-8) at 341)

---

[7] Oliver was thus in custody for approximately two hours and eighteen minutes.

That same day, the DOE Reassigned Staff Tracking Team sent an email to Estwick stating that Oliver had been "administratively reassigned pending an investigation into allegations of employee misconduct." (Arlo Decl., Ex. T. (Staff Tracking Team Email) (Dkt. No. 236-20)) Attached to the email is a letter to Oliver informing him that he has been reassigned. (Id.) The email directs Estwick to "give Mr. Oliver the attached letter and have him report to this office on Monday, March 25, 2019."[8] (Id.)

Estwick delivered the letter of reassignment to Oliver in his classroom, and told him to leave the School. (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 115) Oliver gathered his things and left. (Id. ¶ 116)

Between Oliver's March 22, 2019 arrest and June 10, 2019, he reported to DOE's reassignment center. (Id. ¶ 117) During this period, Oliver's "per session" work,[9] after-school activities, and coaching responsibilities were suspended (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 73), but he continued to receive his regular salary. (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 163)

### D. The Office of Equal Opportunity Investigation

On March 27, 2019, SCI referred the investigation into Oliver's conduct to DOE's Office of Special Investigations, which in turn referred the matter to DOE's Office of Equal Opportunity. (Arko Decl., Ex. V (Bisogna Ltr.) (Dkt. No. 253-22))

In a June 3, 2019 email to Superintendent Chan, Esther Hutchinson – an Equal Opportunity Investigator – states that

> [a]fter a careful review of the allegations [against Oliver], [the Office of Equal Opportunity] determined that the allegations do not articulate sexual harassment under Chancellor's Regulation A-830, but [the Office of Equal Opportunity] is referring the inappropriate nature of the physical contact and comments to your

[8] The letter to Oliver referenced in the email has not been provided to the Court.

[9] "Per session work is similar to overtime work for teachers." (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 176)

> office for you to handle as deemed fit and appropriate. Accordingly, [the Office of Equal Opportunity] will take no further investigative action regarding these matters.

(Arko Decl., Ex. X (Hutchinson Email) (Dkt. No. 253-24)) In a June 6, 2019 memorandum, Hutchinson "administratively close[d] the case." (Arko Decl., Ex. Y (Hutchinson Memo.) (Dkt. No. 253-25) at 2)

In a June 6, 2019 letter to Oliver, the DOE Office of Personnel Investigation notified Oliver that he was authorized to return to his teaching position at Tompkins (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 78), and Oliver returned to his position at the School on June 10, 2019. (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 161) Between June 11, 2019 and the end of the 2018-19 school year, however, Oliver was on medical leave. (See Arko Decl., Ex. F (Oliver Dep.) (Dkt. No. 236-6) at 354-55; Foti Decl., Ex. X (Dr. Polite Ltr.) (Dkt. No. 247-31))

### E. Defendant Mustillo's Investigation

After the Office of Equal Opportunity closed its investigation of the Oliver/G.C. incident, Superintendent Chan referred the matter to Deputy Superintendent Kristine Mustillo for further investigation. (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 77) At deposition, Mustillo testified that she received – either from the DOE's Office of Equal Opportunity or their "legal counsel" – an email stating "that a student made an allegation that a teacher had touched her shoulder in a way that made her uncomfortable, so we were being asked to investigate." (Arko Decl., Ex. L (Mustillo Dep.) (Dkt. No. 236-12) at 67-69)

As part of her investigation, Defendant Mustillo interviewed "students near [G.C.] at the time [of the Oliver/G.C. incident and] other students that [G.C.] discussed her concerns with," questioning them about G.C.'s complaint and unrelated allegations of misconduct that had

been made against Oliver. (Id. at 74; Arko Decl., Ex. Z (Mustillo Notes) (Dkt. No. 236-26) at 1-2)[10]

Mustillo also interviewed Ramona Demme – Oliver's humanities co-teacher – who said that she had not observedd the events giving rise to G.C.'s complaint. (Arko Decl., Ex.

---

[10] Mustillo interviewed five students during her investigation. In her notes summarizing each interview, Mustillo refers to the students she interviewed as "Student[s] A" through "E." (Arko Decl., Ex. Z (Mustillo Notes) (Dkt. No. 236-26) at 1-2) Student A is G.C., and Students B through E are other female students in the seventh grade. (See id.) The Court relies on Mustillo's notes, including the students' statements contained therein, not for the truth of the matters asserted, but for the effect the statements had on Mustillo's state of mind.

According to Mustillo's notes, Student B was in the classroom at the time of the Oliver/G.C. incident. (Id. at 2) Although Student B did not observe the incident, she saw Oliver walk away from G.C.'s desk. (Id.) According to Student B, "[i]t looked like something happened." (Id.) G.C. later told Student B that Oliver "touched her in a way that made her feel uncomfortable," that she "didn't want the cops called," and that G.C. was "scared and felt it was serious." (Id. at 1) Student B also said that Oliver "does scare me because he comes from behind and touches my shoulders. I know he is looking at my work but it's surprising." (Id. at 2) And when Oliver "says 'You know you love me[,]' [Student B] just walk[s] away." (Id.) Student B also said, "I don't really feel safe." (Id.)

Student C reported that she and G.C. "were talking near the meeting area" when Oliver "touched [G.C.] in a weird way." (Id.) G.C. became upset. (Id.) Student C also stated that Oliver "lifted up my friend's (Student D) shirt one time. Just a little." (Id.) Oliver had also "touched [Student C's] face and [her] [waist]. [Student C] was uncomfortable but [she] felt like [Oliver] was joking." (Id.) Student C also stated that "[s]ometimes when [Oliver] asks me for a conference after school and it's just the two of us, he never did anything, but it's uncomfortable." (Id.)

Student D reported that Oliver "is not a bad teacher. You wouldn't think negative about him. He's bright. He's supportive." (Id.) Student D also stated that she "know[s] [G.C.] is uncomfortable because [Oliver] is coming back [to the School]. [Oliver] has touched [Student D] but it doesn't make [her] uncomfortable." (Id.) Student D also stated, "[Oliver] asks me if I need a hug. He wouldn't touch me without my permission." (Id.) Lastly, Student D stated that Oliver "lifted [her] shirt" after she "told him [she] needed to change and [she] didn't have a shirt on underneath [her] shirt." (Id.) According to Student D, "[i]t was uncomfortable but I realized he was doing it to see if I really needed to change or if I was just trying to get out of class." (Id.)

Student E reported that she did not know that G.C. "was the cause of what happened to [Oliver] until [Student E] was questioned by the police." (Id.) She stated that Oliver "is [her] favorite teacher. He is very open minded." (Id.) She also stated that Oliver "has touched me and he touches other people. It's more of a friendly touch. It doesn't make me uncomfortable." (Id.)

L (Mustillo Dep.) (Dkt. No. 236-12) at 73-74) She also interviewed Guidance Counselor Melendez. (Id. at 73)

On June 7, 2019 – the day after Oliver received a letter informing him that he was authorized to return to the classroom – Estwick and Mustillo exchanged text messages regarding Oliver's return. (See Foti Decl., Ex. J (Dkt. No. 247-14) at 31-32) Mustillo asked Estwick for Oliver's email address, explaining that she "need[ed] to send him a notice to meet with me[.] Currently they will not extend the reassignment as [the Office of Equal Opportunity] referred it back[.]" (Id. at 31)

Later that day, Oliver received a letter from Mustillo requesting a meeting "'to discuss an allegation of professional misconduct.'" (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 79 (quoting Foti Decl., Ex. 31 (Mustillo Ltr.) (Dkt. No. 244-31)) On June 11, 2019, Oliver and his United Federation of Teachers representative met with Mustillo. (Id. ¶ 80) Oliver's "union representative gave a brief statement 'that essentially said [that G.C.'s and the other students'] allegations were false." (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 247 (quoting Arko Decl., Ex. L (Mustillo Dep.) (Dkt. No. 253-12) at 123))

In a June 12, 2019 email to Mustillo bearing the subject line "Akeem Incidents Timeline" (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 83), Estwick listed fifteen allegations of misconduct against Oliver, including G.C.'s allegation. These alleged incidents took place between 2011 and 2019. (Foti Decl., Ex. 33 ("Akeem Incidents Timeline" Email) (Dkt. No. 244-33) at 1-3) Mustillo asks Estwick to "note which of these incidents have been documented and how."[11] (Id. at 1)

---

[11] The record does not reveal whether Estwick responded to Mustillo's request for documentation.

On June 17, 2019, Mustillo issued a disciplinary letter to Oliver describing her investigation into G.C.'s "allegation of unwanted physical contact." (Foti Decl., Ex. 32 (Disciplinary Ltr.) (Dkt. No. 244-32) at 1; see Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 85) In the letter, Mustillo states that she has interviewed G.C. and several "other students named during the interview process," and that the "student statements refer to not only the physical interaction which was the source of the initial complaint but ongoing physical interactions that have resulted in some students feeling uncomfortable." (Foti Decl., Ex. 32 (Disciplinary Ltr.) (Dkt. No. 244-32) at 1) Mustillo states that, based on the student interviews, she has concluded that Oliver engaged in "professional misconduct." (Id.) The letter further states that the G.C. "incident may lead to further disciplinary action, including charges that can lead to your termination." (Id.)

On June 19, 2019, Mustillo and Estwick met to discuss the allegations of professional misconduct against Oliver. (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 84)

## III. OLIVER'S CLAIMS

The FAC alleges twenty-one causes of action. The First Cause of Action is brought under Section 1983 against the Arresting Officers and alleges that they

> acted under color of state law to deprive Mr. Oliver of his right to be free from unreasonable searches and seizures and arrests without reasonable suspicion or probable cause as required by the Fourth and Fourteenth Amendments, and in violation of 42 U.S.C. § 1983.

(FAC (Dkt. No. 195) ¶ 170)

The Second Cause of Action is brought under the Fourteenth Amendment against DOE, and alleges that "DOE deprived Mr. Oliver of his ability to work as a teacher and his interest in and right to work as a teacher without due process of law." (Id. ¶ 176)

The Third Cause of Action is brought against the Arresting Officers (Defendants Gonzalez, Taylor, McLeod, and Jiang) for false arrest under New York law. (Id. ¶¶ 179-84)

The Fourth Cause of Action is a Section 1983 supervisory liability claim against Defendant Gonzalez. (Id. ¶¶ 185-89)

The Fifth, Sixth, and Seventh Causes of Action assert Title VII claims against DOE for race discrimination (id. ¶¶ 190-93), hostile work environment (id. ¶¶ 194-97), and retaliation (id. ¶¶ 198-204).

The Eighth, Ninth, and Tenth Causes of Action are Section 1983 claims against Estwick alleging race discrimination (id. ¶ 205-08), hostile work environment (id. ¶¶ 209-212), and retaliation (id. ¶¶ 213-19).

The Eleventh Cause of Action is brought under Section 1983 against Chan and Mustillo for aiding and abetting retaliation. (Id. ¶¶ 220-23)

The Twelfth Cause of Action is a Monell claim against the DOE. (Id. ¶¶ 224-29)

The Thirteenth Cause of Action is a Section 1983 supervisory liability claim against Chan and Mustillo. (Id. ¶¶ 230-34)

The Fourteenth, Fifteenth, and Sixteenth Causes of Action are brought against DOE and Estwick under the New York State Human Rights Law ("NYSHRL") and allege race discrimination (id. ¶¶ 235-40), hostile work environment (id. ¶ 241-46), and retaliation (id. ¶¶ 247-54).

The Seventeenth, Eighteenth, and Nineteenth Causes of Action are brought against DOE and Estwick under the New York City Human Rights Law ("NYCHRL") and allege race discrimination (id. ¶¶ 255-60), hostile work environment (id. ¶¶ 261-66), and retaliation (id. ¶¶ 267-75).

The Twentieth Cause of Action is brought under the NYSHRL and the NYCHRL against Chan and Mustillo and alleges that they aided and abetted retaliation. (Id. ¶¶ 276-79)

The Twenty-First Cause of Action is a respondeat superior claim against DOE. (Id. ¶¶ 280-82)

## IV. PROCEDURAL HISTORY

The Complaint was filed on December 6, 2019 (Dkt. No. 1); the First Amended Complaint was filed on June 4, 2020 (Dkt. No. 33); and the Second Amended Complaint ("SAC") was filed on August 13, 2020. (Dkt. No. 41)

On November 11, 2020, Defendants moved to dismiss the SAC. (Dkt. No. 63) This Court referred Defendants' motion to Magistrate Judge Cott for a Report and Recommendation ("R&R"). (Order of Reference (Dkt. No. 71))

On February 15, 2022, Judge Cott issued an R&R recommending that Defendants' motion to dismiss be granted in part and denied in part.[12] Oliver v. City of New York, et al., 19-CV-11219 (PGG) (JLC), 2022 WL 455851 (S.D.N.Y. Feb. 15, 2022). (Dkt. No. 97) Oliver filed objections to the R&R on March 7, 2022 (Dkt. No. 103); Defendants filed a response to Oliver's objections on March 28, 2022 (Dkt. No. 109); and Plaintiff filed a reply on April 8, 2022 (Dkt. No. 112).

On September 23, 2022, Oliver filed the Third Amended Complaint ("TAC"). (Dkt. No. 139) That same day, the parties filed a joint letter stating "that the substance of the

---

[12] As relevant here, Judge Cott recommended that Defendants' motion to dismiss be granted as to Oliver's

- Section 1983 and state law false arrest claims against Gonzalez;
- New York State Constitution claims against Gonzalez and Taylor;
- race discrimination, hostile work environment, and retaliation claims against the DOE, Chan, and Mustillo;
- supervisory liability claims against Chan and Mustillo under Section 1983; and
- the federal respondeat superior claims against the DOE, and otherwise denied.

Oliver, 2022 WL 455851, at *18, *32.

pending [motion to dismiss] is not changed by the TAC, except that new defendants were added." (Dkt. No. 140) "The newly added defendants simply replaced officers that were named as John Does in the [SAC]." (Id. at 1 n.2)

On February 22, 2023, this Court issued an order adopting the R&R in part, granting Defendants' motion to dismiss in part, and denying Defendants' motion to dismiss in part. Oliver v. City of New York, 19 Civ. 11219 (PGG)(JLC), 2023 WL 2160062 (S.D.N.Y. Feb. 22, 2023). As relevant here, this Court granted Defendants' motion to dismiss as to Plaintiff's New York State Constitution claims; his direct false arrest claim against Gonzalez; the respondeat superior claim against the City for officers' conduct pursuant to Section 1983; the Monell claims against the City; the respondeat superior claim against the DOE pursuant to Section 1983; and the claims against Chan and Mustillo. Defendants' motion was otherwise denied.

On June 7, 2023, Oliver filed the Fourth Amended Complaint. (Dkt. No. 195)

On February 26, 2024, the parties filed cross-motions for summary judgment. (Pltf. Mot. (Dkt. No. 241); Def Mot. (Dkt. No. 235))

## DISCUSSION

### I. LEGAL STANDARD

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material

fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

"'Where, as here, the burden of persuasion at trial would be on the non-moving party[,] . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of

the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)). In ruling on a summary judgment motion, a court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

"In cases that involve claims of discrimination, courts must use 'an extra measure of caution' in determining whether to grant summary judgment 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions.'" Fitchett v. City of New York, 18 Civ. 8144 (PAE), 2021 WL 964972, *8 (S.D.N.Y. Mar. 15, 2021) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)). However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (omission in original) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). As in any other case, a plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts[.]' . . . [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Mere conclusory statements, conjecture or speculation cannot by themselves create a genuine issue of material fact." Gross v. Nat'l Broad.

Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("'[E]ven in the discrimination context, [ ] a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' . . . [and the] 'nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful.'") (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) and Jeffreys, 426 F.3d at 554).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

## II. FALSE ARREST

The parties have cross-moved for summary judgment on Oliver's false arrest claims under Section 1983 and New York law. (Pltf. Sum. J. Br. (Dkt. No. 242) at 13-18; Def. Sum. J. Br. (Dkt. No. 238) at 65-69)

As discussed above, on March 22, 2019, the Arresting Officers took Oliver into custody at the School's entrance. (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 102)

### A. Applicable Law

#### 1. Probable Cause

"A [S]ection 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) (citing Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)); see also Parrish v. Orange Cnty. L. Enf't Agency-M.P.D., 25-CV-1674 (LLS), 2025 WL 2977797, at *5 (S.D.N.Y. Oct. 20, 2025)

("A claim for false arrest under Section 1983 incorporates the elements of a false arrest claim under state law.") (citing Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003)). To state a claim for false arrest, a plaintiff must show that: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" Liranzo v. United States, 690 F.3d 78, 95 (2d Cir. 2012) (emphasis omitted) (quoting Caban v. United States, 728 F.2d 68, 71 (2d Cir. 1984)).

"'The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.'" Jenkins, 478 F.3d at 84 (quoting Weyant, 101 F.3d at 852) (further quotation marks omitted). "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as [p]robable cause does not require absolute certainty." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis in original) (internal quotations and citations omitted); Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.'" (quoting Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006))).

"'Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Figueroa v. Mazza, 825 F.3d 89, 99 (2d Cir. 2016) (quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted)). "Probable cause is a 'fluid' standard that 'does not demand hard certainties or mechanistic inquiries'; nor does it

'demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false.'" Id. (quoting Zalaski v. City of Hartford, 723 F.3d 382, 389, 390 (2d Cir. 2013) (citations and internal quotation marks omitted)). "Rather, it requires only facts establishing 'the kind of fair probability' on which a 'reasonable and prudent' person, as opposed to a 'legal technician[ ],' would rely." Id. (quoting Florida v. Harris, 568 U.S. 237, 243-44 (2013) (internal quotation marks omitted)).

"An arresting officer advised of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) (citations omitted); see also Betts v. Shearman, 751 F.3d 78, 81 (2d Cir. 2014) ("[P]robable cause exists if a law enforcement officer 'received [ ] information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." (quoting Panetta, 460 F.3d at 395 (internal quotation marks and citations omitted in original))).

Where there are circumstances that raise questions about the victim's veracity, "'the officer may need to investigate further.'" Hart v. City of New York, No. 11 Civ. 4678 (RA), 2013 WL 6139648, at *5 (S.D.N.Y. Nov. 18, 2013) (quoting Sankar v. City of New York, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012)). Even in such circumstances, however, an officer's "further inquiry and corroboration of the facts" will be "sufficient to dispel concerns about [the victim's] veracity." Id. Moreover, "the probable cause standard does not require that the arresting officer affirmatively seek out reasons to doubt the victim or witness where none are apparent." Parisi v. Suffolk Cty., No. 04 Civ. 2187 (ENV) (ETB), 2009 WL 4405488, at *7 (E.D.N.Y. Nov. 30, 2009).

**2. Elements of Endangering the Welfare of Child**

Under N.Y. Penal Law § 260.10(1), a person "is guilty of endangering the welfare of a child when . . . [h]e or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old."

"The scope of this statute is quite broad." Bate v. City of New York, 15 Civ. 2631 (PGG), 2018 WL 4757940, at *17 (S.D.N.Y. Sept. 30, 2018). "As an initial matter, '[a]ctual harm to the child need not result for criminal liability; it is "sufficient that the defendant act in a manner which is likely to result in harm to the child."'" Id. (quoting People v. Johnson, 95 N.Y.2d 368, 371 (2000) (emphasis in original)); see also Figueroa, 825 F.3d at 103 (an officer may conclude that a suspect "created a serious risk to [a] child's welfare in violation of § 260.10(1) . . . even if the risk did not materialize into actual harm") (citing People v. Simmons, 92 N.Y.2d 829 (1998)). And "[t]he harm to which the statute refers [may be] 'physical, mental or moral.'" Doe by & through Doe v. E. Irondequoit Cent. Sch. Dist., No. 16 Civ. 6594 (CJS), 2018 WL 2100605, at *2 (W.D.N.Y. May 7, 2018) (alterations in original) (quoting People v. Noce, 24 Misc. 3d 1202(A), *5 (Nassau Cty. Dist. Ct. 2009)).

Given the broad scope of the statute, a wide variety of conduct has been found to constitute "endangering the welfare of a child." For example,

> the provision applies to the assault of a mother in front of her children, Johnson, 95 N.Y.2d 368, 718 N.Y.S.2d 1, 740 N.E.2d 1075; and also to the possession of a large number of firearms and ammunition in easy reach of a child known to have played with the guns, People v. Hitchcock, 98 N.Y.2d 586, 750 N.Y.S.2d 580, 780 N.E.2d 181 (2002). Lower courts in New York have found actual or attempted violations of § 260.10 where a defendant smoked marijuana in his home in the presence of children, People v. Alvarez, 20 Misc.3d 606, 860 N.Y.S.2d 745 (N.Y. Crim. Ct. 2008); where a defendant sold fireworks to a child, People v. Suquisupa, 167 Misc.2d 109, 637 N.Y.S.2d 302 (N.Y. Sup. Ct. 1996); where a defendant left a seven-year-old alone in a locked apartment for two-and-one-half hours, People v. Watson, 182 Misc.2d 644, 700 N.Y.S.2d 651 (N.Y. Crim. Ct. 1999); where a school bus attendant failed to awaken a child who had fallen asleep and remove him from the bus when it reached the school, People v.

> Afia, 17 Misc.3d 734, 843 N.Y.S.2d 906 (N.Y. Crim. Ct 2007); where a father drove drunk with his son in the vehicle, People v. D'Ambrosia, 192 Misc.2d 560, 746 N.Y.S.2d 556 (N.Y. Just. Ct. 2002); where defendants lived with their children in filthy, garbage-filled households, People v. Manon, 226 A.D.2d 774, 640 N.Y.S.2d 318 (N.Y. App. Div. 1996); People v. Ambers, 17 Misc.3d 278, 840 N.Y.S.2d 533 (N.Y. Crim. Ct. 2007); and where a mother left her two young children unsupervised in an automobile for over two hours, People v. Cenat, 176 Misc.2d 39, 671 N.Y.S.2d 578 (N.Y. Crim. Ct. 1997).

Guzman v. Holder, 340 F. App'x 679, 681 (2d Cir. 2009).

The statute also applies to "inappropriate physical contact" with a child. See, e.g., People v. Toft, 156 A.D.3d 1234, 1235 (3d Dept. 2017) (upholding conviction for endangering the welfare of a child based on "inappropriate physical contact" notwithstanding defendant's acquittal on sex crimes); People v. Strickland, 78 A.D.3d 1210, 1211 (3d Dept. 2010) (upholding conviction for endangering the welfare of a child; noting that jury could have concluded that "some impermissible conduct occurred between defendant and the victim," even though defendant was acquitted of sex abuse charges); People v. Sanderson, 68 A.D.3d 1716, 1717 (4th Dept. 2009) ("[A] rational jury could have found that defendant 'knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of [the] child' (Penal Law § 260.10 [1]), based on testimony that, inter alia, defendant attempted to kiss the victim while he was alone with her.").

### B. Defendants' Motion for Summary Judgment on Oliver's False Arrest Claims

Defendants argue that the Arresting Officers had probable cause to arrest Oliver for endangering the welfare of a child based on the Arresting Officers' interview of G.C. (Def. Sum. J. Br. (Dkt. No. 238) at 68-69) According to Defendants, "the objectively inappropriate actions of [Oliver] fit within [the] broad definition [of endangering the welfare of a child]" under N.Y. Penal Law § 260.10. (Id. at 69)

In opposition, Oliver argues that

> [n]o reasonable officer could have found probable cause for the crime of endangering the welfare of a child [based on] (1) the facts (or lack thereof) that were available to the officers at the time of the arrest, (2) the trustworthiness of the testimony on which the officers' relied, and (3) the officers' failure to conduct further inquiry prior to Mr. Oliver's arrest. . . .

(Pltf. Opp. Br. (Dkt. No. 245) at 39)

The Arresting Officers interviewed G.C. before taking Oliver into custody. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶¶ 56-57) During that interview, G.C. told the officers that Oliver repeatedly stroked her arm and said, "I know you love me." (See Foti Decl., Ex. 21 (McLeod-G.C. Interview Video Part 1) (Dkt. No. 244-21) at 02:17-3:15) G.C. showed the officers how Oliver had touched her, using her right hand to stroke her left arm, from the top of her shoulder to just above her elbow. (Id.) G.C. told the officers that she told Oliver to stop touching her, and he walked away. (Id.) When Officer Gonzalez asked G.C. whether Oliver's conduct had made her feel uncomfortable, G.C. nodded her head yes. (Id. at 6:04-6:11) The Arresting Officers did not interview any other witnesses before arresting Oliver.[13] (See Def. R. 56.1 Stmt. (Dkt. No. 237) ¶¶ 97-98)

### 1. Whether G.C. Described Conduct that Constitutes a Crime

Defendants argue that the Arresting Officers had probable cause to arrest Oliver for endangering the welfare of a child in violation of N.Y. Penal Law § 260.10. "[T]he

---

[13] When Olga Urena, G.C.'s mother, called 911, she reported that a male teacher had touched her daughter "sexually." (Foti Decl., Ex. 15 (911 call) (Dkt. No. 244-15)) Defendants have not argued that the Arresting Officers were aware of the substance of Urena's 911 call.

During the Arresting Officers' interview of G.C. at the School, Urena stated that – according to her younger daughter, also a student at the School – Oliver had touched other children in the past. (Foti Decl., Ex. 21 (McLeod-G.C. Interview Video) (Dkt. No. 244-21) at 02:45-3:15) Defendants have not argued that the Arresting Officers relied on this statement in making their probable cause determination.

interpretation of what violates § 260.10 is broad, and certainly, the objectively inappropriate actions of [Oliver] fit within that broad definition." (Def. Sum. J. Br. (Dkt. No. 238) at 69)

None of the cases cited by Defendants suggest that Oliver's alleged conduct constitutes behavior "likely to be injurious to the physical, mental or moral welfare of a child," however. (See id. at 66-67, 72 (citing Guzman, 340 F. App'x at 681; People v. Johnson, 95 N.Y.2d 368 (2000); Pehush v. Town of Wallkill, 15 Civ. 2500 (LMS), 2017 WL 6729716 (S.D.N.Y. Nov. 8, 2017); Peterson-Hagendorf v. City of New York, 146 F. Supp. 3d 483, 487 (E.D.N.Y. 2015); Blythe v. City of New York, 963 F. Supp. 2d 158, 182 (E.D.N.Y. 2013); People v. Simmons, 92 N.Y.2d 829, 831 (1998); People v. Valentin, 17 Misc.3d 1132(A) (Kings Co. Crim. Ct. 2007); People v. Ostrin, 8 Misc.3d 1020(A) (Crim. Ct. Kings Co. 2005); Bate, 2018 WL 4757940; Smith v. Lanati, 271 F. App'x 65 (2d Cir. 2008); Villa v. City of New York, No. 11 Civ. 1669 (RJS) (AJP), 2013 WL 1385207 (S.D.N.Y. Mar. 14, 2013); Betts v. Shearman, No. 12 Civ. 3195 (JPO), 2013 WL 311124 (S.D.N.Y. Jan. 24, 2013)).

As an initial matter, Smith, Villa, and Betts are of no assistance to Defendants, because none of these cases involves allegations that the defendant endangered the welfare of a child in violation of N.Y. Penal Law § 260.10.

In Guzman, as discussed above, the Second Circuit listed a series of cases in which courts have found violations of N.Y. Penal Law § 260.10. These cases involved the following conduct: assaulting a mother in front of her children; leaving a large number of firearms and ammunition within easy reach of a child known to have played with the guns; smoking marijuana in a home in the presence of children; selling fireworks to a child; leaving a seven-year-old alone in a locked apartment for two-and-one-half hours; failing to awaken a child who had fallen asleep on the school bus when it reached the school; driving drunk with a child in

the vehicle; living with children in filthy, garbage-filled households; and leaving children unsupervised in an automobile for more than two hours. Guzman, 340 F. App'x at 681 (citations omitted). None of the conduct discussed in Guzman is similar to the conduct at issue here.

In Bate, the Court found that there was probable cause to arrest where the defendant had "touched [one child's] breast and rubbed [another child's] thigh," and "massag[ed] and rub[bed] [six] girls' backs, shoulders, neck, and feet without their consent." Bate, 2018 WL 4757940, at *18-*19. This conduct is likewise more extreme than that at issue here.

Peterson-Hagendorf and Blythe both involve physical injury. In the former case, the court found probable cause to arrest where the plaintiff "physically interacted with" a first-grade student, resulting in a "red, swollen welt on [the child's] neck." Peterson-Hagendorf, 146 F. Supp. 3d at 485-87. And in Blythe, the court found probable cause to arrest where a teacher

> put her hands on [a student] and forced [the student] back into her seat numerous times. After the officers arrived, they corroborated the information contained in the 911 call: the child complained of "a little bit of pain," and the officers observed "a little bit of redness."

963 F. Supp. 2d at 182.

In Johnson, the New York Court of Appeals upheld a conviction for endangering the welfare of a child where

> the children saw defendant approach their mother and strike her down in the street, whereupon they immediately started crying. In their immediate presence, the defendant then threatened to kill their mother. For over 10 hours they hid in their bedroom, listening to defendant's yelling and cursing, their mother's screams and the sounds of breaking glass.

95 N.Y.2d at 373. No such conduct is at issue here.

Similarly, in Simmons, the New York Court of Appeals upheld convictions for endangering the welfare of a child where the defendant had "repeatedly direct[ed] vulgar

remarks of a sexual nature to a child aged 23 months" "over a period of nearly six weeks." 92 N.Y.2d 829, 830-31.

And in Valentin, the court found a criminal complaint charging endangering the welfare of a child legally sufficient where the complaint alleged that the defendant had "kiss[ed] on the mouth the then 15 year old Complaining Witness, a member of the baseball team the Defendant coached." 17 Misc. 3d 1132(A), at *1-*3.

Finally, in Ostrin, the court found a criminal complaint charging endangering the welfare of a child legally sufficient where the People alleged that the defendant had made "several statements of a sexual nature" to a fifteen-year-old female student, including "a request for the [student] to be the Defendant's 'little sex slave,' and a request for a 'strip tease.'" 8 Misc.3d 1020(A), at *1-*2. The complaint also alleged that the defendant "placed his hands on the [student], kissed and hugged her, and asked her to quantify her love for [him]." Id.

Oliver's alleged conduct – stroking G.C.'s arm and saying "I know you love me" – is not comparable to the allegations in any of the cases cited by Defendants.

In resolving Defendants' motion, the Court must consider the evidence in the light most favorable to Oliver. Spinelli, 579 F.3d at 166. Pursuant to this standard, the Court concludes that Defendants have not shown as a matter of law that G.C.'s allegations constitute conduct "likely to be injurious to the physical, mental or moral welfare of a child." See N.Y. Penal Law § 260.10(1). There are material issues of fact as to whether G.C.'s allegations – as she reported them to the Arresting Officers – were sufficient to establish probable cause to arrest Oliver for the crime of endangering the welfare of a child.

### 2. Qualified Immunity

"In the context of § 1983 actions predicated on allegations of false arrest, [the Second Circuit has] held that an arresting officer is entitled to qualified immunity so long as

'arguable probable cause' was present when the arrest was made." Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016) (quoting Zalaski v. City of Hartford, 723 F.3d 382, 389, 390 (2d Cir. 2013) (internal quotation marks omitted)).

> A police officer has arguable probable cause "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Put another way, an arresting officer will find protection under the defense of qualified immunity unless "no reasonably competent officer" could have concluded, based on the facts known at the time of arrest, that probable cause existed.

Id. (quoting Zalaski, 723 F.3d at 390; Malley v. Briggs, 475 U.S. 335, 341 (1986)) (internal citations omitted).

Here, Defendants assert that the Arresting Officers are entitled to qualified immunity because – even if there was not probable cause to arrest Oliver – "there was arguable probable cause for plaintiff's arrest." (Def. Sum. J. Br. (Dkt. No. 238) at 72 (emphasis in original) (citing Bate, 2018 WL 4757940; Smith, 271 F. App'x at 66; Villa, 2013 WL 1385207, at *16, n.5; Betts, 2013 WL 311124)) In making this argument, Defendants merely reiterate that G.C.'s account provided sufficient grounds for Oliver's arrest: "[F]aced with the allegation that a teacher caressed a young student's arm while making inappropriate statements of love and affection, there was probable cause to arrest plaintiff for endangering the welfare of a minor." (Id. at 71-72)

As discussed above, Bate, Smith, Villa, Betts, and the other cases cited by Defendants are not persuasive here, because the facts of those cases are dissimilar to those here. In Bate, for example, the court found a detective entitled to qualified immunity

> given the absence of proof showing that [the detective] was aware of a "bitter relationship" between Plaintiff and the [six] girls, and the girls' consistent and detailed complaints – which were corroborated, at least in part, by [two of the girls'] mothers as well as several adult mentors in the Big Brothers Big Sisters program.

Bate, 2018 WL 4757940, at *24. Here, the Arresting Officers did not rely on multiple, detailed, and corroborated complaints. They instead relied solely on G.C.'s account. And, as noted above, Smith, Villa, and Betts do not involve allegations that the individual taken into custody had endangered the welfare of a child in violation of N.Y. Penal Law § 260.10.

Here, the Court has determined that there are genuine issues of material fact as to whether G.C.'s allegations – as she reported them to the Arresting Officers – were sufficient to establish probable cause to arrest Oliver for endangering the welfare of a child. Whether officers of reasonable competence could disagree as to whether the probable cause test was met presents a close question that must be resolved by a jury. See Pace v. Town of Southampton, 678 F. Supp. 2d 79, 85-87 (E.D.N.Y. 2010) (finding that "a jury should determine whether reasonably competent officers could disagree about whether probable cause existed" where the court had determined that there was a "material triable issue concerning whether . . . [the officer could] reasonably believe that the [p]laintiff had committed the 'family offenses' of stalking or harassment"). Accordingly, Defendants' motion for summary judgment on Oliver's false arrest claims (Counts One and Three) will be denied.

### C. Oliver's Motion for Summary Judgment on his False Arrest Claims

Oliver moves for summary judgment on the grounds that

> [n]o reasonable officer could have found probable cause for the crime of endangering the welfare of a child or harassment considering (1) the facts (or lack thereof) that were available to the officers at the time of the arrest, (2) the trustworthiness of the testimony on which the officers' relied, and (3) the officers' failure to conduct further inquiry prior to Mr. Oliver's arrest when a reasonable officer would have done so.

(Pltf. Sum. J. Br. (Dkt. No. 242) at 14)[14] According to Oliver, in making their probable cause determination, the Arresting Officers did not, but should have, considered (1) that the incident "occurred in a very public setting, including where students and another teacher were present at the time of the alleged incident"; (2) that Oliver "continued to teach the student for at least a week following the alleged incident without complaints from G.C. or another student"; (3) that "the school itself had taken no steps to remove the teacher from the classroom"; (4) "the overall dynamics of a middle-school classroom"; (5) "whether there was a corroborating witness[]"; (6) "the age and trustworthiness of the complaining witness"; and (7) "if there were other motivating factors underlying the reason for the complaint." (Pltf. Sum. J. Br. (Dkt. No. 242) at 16-17)

As discussed above, where a law enforcement officer receives information from a putative victim that a crime has been committed, probable cause exists "unless the circumstances raise doubt as to the [victim's] veracity." Betts, 751 F.3d at 82. Where there is doubt as to the victim's veracity, "the officer may need to investigate further." Hart, 2013 WL 6139648, at *5 (citation omitted).

Here, Oliver argues that G.C.'s delay in reporting the incident should have raised doubts as to her veracity. (Pltf. Reply Br. (Dkt. No. 248) at 6) Although courts have held that a victim's delay in reporting a crime may undermine the victim's credibility, courts have excused the delay "where there is some reasonable explanation for the delay." Douglas v. City of Peekskill, No.21-CV-10644(KMK), 2025 WL 965018, at *9 (S.D.N.Y. Mar. 31, 2025)

---

[14] Oliver further argues that Sergeant Gonzalez determined that probable cause existed to arrest Oliver "only after Mr. Oliver had been arrested," based on conversations he had with the NYPD Legal Bureau or the Special Victims Unit. (Id. (emphasis in original)) But Gonzalez's communications with the Legal Bureau or the Special Victims Unit have no bearing on "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." See Gonzalez, 728 F.3d at 155 (2d Cir. 2013).

(collecting cases). Here, G.C. told the Arresting Officers that Oliver's alleged misconduct took place about a week earlier, and that she had reported it to Guidance Counselor Melendez the day before she met with the officers. G.C. explained that she had gone to Melendez's office on multiple occasions during that week to report the incident, but every time she went to Melendez's office other students were there. (See Foti Decl., Ex. 21 (McLeod-G.C. Interview Video Part 1) (Dkt. No. 244-21))

At summary judgment, a court "may not make credibility determinations or weigh the evidence." Khan v. City of New York, 19-cv-104 (JGK), 2022 WL 3100941 (S.D.N.Y. Aug. 4, 2022) (quoting Proctor v. LeClaire, 846 F.3d 597, 608 (2d Cir. 2017)) (citing Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015) ("Assessments of credibility . . . are matters for the jury, not for the court on summary judgment.")). Whether G.C.'s delay in reporting Oliver's alleged misconduct was reasonable under the circumstances is a question for the jury.[15] Accordingly, Oliver's motion for summary judgment on his false arrest claims will be denied.

## III. SECTION 1983 SUPERVISORY LIABILITY CLAIM AGAINST GONZALEZ

The FAC asserts a supervisory liability claim against Gonzalez under Section 1983, alleging that, while

---

[15] Oliver also argues that "G.C.'s prior description of the events [to Melendez] was different than that reported to the officers." (Pltf. Reply Br. (Dkt. No. 248) at 6) Oliver does not explain how the account G.C. gave to Melendez differs from what she said to the Arresting Officers, however, nor does he contend that the Arresting Officers were aware of any such discrepancy.

Similarly, Oliver asserts that "the individual [that G.C.] claimed witnessed the alleged interaction [between her and Oliver] had already been interviewed by the guidance counselor and did not corroborate G.C.'s account." (Id.) But Oliver does not contend that the Arresting Officers were aware of any witness account that conflicted with G.C.'s allegations.

Finally, Oliver suggests that G.C.'s age undermines her credibility. (See Pltf. Sum. J. Br. (Dkt. No. 242) at 17) But Oliver does not explain why the Arresting Officers should have doubted G.C.'s account based merely on her age.

> acting under color of state law and in the course and scope of [his] official duties and functions, [Gonzalez] devised, implemented, enforced, encouraged, and sanctioned policies, practices and customs that were a direct and proximate cause of constitutional violations suffered by Mr. Oliver, including by failing to adequately investigate and substantiate citizen complaints of bias-based policing by officers under [his] command and discipline any officers under [his] command involved in bias-based policing.

(FAC (Dkt. No. 195) ¶ 186)

Defendants have moved for summary judgment on this claim, arguing that Oliver cannot sustain a claim for supervisory liability because he has not established an underlying constitutional violation. (Def. Sum. J. Br. (Dkt. No. 238) at 73 (citing Bastuk v. Cnty. of Monroe, 628 F. App'x 4 (2d Cir. 2015); Elek v. Incorp. Vill. of Monroe, 815 F.Supp. 2d 801, 807-08 (S.D.N.Y. 2011))) According to Defendants, "[t]here was probable cause for the arrest of plaintiff, and Sergeant Gonzalez made the decision to arrest plaintiff based on that probable cause." (Id. at 74)

In opposition, Oliver argues that he "has more than adequately pled his false arrest claim under federal and state law, and Sergeant Gonzalez is directly liable for his direct participation, in his role as a supervising officer, in Plaintiff's false arrest." (Pltf. Opp. Br. (Dkt. No. 245) at 42 (citing Pltf. R. 56.1 Resp. (Dkt. No. 246) ¶ 213 ("Sergeant Gonzalez was the supervising officer responsible for making a probable cause determination on the day of Mr. Oliver's arrest."))

## A. Applicable Law

"It is well established that general respondeat superior liability does not exist under Section 1983." Carpenter v. City of New York, 984 F.Supp.2d 255, 268 (S.D.N.Y. 2013) (citing Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004)). "[T]o establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be

deprived of a federal right." Back, 365 F.3d at 122. "An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." Id. at 127 (quoting Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)). A plaintiff can establish "personal involvement" by offering evidence that

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."

Littlejohn v. City of New York, 795 F.3d 297, 314 (2d Cir. 2015) (quoting Back, 365 F.3d at 127).

Where evidence of personal involvement is proffered, "'a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation' and, 'in the § 1983 context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic.'" Lewis v. Roosevelt Island Operating Corp., 246 F.Supp.3d 979, 992 (S.D.N.Y. 2017) (quoting Raspardo v. Carlone, 770 F.3d 97, 116 (2d Cir. 2014)); see also Littlejohn, 795 F.3d at 314.

**B. Analysis**

Here, Oliver has proffered sufficient evidence to show that Gonzalez was personally involved in Oliver's arrest. Indeed, Gonzalez participated in G.C.'s interview and was present for Oliver's arrest. (Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 56-57)

In seeking summary judgment on Oliver's supervisory liability claim against Gonzalez, Defendants assert that – because there was probable cause to arrest Oliver – he cannot

show that Gonzalez violated his constitutional rights. (Def. Sum. J. Br. (Dkt. No. 238) at 73-74) For the reasons set forth above, however, there are material issues of fact as to whether the Arresting Officers had probable cause to arrest Oliver for the crime of endangering the welfare of a child. Accordingly, Defendants are not entitled to summary judgment on Oliver's Section 1983 supervisory liability claim on the grounds that there was probable cause to arrest Oliver, and their motion for summary judgment on this claim (Count Four) will be denied.

## IV. RACE DISCRIMINATION CLAIMS

Oliver asserts claims of "racial discrimination" in violation of Title VII, the NYSHRL, and the NYCHRL against the DOE. (FAC (Dkt. No. 195) ¶¶ 190-93, 235-40) He also asserts claims of "racial discrimination" in violation of Section 1983, the NYSHRL, and the NYCHRL against Estwick. (Id. ¶¶ 205-08, 235-40, 255-60)

Defendants contend that they are entitled to summary judgment on Oliver's discrimination claims because (1) "he was not subjected to an adverse employment action"; (2) "the record does not support an inference of discrimination"; and (3) "defendants had legitimate non-discriminatory reasons for their actions." (Def. Sum. J. Br. (Dkt. No. 238) at 22)

In response, Oliver argues "(1) that his reassignment . . . was, in fact, an adverse employment action that (2) resulted from Defendant Estwick's discriminatory animus for Mr. Oliver." (Pltf. Opp. Br. (Dkt. No. 245) at 15)

## A. Applicable Law

### 1. Discrimination Claims Under Section 1983, Title VII, and the NYSHRL

The McDonnell Douglas burden-shifting framework applies to discrimination claims under Section 1983, Title VII, and the NYSHRL.[16] See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Augustin v. Enlarged City Sch. Dist. of Newburgh, 616 F.Supp.2d 422, 439 (S.D.N.Y. 2009) (McDonnell Douglas applies to Section 1983 discrimination claims); Carr v. N.Y.C. Transit Authority, 76 F.4th 172, 177 (2d Cir. 2023) (McDonnell Douglas applies to Title VII discrimination claims); Rosen v. N.Y.C. Dep't of Educ., 18 Civ. 6670 (AT), 2023 WL 2647532, *6 (S.D.N.Y. Mar. 27, 2023) (McDonnell Douglas applies to NYSHRL discrimination claims).

Under the McDonnell Douglas framework,

> plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Holcomb v. Iona College, 521 F.3d 130, 138 (2d Cir. 2008) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)) (internal citations omitted). The Second Circuit

---

[16] The NYSHRL, which "'historically utilized the same standard as Title VII, . . . was amended in 2019 to align with the NYCHRL's more liberal pleading standard.'" Edelman v. NYU Langone Health System, 141 F. 4th 28, 45 n.9 (2d Cir. 2025) (quoting Qorrolli v. Metro. Dental Assocs., 124 F.4th 114, 122-23 (2d Cir. 2024)). The amendment took effect on August 12, 2019, however, after Oliver's claims arose. See id. (citing 2019 N.Y. Laws 6 (A. 8421)). Because (1) the August 12, 2019 amendment to the NYSHRL "does not have retroactive effect," McHenry v. Fox News Network, LLC, 510 F.Supp.3d 51, 69 (S.D.N.Y. 2020); and (2) Oliver's claims are premised on events that took place before August 12, 2019, Oliver's Section, 1983, Title VII, and NYSHRL claims are governed by the same standard.

has "consistently applied McDonnell Douglas at the summary judgment stage." Bart v. Golub Corp., 96 F.4th 566, 573 (2d Cir. 2024).

To make out a prima facie case of discrimination under Section 1983, Title VII, and the NYSHRL, a plaintiff "must demonstrate the following: (1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011) (citation omitted). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 75 (2d Cir. 2016) (quoting Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (internal quotation marks omitted)). Although the standard for a prima facie case is low, "a plaintiff's case must fail if []he cannot carry this preliminary burden." Beyer v. The Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).

"[O]nce a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's action against the employee." Carr, 76 F.4th at 177 (quoting Truitt v. Salisbury Bank & Tr. Co., 52 F.4th 80, 86-87 (2d Cir. 2022) (internal quotation marks and alterations omitted)).

If the employer presents a "legitimate, nondiscriminatory reason" for its actions, the burden "shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." Id. (quoting Truitt, 52 F.4th at 86–87). "The plaintiff bears 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" Id. (quoting Burdine, 450 U.S. at 256).

For discrimination claims brought under Title VII and the NYSHRL, a plaintiff need only "show that unlawful discrimination was a 'motivating factor' in the employment

action." Delville v. Firmenich Inc., 920 F.Supp.2d 446, 458 n.8 (S.D.N.Y. Jan. 31, 2013); see also Jackson v. Am. C.L. Union, Inc., 21-CV-5037 (JPO), 2024 WL 4766983, *11 n.6 (S.D.N.Y. Nov. 13, 2024) ("[U]nder the NYSHRL and the NYCHRL, Plaintiff can prevail on his claims by merely establishing that discrimination was a 'motivating factor' for Defendants' decision." (citation omitted)).

"[A] § 1983 plaintiff's burden at the third stage of the McDonnell Douglas analysis" is higher, however. Naumovski v. Norris, 934 F.3d 200, 217 (2d Cir. 2019). To show unlawful discrimination under Section 1983, a plaintiff "must establish that the employer's stated reason would not, alone, constitute a sufficient basis for pursuing an adverse action." Id. at 214-15 (emphasis in original). In other words, a Section 1983 plaintiff must offer evidence that "the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action." Id. at 214.

In determining whether a defendant's stated reasons are pretextual, courts are "decidedly not interested in the truth of the allegations against plaintiff," but in "'what motivated the employer.'" McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)) (emphasis in McPherson); see also Moore v. Kingsbrook Jewish Med. Ctr., No. 11 Civ. 3625 (MKB), 2013 WL 3968748, at *13 (E.D.N.Y. July 30, 2013) ("[T]hat an employee 'disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are pretext.'") (quoting Grant v. Roche Diagnostics Corp., No. 09–CV–1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20, 2011)).

**2. Discrimination Claims Under the NYCHRL**

"The Second Circuit has instructed that '[c]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims.'" Baker v. City of New York, Fire Department, 22-CV-3868 (JGLC), 2025 WL 2774181, at *17 (S.D.N.Y. Sept. 29, 2025) (quoting Luo v. AIK Renovation Inc., No. 23-CV-5878 (LJL), 2024 WL 4444283, at *15 (S.D.N.Y. Oct. 8, 2024) (cleaned up) (citing Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013))).

Although discrimination claims under the NYCHRL are also subject to the McDonnell Douglas burden-shifting framework, see Rosen v. N.Y.C. Dep't of Educ., 18 Civ. 6670 (AT), 2023 WL 2647532, *6 (S.D.N.Y. Mar. 27, 2023) (McDonnell Douglas applies to NYCHRL discrimination claims), "[t]o establish a prima facie case of discrimination under the NYCHRL, a plaintiff is not required to show an adverse employment action and need only 'show differential treatment – that [he] was treated "less well" – because of a discriminatory intent.'" Livingston v. City of New York, 563 F.Supp.3d 201, 234 (S.D.N.Y. 2021) (quoting Mihalik, 715 F.3d at 110) (citing Kops v. PPM Am., Inc., No. 15 Civ. 1584 (GBD), 2016 WL 7188793, at *5 (S.D.N.Y. Dec. 5, 2016)). "An employer may present a legitimate, non-discriminatory reason for its actions, but it is entitled to summary judgment 'only if the record establishe[s] as a matter of law that discrimination played no role in its actions.'" Id. (quoting Kops, 2016 WL 7188793, at *5 (citation omitted) (emphasis in Livingston and Kops).

Courts ruling on NYCHRL claims must consider "the totality of the circumstances[,] . . . because 'the overall context in which [the challenged conduct occurs] cannot be ignored.'" Mihalik, 715 F.3d at 112 (quoting Hernandez v. Kaisman, 103 A.D.3d 106 (1st Dep't 2012) (alteration in Mihalik)). "When applying this standard, however, district courts must be mindful that the NYCHRL is not a 'general civility code.'" Id. at 110 (quoting Williams

v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 79 (1st Dept. 2009)). "[W]here a plaintiff fails to demonstrate that the defendant's conduct was caused 'at least in part by discriminatory or retaliatory motive,' or the defendant demonstrates that the alleged conduct did not exceed 'petty slights or trivial inconveniences,' plaintiff's claim must fail." Livingston, 563 F.Supp.3d at 234 (quoting Ramirez v. Michael Cetta Inc., No. 19 Civ. 986 (VEC), 2020 WL 5819551, at *18 (S.D.N.Y. Sept. 30, 2020) (quoting Mihalik, 715 F.3d at 113)).

## B. Analysis

### 1. *Prima Facie* Case

The parties do not dispute that Oliver is a member of a protected class or that he was qualified for his teaching position at the School. (Def. Sum. J. Br. (Dkt. No. 238) at 22) What is in dispute is whether Oliver suffered an adverse employment action,[17] and whether that action occurred under circumstances giving rise to an inference of discrimination.

#### a. Adverse Employment Action

For purposes of discrimination claims, the Second Circuit "define[s] an adverse employment action as a 'materially adverse change' in the terms and conditions of employment." Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (quoting Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)). "To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir.

[17] Although Defendants concede that Oliver's reassignment constitutes an adverse employment action for purposes of his retaliation claims (Def. Opp. Br. (Dkt. No. 251) at 16), they make no such concession for purposes of his discrimination claims. See Hayes v. G&E Real Estate Mgmt. Servs., 24-cv-01459 (ER), 2025 WL 769162, at *12 (S.D.N.Y. Mar. 11, 2025) ("An adverse employment action in the retaliation context is different from the discrimination context. The standards for retaliation and discrimination are not 'coterminous' and consequently the scope of adverse actions covered by a retaliation claim may be broader than a discrimination claim." (internal citations omitted)).

2003)). "Materially adverse" changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. "Changes in assignments or responsibilities that do not 'radical[ly] change' the nature of work are not typically adverse employment actions." Potash v. Florida Union Free Sch. Dist., 972 F.Supp.2d 557, 584 (S.D.N.Y. 2013) (quoting Galabya v. N.Y.C. Bd. of Ed., 202 F.3d 636, 640 (2d Cir. 2000). "Moreover, a plaintiff must set forth objective proof that the alleged action was materially adverse." Id. (citing Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)) (emphasis in original).

In arguing that Oliver's administrative reassignment does not amount to an adverse employment action for purposes of his discrimination claims, Defendants argue that "'the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies.'" (Def. Sum. J. Br. (Dkt. No. 238) at 23 (quoting Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006)) (citing Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012))) And Defendants further argue that "there is no evidence DOE exceeded reasonable disciplinary procedures in reassigning plaintiff." (Id.)

Oliver responds that Defendants "ignore[] the plethora of Second Circuit case law" holding that "disciplinary actions, demotions, reassignments, and other changes to the terms, duties, or privileges of employment" can constitute adverse employment actions.[18] (Pltf. Opp. Br. (Dkt. No. 245) at 15 (citing de la Cruz v. N.Y.C. Hum. Res. Admin. Dep't of Soc.

---

[18] Oliver does not address Defendants' arguments regarding other alleged adverse actions, stating that "many of these acts are alleged only as part of Mr. Oliver's retaliation claim(s) against the DOE Defendants." (Pltf. Opp. Br. (Dkt. No. 245) at 15 n.2) Accordingly, in connection with Oliver's discrimination claims, the Court considers only whether his reassignment constitutes an "adverse employment action."

Servs., 82 F.3d 16, 21 (2d Cir. 1996); Lore v. City of Syracuse, 670 F.3d 127, 170 (2d Cir. 2012); Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008))) Oliver also argues that Defendants' reliance on Joseph and Brown is misplaced because those cases "involved temporary suspensions of employees due to their pending criminal charges," whereas "at no time during his reassignment did Mr. Oliver face criminal charges." (Id. at 16-17)

The cases cited by Oliver are inapposite. In both de la Cruz and Brady, the plaintiffs' discrimination claims were premised on their transfers to different departments or roles within their organizations. See de la Cruz, 82 F.3d at 18-19 (New York City Human Resources Administration caseworker transferred from the Adoption Unit to the Foster Care Unit); Brady, 531 F.3d at 132 (Wal-Mart employee's transfer from the pharmacy to the parking lot, and from the parking lot to the food department). These cases do not involve the temporary reassignment of an employee pending the results of an internal investigation. And in Lore, plaintiff was suspended for 10 days without pay, Lore, 670 F.3d at 170, whereas here Oliver was administratively reassigned – not suspended – with pay.

By contrast, the cases cited by Defendants are directly on point, and indicate that Oliver's temporary reassignment with pay does not constitute an adverse employment action for purposes of his discrimination claims under Section 1983, Title VII, and the NYSHRL.

In Joseph, for example, plaintiff's employment discrimination claim was premised, in part, on his employer's decision to place him on administrative leave, with pay – first during a criminal investigation – and then during a subsequent internal investigation conducted by the employer. Joseph, 465 F.3d at 89. The Second Circuit held that plaintiff's "placement on administrative leave pending the criminal charges against him did not constitute an adverse employment action," because "[t]he terms and conditions of [his] employment did not

include a right to expect that he would be allowed to continue his responsibilities while he was facing serious criminal charges." Id. at 91. As to "[t]he continued administrative leave following the dismissal of the criminal charges," the Second Circuit concluded that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action." Id.[19]

Similarly, in Brown, plaintiff – a Syracuse police officer – brought a discrimination claim based on the police department's decision to suspend him, with pay, pending a criminal investigation concerning his alleged involvement with a fifteen-year-old girl. Brown, 673 F.3d at 150. Brown also disobeyed a direct order "to have no further contact with the girl" and withheld from fellow officers information concerning the girl's location. Id. at 145, 150-51. Under department regulations, an officer was subject to suspension where, inter alia, he had disobeyed a direct order or where there was "substantial evidence to believe the . . . [officer] ha[d] committed an act or omission of such flagrant nature as to render his/her continued presence in [the] department a source of embarrassment." Id. (internal citations and quotation marks omitted). Given that it was undisputed that plaintiff had disobeyed a direct order and deliberately misled fellow officers regarding the girl's whereabouts, "[t]here [was] no contention that [the Syracuse Police Department] took an action to suspend Brown with pay that [the department's] regulations did not permit." Id. at 151. Given these circumstances, the Second Circuit concluded that Brown's suspension did not amount to an adverse employment action,

[19] The Second Circuit noted that "[a]n exceptionally dilatory investigation might constitute a material change in the terms and conditions of employment," and thus amount to an adverse employment action. Id. at 92. Here, Plaintiff has not argued that DOE's internal investigation was "exceptionally dilatory."

because the Syracuse Police Department had applied its disciplinary procedures "in a reasonable manner." Id. at 150-51.

As the Second Circuit explained in Joseph and reiterated in Brown, where an employer has suspended or placed on administrative leave an employee,

> [t]he relevant question [in determining whether the employee has suffered an adverse employment action] is [] whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment. Paid suspension during an investigation could thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies.

Brown, 673 F.3d at 150 (quoting Joseph, 465 F.3d at 92 n.1).

Accordingly, the question here is whether Defendants "applied reasonable disciplinary procedures" when they reassigned Oliver for approximately two-and-a-half months while the Office of Equal Opportunity and later Deputy Superintendent Mustillo conducted their investigations into the allegations made against Oliver by G.C. and other students.

Oliver contends that "Defendants have never identified any DOE policy or disciplinary procedures that would permit, or require, the DOE to reassign a teacher pending an investigation by the [Office of Equal Opportunity] which, unlike [the SCI], investigates less-serious claims of employee misconduct." (Pltf. Opp. Br. (Dkt. No. 245) at 17 (emphasis in original))

In response, Defendants cite Article 21(4) of the Collective Bargaining Agreement between the DOE and Oliver's union – the United Federation of Teachers – entitled "Investigations and Reassignments."[20] (See Def. Reply Br. (Dkt. No. 240) at 15) Article 21(4)

---

[20] In his opposition brief, Oliver argues – without explanation – that Article 21(4) is "inapplicable" to him. (Pltf. Opp. Br. (Dkt. No. 245) at 20-21 n.3) Later in his brief, however, Oliver relies on Article 21(4) to argue that his nearly seventy-day suspension exceeded the sixty-

provides that "[p]ending an investigation of possible misconduct and completion of [an Education Law] §3020-a hearing, the Board ('DOE') may reassign any employee [] to . . . an administrative assignment within his or her school. . . ." (Foti Decl., Ex. Q (Collective Bargaining Agreement) (Dkt. No. 247-23) at 5) Article 21(4) further provides that "[t]he DOE shall prefer charges pursuant to Education Law §3020-a within sixty (60) days of an employee being reassigned. . . ." (Id.) "[S]hould the DOE not prefer §3020-a charges within sixty (60) days, the employee shall be returned to his/her prior assignment." (Id. at 6)

Here, Oliver was reassigned on March 22, 2019, and his reassignment ran through June 5, 2019. (See Def. R. 56.1 Stmt. (Dkt. No. 237) ¶¶ 110) The reassignment was rescinded on June 6, 2019. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 78) The period of his reassignment was thus 75 calendar days. No formal disciplinary charges were ever brought against Oliver. Oliver argues that the 75-day period that the Office of Equal Opportunity and Deputy Superintendent Mustillo investigated his alleged misconduct was unreasonably long and violated the Collective Bargaining Agreement's 60-day limit. (Pltf. Opp. Br. (Dkt. No. 245) at 12, 20-21) But the record does not bear out this assertion.

Under the "Investigations and Reassignments" section of the Collective Bargaining Agreement, "all timelines shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays." (Foti Decl., Ex. Q (Collective Bargaining Agreement) (Dkt. No. 247-23) at 5) The DOE school calendar for the 2018-2019 school year

---

day limit contemplated by the agreement. (Id. at 21) Oliver cannot have it both ways, and it is plain that Article 21(4) governs the DOE's ability to "reassign an employee" "[p]ending investigation of possible misconduct." (Foti Decl., Ex. Q (Collective Bargaining Agreement) (Dkt. No. 247-23) at 5) Nothing in the text suggests that Article 21(4) does not cover the investigation conducted by the DOE's Office of Equal Opportunity.

shows that New York City schools were in spring recess from April 19, 2019 through April 26, 2019, and were not in session on Memorial Day (May 27, 2019) or on Eid al-Fitr (June 4, 2019). 2018-19 School Calendar Year, N.Y.C. Dep't of Educ. (Apr. 10, 2018), https://www.ps42m.org/wp-content/uploads/2019/06/201819SchoolYearCalendar.pdf.[21] Accordingly, ten days within the 75-day period running from March 22, 2019 through June 5, 2019 are not counted.

Moreover, the 60-day period set forth in the Collective Bargaining Agreement does not apply "in cases where the reassignment . . . was caused by (i) an allegation of sexual misconduct defined in section 6 below that is being investigated by the Special Commissioner of Investigation for the New York City School District ('SCI')." (Foti Decl., Ex. Q (Collective Bargaining Agreement) (Dkt. No. 247-23) at 5) In Section 6 of the Collective Bargaining Agreement, "sexual misconduct" is defined as

> behavior that is intended to initiate, create, foster or advance a romantic or sexual relationship by an employee with a student, whether physical, verbal, in writing or by electronic means, regardless of location. It includes:
>
> (1) Any sexual physical contact, or touching, without a legitimate purpose. . . [and]
>
> . . .
>
> (3) . . . making sexual or romantic comments or discussing sexual acts with a student, for the purpose of initiating, creating, fostering or advancing a romantic or sexual relationship.

(Id. at 11) The definition of "sexual misconduct" set forth in the Collective Bargaining Agreement is broad enough to include Oliver's alleged stroking of G.C.'s arm and his comment "I know you love me."

---

[21] The Court takes judicial notice of the New York City Public School Calendar for the 2018-2019 school year. See Gonzales v. Nat'l Westminster Bank PLC, 847 F. Supp. 2d 567, 569 n.2 (S.D.N.Y. 2012) (a court may "take judicial notice of publicly available information including newspaper articles and other public disclosures").

The record indicates that SCI's investigation of Oliver's alleged misconduct began on March 22, 2019 – after Guidance Counselor Melendez reported G.C.'s allegations to SCI on March 21, 2019 (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 44; see Def. R. 56.1 Stmt. (Dkt. No. 237) at 110) – and continued until March 27, 2019, when SCI referred the investigation into Oliver's alleged misconduct to DOE's Office of Special Investigations. (Arko Decl., Ex. V (Bisogna Ltr.) (Dkt. No. 253-22)) Under the Collective Bargaining Agreement, the five-day period between March 22, 2019 and March 27, 2019 would be excluded from the 60-day period, because investigations of sexual misconduct by SCI are not subject to the 60-day period.

In sum, the evidence shows that once the excluded time periods set forth in the Collective Bargaining Agreement are applied – whether school recess, holidays, or days in which sexual misconduct allegations were under investigation by SCI – DOE did not violate the 60-day limit set forth in the Collective Bargaining Agreement for preferring charges or returning Oliver to his previous assignment. Because DOE did no more than apply its reasonable disciplinary procedures – as set forth in the Collective Bargaining Agreement – Oliver has not proffered evidence sufficient to create a material issue of fact as to whether he suffered an adverse employment action for purposes of his Section 1983, Title VII, and NYSHRL discrimination claims. See Brown, 673 F.3d at 150; Joseph, 465 F.3d at 92 n.1. Accordingly, Defendants are entitled to summary judgment on these claims.

**b. Inference of Discrimination**

In seeking summary judgment on Plaintiff's Section 1983, Title VII, and NYSHRL discrimination claims, Defendants also argue that Oliver has not proffered either direct

or circumstantial evidence supporting an inference of racial discrimination.[22] (Def. Sum. J. Br. (Dkt. No. 238) at 26-30) In response, Oliver contends that discriminatory intent can be inferred because certain "similarly situated" White male teachers "received more favorable treatment." (Pltf. Opp. Br. (Dkt. No. 245) at 18)

For Oliver's Section 1983, Title VII, and NYSHRL discrimination claims to survive summary judgment, he must show that he suffered an adverse employment action in circumstances giving rise to an inference of discrimination. As discussed above, Oliver has not offered evidence sufficient to demonstrate that he suffered an adverse employment action. But even if Oliver had proffered such evidence, these claims would still fail, because Oliver has not shown that any such adverse employment action took place in circumstances giving rise to an inference of discriminatory intent.

A discrimination plaintiff may demonstrate discriminatory intent by "showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group.'" Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). "To

---

[22] In asserting that "[t]here is no direct evidence supporting an inference of race discrimination," Defendants address (1) "Estwick's alleged comment in early 2012 that plaintiff was an 'affirmative action hire'" (Def. Sum. J. Br. (Dkt. No. 238) at 26; FAC (Dkt. No. 195) ¶ 53); (2) the panel's findings in the 2015 arbitration decision (id. at 27); and (3) Oliver's claim in the FAC that Defendants were "motivated by 'stereotyping of Black men as predators.'" (Id. at 28 (quoting FAC (Dkt. No. 195) ¶ 59)).

In his opposition brief, Oliver does not respond to Defendants' argument that there is no direct evidence of discriminatory intent. Accordingly, any argument that the above matters constitute direct evidence of discriminatory intent is deemed abandoned. See Senno v. Elmsford Union Free School Dist., 812 F.Supp.2d 454 (S.D.N.Y. 2011) ("Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument.").

Moreover, for the reasons set forth above, the Court will not rely on the arbitration decision as evidence that Oliver suffered harassment or other unfair treatment at Tompkins prior to 2014. See Park W Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 329-30 (S.D.N.Y. 2009).

establish an inference of discriminatory intent through disparate treatment, a plaintiff must allege that '[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself].'" Kunik v. N.Y.C. Dep't of Educ., 436 F.Supp.3d 684, 697 (S.D.N.Y. 2020) (quoting Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000))). "'An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.'" (Id. (quoting Abdul-Hakeem v. Parkinson, 523 F. App'x 19, 21 (2d. Cir 2013) (summary order) (quoting Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010))).

"Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." Mandell, 316 F.3d at 379. "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001). To survive summary judgment, plaintiff must at least "provide 'an objectively identifiable basis for comparability' between h[im]self and other employees." Goldman v. Admin. for Children's Serv., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *7 (S.D.N.Y. May 29, 2007) (citation omitted).

Here, the FAC alleges that "Oliver was subject to disparate treatment compared to [three White male teachers]," which the FAC refers to as "White Teacher Nos. 1, 2, and 3." (FAC (Dkt. No. 195) ¶¶ 143-56)) The record before this Court indicates that White Teacher No.

2 and White Teacher No. 3 are the same person.[23] Accordingly, the Court addresses only White Teacher No. 1 and White Teacher No. 2 as comparators.

**i. White Teacher No. 1**

According to an Office of Special Investigations ("OSI") report dated November 6, 2017, that office "received referrals from the Special Commissioner of Investigations ('SCI') concerning the conduct of [Estwick and White Teacher No. 1]." (Arko Decl., Ex. DD (OSI Report) (Dkt. No. 236-30) at 11) "An anonymous complainant" reported that

- On an unknown date, in either April or May 2017, [White Teacher No. 1] put tape on Student A's mouth during class and told her to shut up.
- [White Teacher No. 1] grabbed Students B, C, and an unidentified female student and told them that they "need to gain weight."
- [White Teacher No. 1] was verbally abusive to students, especially Student D; no further details were provided.
- Principal Estwick was aware of the foregoing incidents and failed to report [White Teacher No. 1's] actions.

(Id.) An OSI investigator later interviewed Student C, who said that White Teacher No. 1 had instructed her to move chairs in the classroom, and had remarked that doing so "would give her muscles 'on those things you call arms.'" (Id. at 11-12) Student C denied that White Teacher No. 1 had ever "grabbed" her. (Id. at 12)

---

[23] The FAC alleges that during the 2017-2018 school year G.C. made accusations of misconduct against White Teacher No. 2. (FAC (Dkt. No. 195) ¶ 149) At deposition, G.C. identified White Teacher No. 2 as Ulysses Soto. (Foti Decl., Ex. 9 (G.C. Dep.) (Dkt. No. 244-9) at 16-17) With respect to White Teacher No. 3, the FAC alleges that he "inappropriately touched [a] student and made the student feel uncomfortable." (FAC (Dkt. No. 195) ¶ 153) In support of this allegation, Oliver cites a complaint filed with the Office of Equal Opportunity, which names Soto as the offending teacher. (Pltf. R. 56.1 Resp. (Dkt. No. 246) ¶ 166; Foti Decl., Ex. Y (Comparator Discovery) (Dkt. No. 247-32) at 118) Accordingly, White Teacher No. 2 and White Teacher No. 3 are the same person.

On October 5, 2017, the OSI investigator interviewed Principal Estwick regarding the anonymous complaints regarding White Teacher No. 1.

> Principal Estwick stated that he had heard of [Student A's] allegation "through the grapevine" and so he questioned [White Teacher No. 1] about it. [White Teacher No. 1] explained to him that he was just joking with Student A and that the student was not upset about it. Principal Estwick then contacted [Student A's mother], who had already been informed of the matter by Student A. [Student A's mother] stated that Student A informed her that [White Teacher No. 1] was simply joking and added that her family has a close, friendly relationship with [White Teacher No. 1]. Principal Estwick stated that he had informed [White Teacher No. 1] that his actions were "inappropriate"; however, he did not discipline [White Teacher No. 1] or report the incident because [Student A's] mother stated that she did not wish to pursue the matter. The principal stated that, in retrospect, he should have filed an Online Occurrence Reporting System ("OORS") entry for the incident.

(Id. at 13)

> Principal Estwick also recalled speaking to [Student B's mother] about [White Teacher No. 1] being "too aggressive in his manner" and for his inappropriate comments to Student B, however, Principal Estwick could not recall [Student B's mother] alleging that [White Teacher No. 1]'s comments concerned Student B's weight or appearance. Principal Estwick further stated that he did not believe that the comments reported to him constituted any misconduct, and so he did not believe that the information had to be reported or documented.

(Id.)

> Principal Estwick stated that he spoke to [Student C's mother] about [White Teacher No. 1] instructing Student C to remain after class to stack chairs and making a "muscle" comment to Student C, but the principal could not recall the exact works that [Student C's mother] used to described the comment. Principal Estwick further stated he mediated a meeting between [White Teacher No. 1] and Student C, during which [White Teacher No. 1] apologized to Student C for upsetting her.

(Id.) Lastly, Estwick was "unaware of any verbal abuse allegation against [White Teacher No. 1] concerning Student D." (Id.)

Two "letters to file for professional misconduct" were issued against White Teacher No. 1 on May 26, 2017, and December 11, 2017, for having inappropriate interactions

with students. Neither incident involved sexual misconduct. (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 175 (citing Arko Decl., Ex. DD (OSI Report) (Dkt. No. 236-30) at 9-10, 22-23, 25-26))

White Teacher No. 1 was not administratively reassigned pending an investigation into his conduct. (See Def. R. 56.1 Stmt. (Dkt. No. 237) ¶¶ 164-75)

**ii. White Teacher No. 2**

The FAC alleges that "[d]uring the 2017-2018 academic year, the year before G.C. made false accusations about Mr. Oliver, G.C. made almost the exact same allegation about [White Teacher No. 2,] who was G.C.'s advisor." (FAC (Dkt. No. 195) ¶ 149) According to the FAC, "G.C. claimed that White Teacher No. 2 inappropriately rubbed against her." (Id.) "G.C. subsequently complained to [the School], requesting that White Teacher No. 2 no longer serve as her advisor." (Id.)

G.C. was asked at deposition whether White Teacher No. 2 "ever ma[d]e [her] uncomfortable," however, and she answered, "[n]o." (Foti Decl., Ex. 9 (G.C. Dep.) (Dkt. No. 244-9) at 16) When asked whether it was true that G.C. "complained about [White Teacher No. 2] making [her] uncomfortable in sixth grade and that's why [G.C.'s] advisory was changed," G.C. explained that "[she] just didn't like [White Teacher No. 2] so [she] just switched"; that she "found [White Teacher No. 2] annoying"; and that she generally preferred her new advisor. (Id. at 16-17) When asked whether White Teacher No. 2 ever "[did] anything to you that you would describe as perverted," G.C. answered, "[n]o." (Id. at 132)

On March 5, 2018, OSI referred a complaint of sexual harassment regarding White Teacher No. 2 – which had been filed on behalf of an eighth-grade student – to the Office of Equal Opportunity. (Foti Decl., Ex. Y (Comparator Discovery) (Dkt. No. 247-32) at 117-18) This student alleged that, in approximately February 2018, White Teacher No. 2 made the student feel "uncomfortable" because he was "staring" and "looking at her weird" during a

school dance. (Id. at 118) According to an Office of Equal Opportunity report, the investigation was closed on September 25, 2018. (Id.)

White Teacher No. 2 was not administratively reassigned pending an investigation into his conduct. (See Def. R. 56.1 Stmt. (Dkt. No. 237) ¶¶ 164-75)

### iii. Analysis

Oliver is not similarly situated to either White Teacher No. 1 or White Teacher No. 2.

Oliver was arrested at Tompkins in view of students and faculty (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 102) after (1) G.C. reported his conduct to her mother; (2) G.C.'s mother called 911; (3) police officers responding to the 911 call interviewed G.C. and her mother at the School; and (4) police officers concluded that G.C.'s allegations against Oliver provided grounds to arrest him. Testagrose v. N.Y.C Hous. Auth., 369 F. App'x 231, 232 (2d Cir. 2010) (summary order)) indicates that an arrest of this sort can be an important factor in conducting the "similarly situated" analysis.

In Testagrose, plaintiff was terminated by the New York City Housing Authority after her arrest for weapons possession, drug possession, and criminal mischief. Plaintiff brought a Section 1983 claim against the New York City Housing Authority alleging that her termination was the result of discriminatory animus. "To show discriminatory animus, Testagrose primarily relied on evidence" "that she was disciplined more harshly than other similarly situated male caretakers." Testagrose, 369 F. App'x at 231. The Second Circuit affirmed the district court's ruling that the alleged comparators were not "similarly situated," finding that "[t]he individuals Testagrose identifies as comparators either were not arrested or were arrested for less serious offenses." Id. at 232. Given that Oliver was arrested at the School – prior to the DOE's decision to reassign and investigate him – Oliver was not "similarly situated in all material respects" to

White Teacher No. 1 and White Teacher No. 2, who were never arrested. See Kunik, 436 F.Supp.3d at 697; Testagrose, 369 F. App'x at 231.[24]

Rubert v. King, No. 19-CV-2781 (KMK), 2020 WL 5751513 (S.D.N.Y. Sept. 25, 2020) is instructive here. In that case, plaintiff – a Puerto Rican Walmart employee – "engaged in a 'confrontation'" with another Walmart employee in the store's parking lot. Id. at *2. "The altercation and arrest led to [p]laintiff's termination by Walmart and his conviction in [state court]." Id. Plaintiff then brought Section 1981, Title VII, and NYSHRL claims against Walmart alleging that his termination was the result of discriminatory animus. In concluding that the alleged comparator – a White Walmart employee – was not similarly situated, the court noted that

> while the [ ] confrontation [in the parking lot] led to Plaintiff's arrest and conviction, Plaintiff has alleged nothing remotely similar with respect to [the White employee]. An employee who has been arrested for and convicted of assault on or near the workplace premises is not similarly situated to an employee who was not arrested or convicted for assault.

Id. at *8 (internal citation omitted).

---

[24] There are other distinctions between Oliver and the alleged comparators. As to White Teacher No. 1, the allegations against him or her were premised on an anonymous complaint (Arko Decl., Ex. DD (OSI Report) (Dkt. No. 236-30) at 11), whereas here Estwick and other DOE employees heard directly from G.C. Moreover, none of the allegations against White Teacher No. 1 involved inappropriate touching with sexual or romantic overtones. (See id.) Finally, Estwick was not able to substantiate most of the anonymous complainant's allegations. (See id. at 13) For example, Student A's mother stated that White Teacher No. 1 was a family friend and viewed White Teacher No. 1's conduct as "simply joking." She asked Estwick not to pursue the matter. (See id. at 12) By contrast, G.C.'s mother contacted 911. Similarly, Student C denied the anonymous complainant's allegation that White Teacher No. 1 had "grabbed" her. (See id.) In sum, Estwick's investigation of White Teacher No. 1 did not indicate that reassignment or other discipline was appropriate.

As to White Teacher No. 2, G.C.'s allegations against this teacher did not include comments of a sexual or romantic nature. And the March 5, 2018 complaint against White Teacher No. 2 – that he or she stared at the student at a school dance (Foti Decl., Ex. Y (Comparator Discovery) (Dkt. No. 247-32) at 117-18) – is not comparable to the misconduct Oliver allegedly engaged in.

In sum, Oliver has not shown that his "employer treated [him] 'less favorably than a similarly situated employee outside his protected group,'" and therefore he has not established a prima facie case of discrimination under Section 1983, Title VII, or the NYSHRL. See Mandell, 316 F.3d at 379.

### 2. Oliver's NYCHRL Discrimination Claim

To establish a prima facie case of discrimination under the NYCHRL, Oliver "need only 'show differential treatment – that [he] was treated "less well" – because of a discriminatory intent.'" Livingston, 563 F.Supp.3d at 234. As under federal and state law, however, "[t]o allege disparate treatment pursuant to the . . . NYCHRL[] a plaintiff has to show that the coworker comparators are similarly situated to the plaintiff in all material respects." Moukdad v. NYU Langone Health Sys., 2026 WL 774270, at *6 (S.D.N.Y. Mar. 18, 2026). For the reasons stated above, Oliver has not proffered evidence sufficient to demonstrate that there is a material issue of fact as to whether the alleged comparators are similarly situated to him in all material respects. Accordingly, Oliver has not established an inference of discrimination under the NYCHRL.

* * * *

Because Oliver has not proffered evidence sufficient to establish an inference of discrimination under Section 1983, Title VII, the NYSHRL, and the NYCHRL, Defendants are entitled to summary judgment on his race discrimination claims brought under these statutes (FAC (Dkt. No. 195) Counts Five, Eight, Fourteen, and Seventeen).

## V. HOSTILE WORK ENVIRONMENT CLAIMS

Oliver contends that the DOE subjected him to a hostile work environment in violation of Title VII, the NYSHRL, and the NYCHRL. (FAC (Dkt. No. 195) ¶¶ 194-97, 241-

46, 261-66) Oliver further contends that Estwick subjected him to a hostile work environment in violation of Section 1983, the NYSHRL, and the NYCHRL. (Id. ¶¶ 209-12, 241-46, 261-66)

Defendants have moved for summary judgment on Oliver's hostile work environment claims on the grounds that (1) Oliver "is barred from relying on any purportedly hostile acts predating the General Release as constituting part [of] his hostile work environment claims in this action"; (2) "[t]o the extent [P]laintiff claims his arrest was part of a hostile work environment, it is undisputed that no one from DOE caused that event"; and (3) "[t]o the extent [P]laintiff alleges other acts that occurred after he signed the General Release constitute a hostile work environment . . . [Oliver] has not developed any evidence that they were motivated by discriminatory animus aside from Estwick's alleged 2012 stray comment." (Def. Sum. J. Br. (Dkt. No. 238) at 36, 38)

Oliver responds that "[t]o the extent that [he] refers to acts that occurred before 2019, or that were the basis for his 2017 action, it is to provide an historical context for the current action and to demonstrate how these acts created the overall environment in which he worked at the time of G.C.'s allegations in 2019." (Pltf. Opp. Br. (Dkt. No. 245) at 26) As evidence of a hostile work environment, Oliver cites the following:

> (1) an unlawful and humiliating public arrest at [Tompkins]; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there for two and a half months; (4) being unable to transfer to a different DOE school or participate in per session activities due to his reassignment, which resulted in a loss of additional income; (5) having an email sent to [Tompkins] parents regarding reassignment to the Rubber Room, (6) receiving a disciplinary letter, which prevented Mr. Oliver from transferring to a different DOE school; (7) having his reassignment to the Rubber Room permanently listed on his DOE employment records; and (8) refusal from Defendant Estwick to remove outdated counseling and disciplinary letters from his file.

(Id. at 26-27) As with his discrimination claims, Oliver argues "the record clearly establishes that Mr. Oliver was treated less-well than his White peers." (Id. at 27)

### A. Applicable Law

#### 1. Hostile Work Environment Claims Under Section 1983, Title VII, and the NYSHRL

"'A custom or policy of harassment and other discriminatory acts giving rise to hostile work environment claims can form the basis of [S]ection 1983 claims.'" Chislett v. N.Y.C. Dep't of Educ., 157 F.4th 172, 187 (2d Cir. 2025) (quoting Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 62 (2d Cir. 2014)). Similarly, under Title VII and the NYSHRL a plaintiff may bring an action for "discriminatory conduct that manifests itself in a hostile working environment." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 151 n.6 (2d Cir. 2014) ("Claims under the New York Human Rights Law are 'generally governed by the same standards as federal claims under Title VII.'") (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006)).

To establish a hostile work environment claim under Section 1983, Title VII, and the NYSHRL, "a plaintiff must demonstrate that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" Guzman v. City of N.Y, 93 F.Supp.3d 248, 263 (S.D.N.Y. 2015) (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotation marks omitted)). "'This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.'" Bentley v. AutoZoners, LLC, 935 F.3d 76, 90 (2d Cir. 2019) (quoting Raspardo, 770 F.3d at 114).

"Additionally, the plaintiff must establish that the hostile work environment was due to [his] protected characteristic." Chislett, 157 F.4th at 187; see also Guzman 93 F.Supp.3d

at 263 ("a plaintiff bringing a hostile work environment claim must demonstrate that the hostile conduct at issue was carried out because of [his] membership in a protected class") (emphasis in original). An inference of such discriminatory intent "may be derived from a variety of circumstances, including, 'invidious comments about others in the employee's protected group,' or 'the more favorable treatment of employees not in the protected group.'" Dodd v. My Sisters' Place, Inc., No. 21 CV 10987 (VB), 2024 WL 3028474, at *11 (S.D.N.Y. June 17, 2024) (quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)). At summary judgment, "a plaintiff must introduce evidence of hostile conduct that a reasonable juror could find was a result of the plaintiff's membership in a protected class." Gore v. RBA Grp., Inc., No. 03-CV-9442 (KMK) JCF, 2008 WL 857530, at *6 (S.D.N.Y. Mar. 31, 2008) (citing Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999)).

"As a general rule, [allegedly hostile] incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). "[A] plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of her working environment.'" Alfano, 294 F.3d at 374 (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) and Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). "'The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean[, however,] that employers are free from liability in all but the most egregious of cases,'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000) (quoting Torres v. Pisano, 116 F.3d 625, 631 (2d Cir.

1997)), and the Second Circuit has "cautioned against setting the bar too high." Terry, 336 F.3d at 148.

"In assessing whether a plaintiff has met [his] burden, 'courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" Belton v. City of New York, No. 12 Civ. 6346 (JPO), 2014 WL 4798919, at *8 (S.D.N.Y. Sept. 26, 2014) (alterations in original) (quoting Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014)).

**2. Hostile Work Environment Claims Under the NYCHRL**

"Under the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims; rather, 'there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based [on a protected characteristic].'" Clarke v. InterContinental Hotels Grp., PLC, No. 12 Civ. 2671 (JPO), 2013 WL 2358596, at *11 (S.D.N.Y. May 30, 2013) (quoting Sotomayor v. City of New York, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012)). In order to prevail on a hostile work environment claim under the NYCHRL, a plaintiff "'need only demonstrate by a preponderance of the evidence that [he] has been treated less well than other employees' because of a protected trait." Johnson v. Strive E. Harlem Emp. Grp., 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (quoting Mihalik, 715 F.3d at 110). That is, "the plaintiff need only show differential treatment – that [he] is treated 'less well' – because of a discriminatory intent." Mihalik, 715 F.3d at 110. Moreover, "[t]he NYCHRL imposes liability for harassing conduct that does not qualify as 'severe or pervasive,' and 'questions of "severity" and "pervasiveness" are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability.'" Bermudez v. City of New York, 783 F. Supp. 2d 560,

579 (S.D.N.Y. 2011) (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 76 (1st Dept. 2009)). As noted above, however, "[w]hen applying this standard . . . district courts must be mindful that the NYCHRL is not a 'general civility code.'" Mihalik, 715 F.3d at 110 (quoting Williams, 61 A.D.3d at 79).

**B. Analysis**

To establish a prima facie case of hostile work environment, Oliver must proffer evidence supporting an inference of discriminatory intent. In seeking to demonstrate discriminatory intent, Oliver contends that he "was treated less-well than his White peers." (Pltf. Opp. Br. (Dkt. No. 245) at 27) As discussed above in connection with Oliver's discrimination claims, however, he was not "similarly situated in all material respects" to White Teacher No. 1 and White Teacher No. 2 because, inter alia, White Teacher No. 1 and White Teacher No. 2 were not the subject of a 911 call by a child's parent and were not arrested on School property by the NYPD. See Kunik, 436 F.Supp.3d at 697; Testagrose, 369 F. App'x at 231; Rubert, 2020 WL 5751513, at *8. Because Oliver has not proffered sufficient evidence to establish an inference of discrimination, he cannot sustain a hostile work environment claim under Section 1983, Title VII, the NYSHRL, or the NYCHRL. See Mihalik, 715 F.3d at 110.

Accordingly, Defendants are entitled to summary judgment on Oliver's hostile work environment claims under Section 1983, Title VII, the NYSHRL, and the NYCHRL (FAC (Dkt. No. 195) Counts Six, Nine, Fifteen, and Eighteen).

**VI. RETALIATION CLAIMS**

Oliver asserts Title VII, NYSHRL, and NYCHRL retaliation claims against the DOE (FAC (Dkt. No. 195) ¶¶ 198-204, 247-54, 267-75), and Section 1983, NYSHRL, and NYCHRL retaliation claims against Estwick. (Id. ¶¶ 213-19, 247-54, 267-75)

The parties have cross-moved for summary judgment on Oliver's retaliation claims under Title VII, the NYSHRL, and the NYCHRL.[25] (Pltf. Sum. J. Br. (Dkt. No. 242) at 18-24; Def. Sum. J. Br. (Dkt. No. 238) at 40-48) Defendants have also moved for summary judgment on Oliver's Section 1983 retaliation claim against Estwick. (Def. Sum. J. Br. (Dkt. No. 238) at 48-49)

### A. Applicable Law

#### 1. Retaliation Claims Under Section 1983, Title VII, and the NYSHRL

"Federal and state law retaliation claims are reviewed under the burden-shifting approach of McDonnell Douglas." Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013). To establish a prima facie case of retaliation under Section 1983, Title VII, and the NYSHRL, a plaintiff must show "1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" Kwan, 737 F.3d at 844 (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)); see also Owens v. City of New York Dep't of Educ., 17-Cv-519 (SHS), 2021 WL 3862974, at *15 (S.D.N.Y. Aug. 30, 2021) ("[T]he elements of a prima facie case of retaliation [under Section 1983, the ADA, Title VII, the NYSHRL, and the NYCHRL] are essentially the same"); Emanuel v. City of New York, 23-CV-2980 (JMF), 2024 WL 3638328, at *6 (S.D.N.Y. Aug. 2, 2024) ("[T]he elements required for a prima facie case of retaliation under Section 1983 are the same as those required under Title VII.") (citing Littlejohn,795 F.3d at 312).

For purposes of a retaliation claim, a "protected activity" is an "action taken to protest or oppose statutorily prohibited discrimination." Garrison v. Am. Sugar Refin., Inc., 789

---

[25] Oliver does not substantively address his Section 1983 retaliation claim in his moving brief. (See Pltf. Sum. J. Br. (Dkt. No. 242) at 18-24)

F.Supp.3d 291, 309 (S.D.N.Y. 2025) (quoting Jarrell v. Hosp. for Special Care, 626 F. App'x 308, 311 (2d Cir. 2015) (summary order)). "[C]omplaints of unfair treatment or 'generalized grievances about an unpleasant or even harsh work environment, without more[,] . . . fail to rise to the level of protected activity.'" Id. (quoting Green v. Mount Sinai Health Sys., Inc., 826 F. App'x 124, 125 (2d Cir. 2020) (summary order)). "[P]rotected activity" includes "[formal] . . . as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990); see also Knox v. CRC Mgmt. Co., LLC, 134 F.4th 39, 49 (2d Cir. 2025) ("'[M]aking complaints to management' about workplace discrimination qualifies as protected activity") (citation omitted)).

For purposes of a Section 1983, Title VII, or NYSHRL retaliation claim, an "adverse employment action" is an act that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006) (quotations omitted). The adverse action at issue "need not affect the terms and conditions of a plaintiff's employment." Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 720 n.6 (2d Cir. 2010).

A causal connection between the protected activity and the adverse employment action must be shown. Causation at the prima facie case stage "can be established either (1) 'directly, through evidence of retaliatory animus' toward the plaintiff, or (2) 'indirectly,' through 'circumstantial evidence.'" Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 239 (2d Cir. 2024) (quoting Hicks, 593 F.3d at 170). For purposes of establishing a prima facie case, it is sufficient for plaintiff to "'show[] that the protected activity was closely followed in time by the adverse

employment action.'" Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 131 (2d Cir. 2012) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010)).

In determining whether the necessary temporal proximity is present, "courts in this circuit have typically measured that gap as a matter of months, not years." Id. at 131. Indeed, "most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference," James v. N.Y.C. Health + Hosps. Corp. Off. of Legal Affs. Claims Div., 23 Civ. 1206 (PGG) (OTW), 2025 WL 959093, at *19 (S.D.N.Y. Mar. 31, 2025) (quoting De Figueroa v. New York, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) (citing Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 503-04 (S.D.N.Y. 2010) (collecting cases)). However, the Second Circuit has stated on multiple occasions "'that five months is not too long to find the causal relationship.'" Rasmy v. Marriott Int'l, 952 F.3d 379, 391, 391 n.59 (2d Cir. 2020) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010)).

Where a plaintiff has established a prima facie case of retaliation, "the burden shifts to the employer to put forth evidence of a non-retaliatory rationale." Cox v. Onondaga Cnty. Sheriff's Dep't, 760 F.3d 139, 145 (2d Cir. 2014) (citing Holt v. KMI-Continental, 95 F.3d 123, 130 (2d Cir. 1996)). Where the employer does so, "'the presumption of retaliation dissipates' . . . and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015) (quoting Jute, 420 F.3d at 173 and Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013)).

"'Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial.'" Colon v. N.Y.C. Hous. Auth., No. 16-CV-4540 (VSB),

2021 WL 2159758, at *13 (S.D.N.Y. May 26, 2021) (quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)); see also Dortz v. City of New York, 904 F. Supp. 127, 148 (S.D.N.Y. 1995) ("Where a Title VII defendant's intent is at issue, summary judgment is generally inappropriate."); MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 557 (S.D.N.Y. 2012) ("The issue of intent in a discrimination case presents a classic jury question.").

The Second Circuit has, however, made "clear that temporal proximity 'alone is insufficient to defeat summary judgment at the pretext stage.'" Carr v. N.Y.C. Transit Auth., 76 F.4th 172, 182 (2d Cir. 2023) (affirming grant of summary judgment on Title VII, ADEA, and Section 1981 retaliation claims) (quoting Kwan, 737 F.3d at 847; see also Fletcher v. ABM Bldg. Value, 775 F. App'x 8, 14 (2d Cir. 2019) (summary order) ("Although the termination came close in time to [plaintiff's] protected activity, '[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage.'") (quoting Kwan, 737 F.3d at 847). To show pretext at the summary judgment stage, a plaintiff must supplement temporal proximity with "other evidence." Kwan, 737 F.3d at 847. "Absent other evidence, no factfinder could reasonably determine that [plaintiff's] protected activities were the but-for cause of [the adverse employment action]." Carr, 76 F.4th at 182. Evidence of pretext can include "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action," such that "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Kwan, 737 F.3d at 846.

Consistent with this precedent, district courts in this Circuit considering a pretext argument in connection with a retaliation claim routinely grant defendants summary judgment where plaintiff has alleged nothing more than temporal proximity. See, e.g., Hahn v. Bank of Am. Inc., No. 12 Civ. 4151(DF), 2014 WL 1285421, at *21 (S.D.N.Y. Mar. 31, 2014) (granting

summary judgment on retaliation claim where plaintiff did not "point to any weaknesses, implausibilities, inconsistencies, or contradictions in [d]efendant's proffered reasons for her termination"); Carr v. N.Y.C. Transit Auth., No. 16-CV-9957 (VSB), 2022 WL 824367, at *11 (S.D.N.Y. Mar. 18, 2022), aff'd, 76 F.4th 172 (2d Cir. 2023) (granting defendant summary judgment on retaliation claim where alleged inconsistencies were "not actually inconsistencies, much less ones suggesting that [d]efendants ever considered race or gender or age in not promoting [p]laintiff"); Hongmian Gong v. City Univ. of New York, No. 18 CIV. 3027 (LGS), 2020 WL 1467353, at *4 (S.D.N.Y. Mar. 25, 2020), aff'd sub nom. Gong v. City Univ. of New York, 846 F. App'x 6 (2d Cir. 2021) (same); Kunzler v. McDonough, No. 19-CV-07181(JS)(ARL), 2024 WL 197927, at *14 (E.D.N.Y. Jan. 18, 2024) (granting defendant summary judgment on retaliation claim where plaintiff provided "no other circumstantial or direct evidence" for pretext "other than temporal proximity"); Turner v. NYU Hosps. Ctr., 784 F. Supp. 2d 266, 277-78 (S.D.N.Y. 2011), aff'd, 470 F. App'x 20 (2d Cir. 2012) (same; noting that plaintiff "ha[d] not identified an inconsistency" suggesting pretext); Naemit v. Vill. of Spring Valley, No. 20 CIV. 1882 (JCM), 2022 WL 1443675, at *12 (S.D.N.Y. May 6, 2022) (same; "[p]laintiff has not produced any evidence suggesting that this stated reason for the role's discontinuance was false").

### 2. Retaliation Claims Under the NYCHRL

"A retaliation claim under the NYCHRL must be analyzed 'separately and independently' from state and federal discrimination claims, as the NYCHRL's provisions are 'uniquely broad.'" Stanley v. Mount Sinai Health Sys., Inc., 21-CV-4619 (VEC), 2023 WL 8355393, at *13 (S.D.N.Y. Dec. 1, 2023) (quoting Mihalik, 715 F.3d at 110); see also McHenry v. Fox News Network, LLC, 510 F.Supp.3d 51, 67 (S.D.N.Y. 2020) ("Retaliation claims under the NYCHRL are subject to a broader standard than under the NYSHRL and Title VII." (citing

Dodd v. City Univ. of N.Y., 489 F.Supp.3d 219, 268 (S.D.N.Y. 2020))). "Otherwise, a prima facie case of retaliation faces the same requirements under the NYCHRL as under the NYSHRL." Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012) (citing Rozenfeld v. Dep't of Design & Constr. of City of New York, 875 F. Supp. 2d 189, 208 (E.D.N.Y. 2012)).

In contrast to federal anti-discrimination statutes, "the NYCHRL does not require a plaintiff to show but-for causation." Enechi v. City of New York, 20 Civ. 8911 (AT), 2023 WL 6293941, at *9 (S.D.N.Y. Sept. 27, 2023) "Instead, 'summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision.'" Id. (citing Mihalik, 715 F.3d at 116 (2d Cir. 2013)).

### B. Oliver's Motion for Summary Judgment on His Retaliation Claims

In moving for summary judgment, Oliver contends that he has demonstrated as a matter of law that the DOE and Estwick retaliated against him for filing the 2017 Discrimination Lawsuit. (Pltf. Sum. J. Br. (Dkt. No. 242) at 20)

#### 1. Prima Facie Case

##### a. Protected Activity

Although the parties do not dispute that Oliver engaged in protected activity when he filed the 2017 Discrimination Lawsuit (Def. Opp. Br. (Dkt. No. 251) at 15), they disagree as to whether his protected activity includes the entirety of that litigation and the December 27, 2018 settlement. Oliver contends that his protected activity includes the entirety of that litigation and the resulting settlement (Pltf. Sum. J. Br. (Dkt. No. 242) at 20),[26] while Defendants – in

[26] Although Defendants assert that "Plaintiff alleges he engaged in four protected activities: [p]ursuing an arbitration proceeding in 2014; making an [Office of Equal Opportunity] complaint in 2014; making an EEOC complaint on June 1, 2018; and pursuing his 2017 lawsuit" (Def.

asserting that there is no temporal proximity between Oliver's protected activity and the adverse employment actions he cites – argue that Oliver's only protected activity occurred in 2017 when he filed his discrimination lawsuit. (Def. Opp. Br. (Dkt. No. 251) at 15-16)

In opposing Defendants' motion to dismiss, Oliver argued "that litigating, including settling, his previous legal action is protected activity for the purposes of a retaliation claim." Oliver v. City of New York, 19-CV-11219 (PGG) (JLC), 2022 WL 455851, at *25 (S.D.N.Y. Feb. 15, 2022), report and recommendation adopted in part by, Oliver I, 2023 WL 2160062. This Court found no clear error in Magistrate Judge Cott's conclusion that the "settlement of a previous claim can constitute a protected activity for the purposes of a retaliation claim," and that "Oliver therefore participated in protected activity when he settled the [2017 Discrimination Lawsuit] on December 27, 2018." Oliver I, 2023 WL 2160062, at *22 (quoting Oliver, 2022 WL 455851, at *26). Because the parties had a full and fair opportunity to litigate the scope of protected activity at the motion to dismiss stage, and because this Court expressly resolved the issue in Oliver I, Defendants' argument that Oliver's only protected activity occurred in 2017 is barred by the law of the case doctrine.[27] See Pure Power Boot Camp, Inc. v.

Sum. J. Br. (Dkt. No. 238) at 41 (internal citations omitted)), Oliver discusses only one alleged "protected activity" in his briefing: the 2017 Discrimination Lawsuit. (Pltf. Sum. J. Br. (Dkt. No. 242) at 20; Pltf. Opp. Br. (Dkt. No. 245) at 31-32)

27 "The doctrine of the law of the case posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." Aramony v. United Way of Am., 254 F.3d 403, 410 (2d Cir. 2001); accord Novick v. AXA Network, LLC, 714 Fed. App'x 22, 25 (2d Cir. 2017). "Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." Aramony, 254 F.3d at 410; accord In re Terrestar Corp., 16 Civ. 1421, 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017). "Although not binding, the doctrine 'counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new

Warrior Fitness Boot Camp, LLC, 759 F.Supp.2d 417, 424 n.5 (S.D.N.Y. 2010) ("A Report and Recommendation prepared by a magistrate judge and adopted by a district judge, constitutes the law of the case for all issues addressed in the report.") (collecting cases). Accordingly, Oliver's protected activity continued through the December 27, 2018 settlement.

**b. Knowledge of the Protected Activity**

The parties do not dispute that the DOE and Estwick had knowledge of the 2017 Discrimination Lawsuit and the December 27, 2018 settlement. (See Pltf. R. 56.1 Resp. (Dkt. No. 246) ¶ 6)

**c. Alleged Adverse Employment Actions**

The FAC alleges that Oliver suffered the following "adverse employment actions" as a result of the protected activity in which he engaged:

> (1) . . . an unlawful and humiliating public arrest at [Tompkins]; (2) being the subject of an unwarranted investigation; (3) being reassigned to the Rubber Room to sit and idle there between March 22 and June 7, 2019; (4) due to his reassignment to the Rubber Room, being unable to transfer to a different DOE school or participate in per session activities, which resulted in a loss of additional income; (5) having an email sent to [Tompkins] parents regarding reassignment to the Rubber Room; (6) receiving a disciplinary letter, which prevented Mr. Oliver from transferring to a different DOE school; (7) having his reassignment to the

---

> evidence, or the need to correct a clear error or prevent manifest injustice.'" Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 736 F.3d 198, 208 (2d Cir. 2013) (quoting Ali v. Mukasey, 529 F.3d 478, 490 (2d Cir. 2008)); accord Reches v. Morgan Stanley & Co. LLC, 736 Fed. App'x 306, 307 (2d Cir. 2018) (summary order). "The doctrine is properly applied only when the parties had a full and fair opportunity to litigate the initial determination." Hamlen v. Gateway Energy Servs. Corp., No. 16 Civ. 3526, 2018 WL 1568761, at *1 (S.D.N.Y. Mar. 29, 2018) (citing Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 219 (2d Cir. 2002)). The law of the case doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009); accord Tomasino v. Estee Lauder Companies, Inc., No. 13 Civ. 4692, 2015 WL 1470177, at *1 (E.D.N.Y. Mar. 31, 2015).

Esposito v. Gary, 18 Civ. 11245 (PGG) (OTW), 2025 WL 1786243, at *11 (S.D.N.Y. June 26, 2025) (quoting Chan Ah Wah v. HSBC N. Am. Holdings Inc., 15 Civ. 8974 (LGS), 2019 WL 859042, at *4 (S.D.N.Y. Feb. 22, 2019)).

> Rubber Room permanently listed on his DOE employment records; and (8) subjecting him to irreparable reputational damage.

(FAC (Dkt. No. 195) ¶¶ 202, 217, 250, 271)

In moving for summary judgment on his retaliation claims, Oliver cites a somewhat different assortment of alleged adverse employment actions:

> Estwick (1) encouraged multiple DOE investigations of Mr. Oliver, despite not conducting any investigation (or interviews) himself regarding G.C's allegations, (2) removed Mr. Oliver from his classroom and directed the NYPD to arrest Mr. Oliver in the main hallway, (3) emailed the entire [Tompkins] community about Mr. Oliver's reassignment, despite this being highly unprofessional, (4) sent a list of unsubstantiated allegations (dating as far back as 2011) to [Estwick's] supervisor, Defendant Mustillo, and (5) ultimately encouraged Mustillo to file a disciplinary letter in Mr. Oliver's file. Finally, despite multiple requests from Mr. Oliver per the UFT Collective Bargaining Agreement, Estwick refused to remove disciplinary letters from Mr. Oliver's file and caused counseling letters to be placed in his file contrary to the [Collective Bargaining Agreement].

(Pltf. Sum. J. Br. (Dkt. No. 242) at 24) Oliver also complains about "Estwick's inaction" prior to Oliver's arrest, including his (1) "refus[al] to meet with [G.C.'s mother] after she learned about [G.C.'s] complaint"; (2) "refus[al] to reassure [G.C.'s mother] that the school was taking action to investigate the complaint"; (3) failure to "inform the police officers about the actions the school had and <u>had</u> <u>not</u> taken to investigate the incident"; and (4) failure to "provid[e] any contextual details." (<u>Id.</u> at 21-22 (emphasis in original))

### i. <u>Adverse Actions Not Pled in FAC</u>

In moving for summary judgment, Oliver cites a number of alleged adverse employment actions not pled in the FAC, including Estwick's aforementioned "inaction" prior to Oliver's arrest; Estwick's transmission of "unsubstantiated allegations" to Deputy Superintendent Mustillo; Estwick's encouraging Mustillo to issue a disciplinary letter to Oliver; and Estwick's refusal to remove disciplinary and counseling letters from Oliver's DOE personnel file. (Pltf. Sum. J. Br. (Dkt. No. 242) at 21-22, 24)

As to Estwick's "inaction," the FAC pleads that Estwick played an active role in connection with the investigation and arrest of Oliver, including by "immediately reporting the Alleged Incident to G.C.'s parents and/or the NYPD, encouraging G.C. and her parents to report the Alleged Incident to the NYPD, and/or by encouraging the NYPD to arrest Mr. Oliver." (FAC (Dkt. No. 195) ¶ 78) The FAC makes no mention of Estwick's alleged transmission of "unsubstantiated allegations" to Mustillo, of his alleged encouragement to Mustillo to issue a disciplinary letter to Oliver, or of Estwick's alleged refusal to remove disciplinary and counseling letters from Oliver's personnel file.

It is "'well settled that a Court should not on summary judgment consider factual allegations and legal theories not raised in the complaint.'" Lopez v. Gap, Inc., 883 F.Supp.2d 400, 413 (S.D.N.Y. 2012) (quoting Brown v. Magistro, No. 10–CV–3705 (CS)(PED), 2011 WL 6399514, at *3 (S.D.N.Y. Dec. 20, 2011); see also Cardwell v. Davis Polk & Wardwell LLP, 1:19-cv-10256-GHW, 2023 WL 2049800, at *33 (S.D.N.Y. Feb. 16, 2023) (declining to consider an alleged adverse employment action in a retaliation case because the plaintiff "failed to raise it in his complaint") (citing, inter alia, Scott v. City of New York Dep't of Corr., 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009), aff'd sub nom. 445 F. App'x 389 (2d Cir. 2011)); Lee v. HealthFirst, Inc., No. 04 Civ. 8787 (THK), 2006 WL 177175, at *5 (S.D.N.Y. Jan. 25, 2006) ("It must be clear from a discrimination complaint 'what adverse employment action or actions serve as the basis for [a plaintiff's] . . . discrimination claim [thereby] giv[ing] fair notice in her complaint of the grounds upon which her claim that those actions were discriminatory rests.'") (quoting Galvez v. New York Mortg. Co., LLC, No. 05 Civ. 2365 (DLC), 2005 WL 2124112, at *2 (S.D.N.Y. Sept. 1, 2005)); Wolde-Meskel v. Argus Community, Inc., No. 99 Civ. 10112 (LMM), 2001 WL 883648, at *5 n.3 (S.D.N.Y. Aug. 7, 2001) ("Plaintiff alleges for the first time in his

[opposition to plaintiff's motion for summary judgment] that [defendant's] inaction in repairing or upgrading his computer in a timely fashion was an additional instance of discriminatory treatment. Because no such allegation was contained in plaintiff's complaint, the Court need not consider this alleged adverse employment action.") (internal citation omitted). Because Oliver did not allege in the FAC that the above conduct constitutes adverse employment actions, he may not do so now.

**ii. Adverse Employment Actions Pled in the FAC**

"For [Title VII] retaliation claims, the definition of adverse employment action is broader than for employment discrimination claims." Accely v. Con. Ed. Co. of N.Y., Inc., 19 Civ. 5984 (AT), 2022 WL 973415, at *12 (S.D.N.Y. Mar. 31, 2022) (quoting Hicks, 593 F.3d at 165). "The 'employer's action[ ] must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Burlington N. & Santa Fe Ry. Co., 548 U.S. at 57)). "Further, for retaliation claims, adverse employment actions must be 'considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable.'" Id. (quoting Hicks, 593 F.3d at 165 (quotation marks omitted). "The standard is the same under [the] NYSHRL." Id. (citing Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013).

Defendants concede in their opposition brief that Oliver's administrative reassignment constitutes an adverse employment action for purposes of his retaliation claims. (See Def. Opp. Br. (Dkt. No. 251) at 16 ("Plaintiff's attempt to show that adverse actions were taken against him after his arrest (other than his administrative reassignment) fails.")) Where – as here – a work reassignment involves significantly diminished responsibilities, the employee has suffered an adverse employment action for purposes of a retaliation claim. See Dinkins v.

Mayorkas, 2024 WL 1806174, at *10 (S.D.N.Y. Apr. 25, 2024) ("The reassignment of Plaintiff's work constitutes an adverse employment action for purposes of the retaliation claim."); New York ex rel. Khurana v. Spherion Corp., 511 F.Supp.3d 455, 478 (S.D.N.Y. 2021) ("To be sure, reassignment to a position with 'significantly diminished responsibilities' can constitute adverse employment action for purposes of a retaliation claim") (citation omitted).

As to Estwick, however, Plaintiff has not proffered evidence demonstrating that he played any role in the decision to reassign Oliver. To the contrary, the evidence shows that after Oliver's arrest the DOE Reassigned Staff Tracking Team sent an email to Estwick informing him that Oliver had been "administratively reassigned pending an investigation into allegations of employee misconduct." (Arlo Decl., Ex. T (Dkt. No. 236-20) Attached to the email is a letter to Oliver informing him that he has been reassigned. (Id.) The email directs Estwick to "give Mr. Oliver the attached letter and have him report to this office on Monday, March 25, 2019." (Id.) In sum, Oliver has not proffered evidence demonstrating that Estwick played any role in the decision to reassign Oliver.

As to the alleged "humiliating public arrest" (FAC (Dkt. No. 195) ¶¶ 202, 217, 250, 271), Oliver argues that Estwick "direct[ed] the NYPD to arrest Mr. Oliver in the main entryway of the school in front of teachers, parents, staff, and students." (Pltf. Sum. J. Br. (Dkt. No. 242) at 22) Defendants concede that "Estwick suggested a discrete location where police could effectuate their arrest of plaintiff." (Def. Opp. Br. (Dkt. No. 251) at 17) Indeed, Officer McLeod testified that the Arresting Officers "met [Oliver] in the front of the building . . . by the guidance of the principal." (Foti Decl., Ex. 24 (McLeod Dep.) (Dkt. No. 244-24) at 47) Defendants argue that Estwick's suggestion that the police arrest Oliver at the main entrance of the School does not amount to an adverse employment action. (Def. Opp. Br. (Dkt. No. 251) at

17) A reasonable jury could find, however, that Estwick's suggestion that the police arrest Oliver at the front entrance of the School – in front of teachers, parents, staff, and students – would "dissuade a reasonable worker from making or supporting a charge of discrimination." See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 57.

Oliver also argues that he suffered an adverse employment action when he was subjected to an "unwarranted investigation." (FAC (Dkt. No. 195) ¶ 202, 217, 250, 271; see also Pltf. Sum. J. Br. (Dkt. No. 242) at 24) The investigations conducted by the Office of Equal Opportunity and Deputy Superintendent Mustillo did not result in any disciplinary sanction, and courts in this Circuit "have disagreed as to whether an investigation into disciplinary charges that does not result in any discipline may be sufficient [to] constitute an adverse action in the retaliation context." Olaechea v. City of New York, No. 17-CV-4797 (RA), 2019 WL 4805846, at *9 (S.D.N.Y. Sept. 30, 2019) (citing Burgos v. City of New York, 18-CV-1150 (JPO), 2019 WL 1299461, at *8 (S.D.N.Y. Mar. 21, 2019)). "Some courts have found that the commencement of an investigation, even without attendant negative consequences, is sufficient to establish an adverse employment action." Chidume v. Greenburgh-North Castle Union Free Sch. Dist., 18-cv-01790 (PMH), 2020 WL 2131771, at *7 (S.D.N.Y. May 4, 2020) (citing Weber v. City of New York, 973 F. Supp. 2d 227, 269–70 (E.D.N.Y. 2013) (collecting cases). Here, a reasonable juror could conclude that these investigations and Oliver's suspension from teaching over a two-month period – actions that continued after the NYPD had voided Oliver's arrest (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 68) – would dissuade a reasonable employee from making complaints about discrimination.

After Oliver was released from the Ninth Precinct and returned to Tompkins, Estwick sent an email to parents stating, "Teacher Akeem Oliver has been reassigned away from

the school pending the results of an investigation." (Foti Decl., Ex. 28 (Reassignment Email) (Dkt. No. 244-28); see Def. R. 56.1 Resp. (Dkt. No. 252) ¶ 70) Courts in this Circuit have acknowledged that conduct resulting in reputational harm may constitute an adverse employment action for purposes of a retaliation claim. See Frontline Comms. Intern., Inc. v. Sprint Comms. Co., 374 F.Supp.2d 368, 371 (S.D.N.Y. 2005) ("[a]llegations of fraud" may constitute an adverse employment action because they "may diminish future employment prospects by damaging one's reputation") (citing Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) (where former employer "sullies the plaintiff's reputation" plaintiff may have suffered an adverse employment action for purposes of a retaliation claim))

In a June 17, 2019 letter, Defendant Mustillo informed Oliver that he had engaged in "professional misconduct." The letter also states that "'this incident [involving inappropriate touching of G.C.] may lead to further disciplinary action, including charges that can lead to your termination.'" (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 85 (quoting Foti Decl., Ex. 32 (Disciplinary Ltr.) (Dkt. No. 244-32) at 1)) "[A] disciplinary warning letter may constitute an adverse action in the retaliation context." Burgos, 2019 WL 1299461, at *8 (citing Davis v. Goodwill Indus. of Greater New York & New Jersey, Inc., No. 15 Civ. 7710, 2017 WL 1194686, at *9 (S.D.N.Y. Mar. 30, 2017) (quoting Thomson v. Odyssey House, No. 14 Civ. 3857, 2015 WL 5561209, at *21 (E.D.N.Y. Sept. 21, 2015)); Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 92 (2d Cir. 2015) ("[A] poor performance evaluation could very well deter a reasonable worker from complaining.").

The Court concludes that Oliver has proffered evidence from which a reasonable jury could find that he suffered adverse employment actions for purposes of his retaliation claims.

**d. Causal Connection**

The parties dispute whether Oliver has proffered evidence sufficient to establish the fourth element of his prima facie case – "a causal connection between the protected activity and the adverse employment action." Kwan, 737 F.3d at 844. Defendants contend that the less than three-month gap between the December 27, 2018 settlement of the 2017 Discrimination Lawsuit and Oliver's March 22, 2019 arrest is too long to establish temporal proximity. (Def. Opp. Br. (Dkt. No. 251) at 20-21)

As discussed above, for purposes of making out a prima facie case of retaliation, "[c]ausation can be sufficiently established through temporal proximity." Craven, 2023 WL 3097434, at *5. "'There is no firm outer limit to the temporal proximity required.'" As discussed above, although "'most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference,'" James, 2025 WL 959093, at *19 (quoting De Figueroa v. New York, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) (citing Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 503-04 (S.D.N.Y. 2010) (collecting cases)), the Second Circuit has noted in at least two decisions "'that five months is not too long to find the causal relationship.'" Rasmy, 952 F.3d at 391, 391 n.59 (quoting Gorzynski, 596 F.3d at 110).

Here, the Court concludes that the less-than-three-month gap between the December 27, 2018 settlement and Oliver's March 22, 2019 arrest is sufficient to establish a causal connection for purposes of making out a prima facie case. See Babcock v. N.Y.S. Off. of Mental Health, No. 04 Civ. 2261, 2009 WL 1598796 (PGG), at *23 (S.D.N.Y. June 8, 2009) ("This Court declines to rule as a matter of law that the three-month gap between the [protected activity] and the [adverse employment action] is insufficient to establish 'that the protected activity was closely followed in time by the adverse action.'") (quoting Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004)).

**2. Alleged Legitimate Non-Retaliatory Reason**

Because the Court concludes that Oliver has established a prima facie case of retaliation, the burden shifts to Defendants to articulate legitimate, non-retaliatory reasons for the alleged adverse employment actions. With respect to the decisions to reassign and investigate Oliver, Defendants assert that – after learning of G.C.'s allegations and Oliver's arrest – the DOE needed to "determine the facts, and ensure the safety of [Tompkins] students." (Def. Opp. Br. (Dkt. No. 251) at 18)) With respect to Estwick's March 22, 2019 email to School parents reporting Oliver's reassignment pending an investigation, Defendants argue that – because Oliver's arrest was "widely known" – it was "not unreasonable to simply inform [School] parents by email that [Oliver] had been reassigned pending an investigation of the incident." (Id.)

Given G.C.'s allegations regarding Oliver and the highly public nature of his arrest, the Court finds that Defendants' interest in protecting students, in investigating G.C.'s allegations, and in reassuring parents that Tompkins provides a safe environment for its students constitute legitimate, non-retaliatory reasons for Defendants' actions. See Jones v. Bay Shore Union Free Sch. Dist., 666 F. App'x 92, 94-95 (2d Cir. 2016) (summary order) (concern for student safety was a legitimate, non-retaliatory reason for barring defendant from school property following allegations of sexual misconduct).

**3. Pretext**

Where, as here, a "'defendant articulates a non-retaliatory rationale for its employment decision, the burden shifts back to the plaintiff to show that the defendant's proffered explanation is a pretext for unlawful retaliation.'" White v. Pacifica Found., 973 F.Supp.2d 363, 383-84 (S.D.N.Y. 2013) (quoting Mayers v. Emigrant Bancorp, Inc., 796 F.Supp.2d 434, 447 (S.D.N.Y. 2011)). "'At this stage of the inquiry, merely disproving the

defendant's legitimate explanation is insufficient; the plaintiff must produce competent evidence that "the employer's decision was motivated, at least in part, by an intent to retaliate against him."'" Id. (quoting Mayers, 796 F. Supp. 2d at 446 (quoting El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010)).

Defendants argue that Oliver has not established pretext because he "relies exclusively" on "the temporal proximity between his protected activity and the alleged adverse actions." (Def. Opp. Br. (Dkt. No. 251) at 19 (citing Russell v. N.Y. Univ., 739 F. App'x 28, 34 (2d Cir. 2018) ("[I]t is well-settled in our Circuit that 'temporal proximity alone is not enough to establish pretext.'" (quoting Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014)))))

But Oliver relies on more than temporal proximity in arguing that Defendants' stated reasons for his reassignment are pretextual. For example, Oliver points to the following text message exchange between Estwick and Mustillo on June 7, 2019 – the day after Oliver was notified that the DOE Office of Personnel Investigation had authorized his return to his teaching position:

| | |
|---|---|
| Estwick: | Please call me when you have a moment |
| Mustillo: | Akeem is tenured? |
| Estwick: | Yes |
| Mustillo: | File number please |
| Estwick: | 841467 |
| Mustillo: | Is there a tsms email in addition to his doe |
| Estwick: | His TSMS email is aoliver@tsmsonline.org |
| Estwick: | Why do you ask? |

Mustillo: Because I need to send him a notice to meet with me Currently they will not extend the reassignment as [the Office of Equal Opportunity] referred it back

Estwick: His personal email is AOliver07@gmail.com

Mustillo: I'm sending it to his doe and copying to tsms...I'll stick to work emails

Estwick: Yup

(Foti Decl., Ex. J (Dkt. No. 247-14) at 31-32)

According to Oliver, these text messages "clearly demonstrate that [Estwick and Mustillo] wanted to extend Mr. Oliver's reassignment, even though he had been cleared many times over of wrongdoing." (Pltf. Reply Br. (Dkt. No. 248) at 12)

On June 12, 2019 – five days later – Estwick emailed Mustillo the "Akeem Incidents Timeline," which "contain[ed] 15 other incidents allegedly involving Mr. Oliver[,] . . . only one of [which] pertained to Plaintiff's conduct towards G.C." (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 83 (citing Foti Decl., Ex. 33 (Akeem Incidents Timeline email) (Dkt. No. 244-33)) And on June 17, 2019, Defendant Mustillo issued a disciplinary letter to Oliver stating that he had engaged in "professional misconduct" in connection with G.C., and informing him that "'this incident may lead to further disciplinary action, including charges that can lead to your termination.'" (Id. ¶ 85 (quoting Foti Decl., Ex. 32 (Disciplinary Ltr.) (Dkt. No. 244-32) at 1))

While these text messages could be read to indicate that Estwick and Mustillo wanted to pursue further action against Oliver, Oliver is not entitled to judgment as a matter of law on his retaliation claims. Neither the NYPD's voiding of Oliver's arrest nor the Office of Equal Opportunity's closure of its investigation establishes that Oliver was "cleared . . . of wrongdoing." The NYPD's decision not to pursue criminal charges against Oliver does not demonstrate that his alleged conduct vis a vis G.C. was appropriate for the classroom. And

while the Office of Equal Opportunity concluded that G.C.'s "allegations do not articulate sexual harassment under Chancellor's Regulation A-830,"[28] the Office of Equal Opportunity referred "the inappropriate nature of the physical contact and comments to [Superintendent Chan] . . . to handle as deemed fit and appropriate." (Arko Decl., Ex. X (Hutchinson email) (Dkt. No. 253-24))

Because there are material issues of fact as to whether Estwick and Mustillo were motivated by retaliatory animus, Oliver's motion for summary judgment on his retaliation claims under Title VII, the NYSHRL, and the NYCHRL will be denied.

### C. <u>Defendants' Motion for Summary Judgment on Oliver's Retaliation Claims</u>

#### 1. <u>Title VII, NYHSRL, and NYCHRL Retaliation Claims</u>

In moving for summary judgment on Oliver's Title VII, NYSHRL, and NYCHRL retaliation claims, Defendants rely on the same arguments they made in opposing Oliver's summary judgment motion. (<u>See</u> Def. Sum. J. Br. (Dkt. No. 238) at 40-48) For example, Defendants argue that Oliver has not established a <u>prima</u> <u>facie</u> case of retaliation because he has not shown a sufficient causal connection between his protected activity – Oliver's 2017

---

28 Chancellor's Regulation A-830 prohibits the sexual harassment of students by DOE employees:

> Sexual conduct between an adult and a student can <u>never</u> be considered welcome or appropriate. Sexual harassment of a student by an employee consists of sexual advances, requests for sexual favors and other verbal and physical conduct of a sexual nature. . . .
> . . . .
> Sexual harassment may take different forms, including explicit sexual propositions or threats, sexual innuendos, sexually suggestive comments, sexually oriented jokes, obscene gestures, displays of pornographic or obscene visual or printed material, and physical contact, such as touching, patting, pinching or brushing against another's body.

(Foti Decl., Ex. Q (Chancellor Regulations) (Dkt. No. 247-21) at 17 (emphasis in original))

Discrimination Lawsuit – and the "only arguably qualifying adverse action" – Oliver's March 2019 administrative reassignment. (Def. Sum. J. Br. (Dkt. No. 238) at 42-47) Defendants further argue that "there are legitimate, non-retaliatory reasons for plaintiff's administrative reassignment," and that there is "no evidence that this legitimate reason was a pretext to mask retaliation." (Id. at 48)

For the reasons discussed above in connection with Oliver's motion for summary judgment, there are material issues of fact as to whether the following constitute adverse employment actions for purposes of Oliver's retaliation claims: (1) Estwick's suggestion to the Arresting Officers that they arrest Oliver at the front entrance of the School; (2) Oliver's administrative reassignment; (3) Estwick's email to School parents announcing Oliver's reassignment and the investigation into his conduct; (4) Defendants' multiple investigations of Oliver's conduct; and (5) Mustillo's issuance of a disciplinary letter to Oliver stating that he had engaged in "professional misconduct" and might face termination. And for reasons also stated above, material issues of fact exist as to whether Defendants Estwick and Mustillo were motivated by retaliatory animus.

Accordingly, Defendants' motion for summary judgment on Oliver's Title VII, NYSHRL, and NYCHRL retaliation claims will be denied.

**2. Section 1983 Claim Against Estwick**

Defendants contend that they are entitled to summary judgment on Oliver's Section 1983 retaliation claim against Estwick, because Estwick is entitled to qualified immunity. (Def. Sum. J. Br. (Dkt. No. 238) at 48-49)

**a. Individual Liability under Section 1983**

"[T]o establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the

plaintiff to be deprived of a federal right." Back, 365 F.3d at 122. "An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." Id. at 127.

A Section 1983 plaintiff can establish a defendant's "personal involvement" in a constitutional deprivation by showing that:

> "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."

Littlejohn, 795 F.3d at 314 (quoting Back, 365 F.3d at 127). Where a supervisor's personal involvement is shown, a Section 1983 "'plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation' and . . . 'that [the] supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic.'" Lewis, 246 F.Supp.3d at 992 (quoting Raspardo, 770 F.3d at 116); see also Littlejohn, 795 F.3d at 314.

There is no dispute here as to the "acting under color of law" element or with respect to Estwick's personal involvement in certain of the alleged constitutional deprivations, including the suggestion to arrest Oliver at the front entrance of the School, and the email to parents concerning Oliver's reassignment and the investigation into his conduct.

**b. <u>Qualified Immunity</u>**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan,

555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "A right is clearly established if its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Spang v. Katonah-Lewisboro Union Free School Dist., 626 F.Supp.2d 389, 399 (S.D.N.Y. 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (citing Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) ("A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'") (quoting Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998))).

Defendants contend that,

> should the Court find Estwick could potentially be liable for reassigning plaintiff, which defendants dispute, Estwick acted objectively reasonably given G.C.'s complaint and the ensuing arrest of plaintiff. To the extent the Court finds Estwick potentially liable based on disparate treatment of White Teacher No. 1, Estwick reasonably believed, even if mistaken, that the nature of G.C.'s complaint, coupled with plaintiff's arrest, rendered plaintiff and White Teacher No. 1 not similarly situated.

(Def. Sum. J. Br. (Dkt. No. 238) at 49)

As discussed above, there is no evidence that Estwick made the decision to reassign Oliver. (See Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 73) Moreover, Oliver's disparate treatment arguments regarding White Teacher No. 1 and White Teacher No. 2 are not persuasive, because these alleged comparators were not similarly situated to Oliver. Defendants do not address, however, whether Estwick acted reasonably in (1) suggesting to officers that they arrest Oliver at the front entrance of the School, or (2) sending an email to School parents on March 22, 2019 announcing Oliver's reassignment and the fact that he was under investigation. Accordingly, Defendants have not shown as a matter of law that Estwick is entitled to qualified immunity with respect to Oliver's Section 1983 retaliation claim. See Mosby v. City of New

York, 20 Civ. 1485 (AT), 2022 WL 4095931 n.5 (S.D.N.Y. Sept. 7, 2022) ("Defendants, having raised qualified immunity as to other claims but not as to this claim[,] have waived a qualified immunity argument for this claim.") (citing McCardle v. Haddad, 131 F.3d 43, 51-52 (2d Cir. 1997) ("The qualified immunity defense can be waived . . . by failure to raise it with sufficient particularity")).

Accordingly, Defendants' motion for summary judgment on Oliver's Section 1983 retaliation claim will be denied.

## VII. MONELL LIABILITY

The FAC alleges that the DOE is subject to Section 1983 liability under the Monell doctrine based on the "DOE's failure to supervise and discipline Defendant Estwick." (FAC (Dkt. No. 195) ¶ 225) Defendants have moved for summary judgment on this claim. (Def. Sum. J. Br. (Dkt. No. 238) at 56-62)

### A. Applicable Law

Monell v. New York City Department of Social Services, 436 U.S. 658 (1978) "provides that a municipality or municipal agency may be liable under § 1983 when its policy or custom causes a constitutional violation." Chislett, 157 F.4th at 184. "The DOE is a municipal organization and is only subject to liability under § 1983 if the Monell requirements are satisfied." Cohen v. Walcott, 13-cv-9181 (JGK), 2017 WL 2729091, at *4 n.1 (S.D.N.Y. June 23, 2017) (citing Fierro v. N.Y.C. Dep't of Educ., 994 F. Supp. 2d 581, 588 (S.D.N.Y. 2014).

"'The elements of a Monell claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right.'" Chislett, 157 F.4th at 184 (quoting Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 97 (2d Cir. 2020). "A municipality cannot be held liable on the theory of respondeat superior; the plaintiff must

establish that the municipality's policy or custom itself was a 'moving force of the constitutional violation.'" Id. (citing Monell, 436 U.S. at 691) (emphasis in Chislett).

"The Supreme Court has explained that '[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.'" Breton v. City of New York, 404 F.Supp.3d 799, 818 (S.D.N.Y. 2019) (quoting Connick v. Thompson, 563 U.S. 51, 61 (2011). A failure to train claim under Monell is actionable "'only where a [p]laintiff can demonstrate that a municipality's failure to train amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.'" Id. (quoting Peterec v. Hilliard, No. 12cv3944, 2013 WL 5178328, at *11 (S.D.N.Y. Sept. 16, 2013) (internal quotation marks omitted)). "[A] jury may infer deliberate indifference 'where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs.'" Cowan v. City of Mount Vernon, 95 F.Supp.3d 624, 638 (S.D.N.Y. 2015) (quoting Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (citations, alterations, and internal quotation marks omitted)).

To establish that a "failure to train or supervise constitutes deliberate indifference," a plaintiff must show

> "[(1)] that [the] policymaker knows to a moral certainty that her employees will confront a given situation . . . [;] [(2)] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation . . . [;] [and] [(3)] that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."

Cowan, 95 F.Supp.3d at 638 (quoting Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007)). "Moreover, 'at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that the deficiency is closely related to the

ultimate injury, such that it actually caused the constitutional deprivation.'" Id. (quoting Jenkins, 478 F.3d at 94 (internal quotation marks omitted)).

**B. Analysis**

Defendants argue that Oliver's Monell claim "fails as a matter of law as plaintiff cannot establish deliberate indifference on the part of the DOE." (Def. Sum. J. Br. (Dkt. No. 238) at 56) According to Defendants, "the record is utterly devoid of any evidence concerning municipal policies, patterns, practices, or customs that caused any alleged constitutional violation." (Id. at 57) In the alternative, Defendants argue that Oliver's Monell claim is "barred by the 2018 General Release." (Id. at 61)

In response, Oliver argues that the DOE is subject to Monell liability because it "failed to oversee those responsible for correctly implementing the reassignment procedures when it failed to prevent Mr. Oliver from being reassigned beyond the 60-day limit." (Pltf. Opp. Br. (Dkt. No. 245) at 21 n.5)

As discussed above, Oliver was reassigned from March 22 to June 5, 2019 (see Def. R. 56.1 Stmt. (Dkt. No. 237) ¶¶ 110), and the reassignment was rescinded on June 6, 2019. (Pltf. R. 56.1 Stmt. (Dkt. No. 243) ¶ 78) According to the Collective Bargaining Agreement between the DOE and the United Federation of Teachers, the duration of any investigation or reassignment "shall be measured in calendar days, but shall not include the summer break, all recess periods and holidays." (Foti Decl., Ex. Q (Collective Bargaining Agreement) (Dkt. No. 247-23) at 5) Moreover, the 60-day period set forth in the Collective Bargaining Agreement does not apply where, as here, the Special Commissioner of Investigation for the New York City School District is investigating an allegation of sexual misconduct. (Id.)

As discussed above, after accounting for school recess periods, holidays, and days in which sexual misconduct allegations were under investigation by SCI, the record shows that

Oliver's reassignment did not exceed the 60-day limit imposed by the Collective Bargaining Agreement. Accordingly, the duration of Oliver's reassignment does not provide a basis for Monell liability.

Even if DOE had violated the Collective Bargaining Agreement's 60-day limit for reassignments, Oliver has not offered evidence of an agency-wide policy or custom of doing so. Nor has he offered evidence that the DOE's failure to train Estwick led to any violation of the Collective Bargaining Agreement's 60-day limit provision.

Oliver also argues that the "DOE's policy and practices directly caused Mr. Oliver to be subjected to discriminatory and retaliatory acts by its employees," and that the "DOE's policy and practices . . . were inadequate to prevent a constitutional violation." (Pltf. Opp. Br. (Dkt. No. 245) at 21 n.5) Oliver does not "'identify a specific deficiency in the city's training program,'" however, nor does he offer evidence "'establish[ing] that the deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" Cowan, 95 F.Supp.3d at 638 (quoting Jenkins, 478 F.3d at 94). Oliver's conclusory allegations that the DOE had policies and practices that caused its employees to engage in discrimination and retaliation are insufficient to survive summary judgment. Watts v. N.Y.C. Police Dep't, 100 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) ("A plaintiff's '[c]onclusory allegations of municipal liability will not defeat a motion for summary judgment on a Monell claim.'" (quoting Jouthe v. City of New York, 2009 WL 701110, at *8 (E.D.N.Y. Mar. 10, 2009)) (alteration in Watts)); see also Lugo v. City of New York, 2025 WL 1952029, 19-CV-6086 (VSB) (S.D.N.Y. July 16, 2025) (same). Accordingly, Defendants are entitled to summary judgment on Oliver's Monell claim (Count Twelve).

## VIII. OLIVER'S CLAIMS AGAINST CHAN AND MUSTILLO

The FAC asserts three claims against Superintendent Chan and Deputy Superintendent Mustillo: aiding and abetting retaliation under NYSHRL § 296 and NYCHRL § 8-107; aiding and abetting retaliation in violation of Section 1983; and "supervisory liability."[29] (FAC (Dkt. No. 195) ¶¶ 220-23, 230-34, 276-79)

The parties have cross-moved for summary judgment on Oliver's aiding and abetting retaliation claims under the NYSHRL and the NYCHRL. (Def. Sum. J. Br. (Dkt. No. 238) at 49-53; Pltf. Sum. J. Br. (Dkt. No. 242) at 25-28) Defendants have also moved for summary judgment on Oliver's aiding and abetting retaliation claim under Section 1983, as well as his supervisory liability claim against Chan and Mustillo. (Def. Sum. J. Br. (Dkt. No. 238) at 53-56)

---

[29] The FAC does not specify whether Oliver's "supervisory liability" claim is asserted under Section 1983, the NYSHRL, or the NYCHRL. In moving for summary judgment, Defendants construe the supervisory liability claim as brought under Section 1983, because Plaintiff alleges that Chan and Mustillo were "acting under color of state law." (Def. Sum. J. Br. (Dkt. No. 238) at 54 n.8; see FAC (Dkt. No. 195) ¶¶ 231, 233) In response, Oliver states that "Chan and Mustillo should be held individually liable as supervisors under §1983, [the] NYSHRL, and [the] NYCHRL." (Pltf. Opp. Br. (Dkt. No. 245) at 36) Because Oliver's supervisory liability claim – as pled in the FAC – repeatedly alleges that Chan and Mustillo were "acting under color of state law" (see FAC (Dkt. No. 195) ¶¶ 231, 233), the Court concludes that the supervisory liability claim alleged in the FAC is premised on Section 1983.

The FAC also does not specify whether Oliver seeks to impose supervisory liability on Chan and Mustillo in connection with Oliver's claims for discrimination, hostile work environment or retaliation. For the reasons explained above, Oliver's discrimination and hostile work environment claims fail as a matter of law. Given these circumstances, Oliver's supervisory liability discrimination and hostile work environment claims against Chan and Mustillo likewise fail. See Williams v. N.Y.C. Dep't of Educ., 1:19-cv-01353(MKV), 2021 WL 1178118, at *12 ("Plaintiff's failure to sustain a primary civil rights violation claim precludes her claims for supervisory liability under Section 1983."); Stryker v. HSBC Securities (USA), 16-cv-9424(JGK), 2020 WL 5127461, at *16 (S.D.N.Y. Aug. 31, 2020) (supervisors could not be held liable for failure to accommodate or for creating a hostile work environment where plaintiff had not established a prima facie case as to these claims). Accordingly, this Court's analysis of Oliver's supervisory liability claim against Chan and Mustillo focusses solely on whether they can be held liable in connection with Oliver's retaliation claim under Section 1983.

## A. Aiding and Abetting Liability Under the NYSHRL and NYCHRL

To establish an aiding and abetting claim under the NYSHRL and the NYCHRL, a plaintiff must show "(A) proof of an underlying violation, that is, that the employer or an individual with some supervisory authority violated the NYSHRL and (B) proof that the defendant aided and abetted that conduct by 'actually participat[ing] in the conduct giving rise to a discrimination claim.'" Beniquez v. N.Y.S. Unified Ct. Sys., 23cv7735 (DLC), 2025 WL 861299 (S.D.N.Y. Mar. 18, 2025) (quoting Feingold, 366 F.3d at 158). "The same standards of analysis" apply to aiding and abetting claims under the NYSHRL and the NYCHRL "because the language of the two laws is 'virtually identical.'" Lee v. Riverbay Corp., 751 F.Supp.3d 259, 291 (S.D.N.Y. 2024) (quoting Feingold, 366 F.3d at 158-59).

> For an individual defendant to be liable for retaliation under the NYCHRL [and the NYSHRL], he must have "actually participated in the conduct giving rise to the plaintiff's" claims. Such participation requires retaliatory "intent," – and therefore necessarily requires an individual's knowledge of the protected activity at the time of his participation. To show knowledge of protected activity, "it is not sufficient that an employer could or even should have known about an employee's complaint."

Olaechea, 2022 WL 3211424, at *5 (internal citations omitted) (quoting Malena, 886 F. Supp. 2d at 366); see also Fay v. City of Newburgh, No. 21 Civ. 3140 (NSR), 2024 WL 4169552, at *11 (S.D.N.Y. Sept. 12, 2024) ("[I]t is axiomatic that a defendant 'must have "knowledge" of the protected activity to be able to "engage in retaliation."'") (quoting Little v. Nat'l Broad. Co., 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002)).

There is no evidence here, however, that either Chan or Mustillo were aware of Oliver's alleged protected activity – i.e., the 2017 Discrimination Lawsuit and the December 27, 2018 settlement – prior to the alleged adverse employment actions about which Oliver

complains.[30] To the extent that Oliver contends that "Mustillo clearly knew about the allegations underlying the 2017 [Discrimination] [L]awsuit" because Estwick listed them in the "Akeem Incidents Timeline," this argument is unavailing. (See Pltf. Reply Br. (Dkt. No. 248) at 13 n.8) Whether Mustillo was aware – at the time of her investigation – of prior allegations of misconduct brought against Oliver has no bearing on whether she was aware of Oliver's protected activity – that being the 2017 Discrimination Lawsuit and the December 27, 2018 settlement. Because Oliver has not proffered evidence that either Chan or Mustillo were aware of his alleged protected activity, Oliver's motion for summary judgment on his NYSHRL and NYCHRL aiding and abetting claims against Chan and Mustillo will be denied, and Defendants' motion for summary judgment on these claims (Count Twenty) will be granted.

### B. Aiding and Abetting Liability Under Section 1983

In moving for summary judgment on Oliver's Section 1983 aiding and abetting retaliation claim against Chan and Mustillo, Defendants argue that this claim

> fails as a matter of law because no such cause of action exists. "There is no civil aiding and abetting liability under 42 U.S.C. § 1983. The plain text of 42 U.S.C. § 1983 does not provide for aiding and abetting liability. Congress knows how to impose aiding abetting liability when it chooses to do so."

(Def. Sum. J. Br. (Dkt. No. 238) at 53 (quoting W. Daniels Land Ass'n v. Wasatch Cnty., No. 2:10-cv-558, 2011 WL 1584822, at *2 (D. Utah Apr. 26, 2011) (citing Theriot v. Woods, No. 2:09-cv-199, 2010 WL 623684 (W.D. Mich. 2010))))

[30] Oliver also argues that Chan was aware of his 2015 arbitration claim. (Pltf. Opp. Br. (Dkt. No. 245) at 34) But the alleged protected activity here is Oliver's 2017 Discrimination Lawsuit and the subsequent settlement. In any event, Chan testified that she learned of the 2015 arbitration only in connection with the instant lawsuit (Foti Decl., Ex. 4 (Chan Dep.) (Dkt. No. 244-4) at 10-11), and there is no contrary evidence.

In response, Oliver concedes that it is "technically accurate" that "[Section] 1983 does not provide for aiding and abetting liability." (Pltf. Opp. Br. (Dkt. No. 245) at 33 n.8) He goes on to state that

> to the extent Plaintiff's claim against Chan and Mustillo is stylized as "aiding and abetting," that language should be applied to his NYSHRL and NYCHRL claims and the claim under §1983 should be characterize[d] as [a] direct liability claim[].

(Id.) Oliver already asserts a separate Section 1983 supervisory liability claim against Chan and Mustillo, however. (See FAC (Dkt. No. 195) ¶¶ 230-34)

Because Section 1983 does not provide for aiding and abetting liability, see Maddix v. City of New York, 25-CV-1909 (HG), 2026 WL 948287, at *7 n.10 (E.D.N.Y. Apr. 8, 2026) ("The Court need not, and does not, address Plaintiff's aiding and abetting liability argument given '§ 1983 does not support aiding and abetting liability.'") (quoting Woods v. Chadwick, No. 21-cv-0662, 2021 WL 12318012, at *3 n.4 (N.D.N.Y. July 19, 2021) (citing Yi Tai Shao v. Roberts, No.: 18-1233 (RC), 2019 WL 249855, at *17 (D.D.C. Jan. 17, 2019) (collecting cases))), Defendants' motion for summary judgment on Oliver's aiding and abetting claim under Section 1983 (Count Eleven) will be granted.

**C. Supervisory Liability Under Section 1983**

As discussed above, "to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." Back, 365 F.3d at 122. "An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." Id. at 127.

"In a retaliation action based on the filing of a prior discrimination complaint, the plaintiff must establish that each defendant was personally aware of the prior complaint at the

time he engaged in the alleged retaliatory conduct at issue." Alali v. DeBara, No.07-CV-2916 (CS), 2008 WL 4700431 (S.D.N.Y. Oct. 24, 2008) (citation omitted). "Unsubstantiated speculation that an individual with awareness of a prior complaint 'must have' informed a defendant of the prior complaint based merely on their relationship with one another is insufficient to establish awareness." Id. (quoting Montanile v. NBC, 211 F.Supp.2d. 481, 488 (S.D.N.Y. 2002)).

As discussed above, there is no evidence that either Chan or Mustillo had knowledge of Oliver's protected activity – the 2017 Discrimination Lawsuit and the December 27, 2018 settlement – prior to the alleged retaliatory acts. As a result, Oliver's Section 1983 supervisory liability claim against them premised on retaliation fails. See Springs v. City of N.Y., 17-cv-451 (AJN), 2019 WL 1429567, at *10 (S.D.N.Y. Mar. 29, 2019) (granting defendants summary judgment where plaintiff "pointed to no evidence to suggest that [the] [i]ndividual [d]efendants were actually aware of [plaintiff's protected activity]") (citing Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)); Carmody v. New York Univ., 21 Civ. 8186 (LGS), 2023 WL 5803432, at *10 (S.D.N.Y. Sept. 7, 2023) (granting defendants summary judgment on retaliation claim against dean of medical school where "[p]laintiff [did] not provide[] evidence that [the dean] was aware of her complaints about discrimination"; to succeed on a retaliation claim against an individual defendant, "[p]laintiff must show the individual [d]efendants 'had personal knowledge of [her] protected activity'" (quoting Cardwell v. Davis Polk & Wardwell LLP, No. 19 Civ. 10256, 2023 WL 2049800, at *26 (S.D.N.Y. Feb. 16, 2023) (collecting cases))); Brown v. N.Y. City Transit Auth., 22-cv-02949 (ALC), 2024 WL 1347283, at *8 (S.D.N.Y. Mar. 29, 2024) (dismissing supervisory liability claim; "[supervisor's]

lack of knowledge about the protected activity demonstrates she was not personally involved in allegedly retaliating against Plaintiff")

Defendants' motion for summary judgment on Oliver's Section 1983 supervisory liability claim against Chan and Mustillo (Count Thirteen) will be granted.

## IX. RESPONDEAT SUPERIOR

Pursuant to the doctrine of respondeat superior, Oliver moves for summary judgment against DOE on his discrimination, hostile work environment, and retaliation claims under the NYSHRL and the NYCHRL. (Pltf. Sum. J. Br. (Dkt. No. 242) at 28)

Defendants cross-move for summary judgment on Oliver's respondeat superior claims, arguing that because Estwick, Chan, and Mustillo are not liable for discrimination, hostile work environment, or retaliation under the NYSHRL and the NYCHRL, the DOE cannot be held vicariously liable under these statutes. (Def. Sum. J. Br. (Dkt. No. 238) at 56 n.9)

### A. Applicable Law

Although a municipality cannot be held liable for a Section 1983 violation on a respondeat superior theory, see Monell, 436 U.S. at 691, such liability is permissible under New York law. Bonds v. City of New York, No. 12 Civ. 1772 (ARR) (MDG), 2014 WL 2440542, at *10 n.5 (E.D.N.Y. May 30, 2014) (citing Anderson v. City of New York, 817 F. Supp.2d 77, 98 (E.D.N.Y. 2011); see also Chimurenga v. City of New York, 45 F. Supp. 2d 337, 344 (S.D.N.Y. 1999) ("Under the common law . . . a municipality may be held liable for . . . malicious prosecution on a theory of respondeat superior.") (citation omitted). Municipal liability is, however, contingent on proof of an underlying violation. See, e.g., Clarke v. City of New York, No. 96 Civ. 5762 (ERK), 1999 WL 608857, at *14 (E.D.N.Y. July 22, 1999) ("If plaintiff can establish any of her pendent state law claims, she can recover against the City of New York under the common law doctrine of respondeat superior.").

### B. Analysis

Because Defendants are entitled to summary judgment on (1) Oliver's discrimination and hostile work environment claims against Estwick; and (2) aiding and abetting and supervisory liability claims against Chan and Mustillo, Defendants are also entitled to summary judgment on Oliver's respondeat superior claim against the DOE to the extent that claim is premised on the conduct of Chan and Mustillo, and on the conduct of Estwick as it relates to alleged discrimination and hostile work environment.

Oliver's respondeat superior claim against the DOE survives, however, to the extent that it is premised on Oliver's NYSHRL and NYCHRL retaliation claims against Estwick. See Brathwaite v. City of New York, 19-cv-09235 (JLR) (BCM), 2023 WL 5713189, at *8 (S.D.N.Y. Sept. 5, 2023) ("Because the false arrest claim against [the individual defendant] remains, the respondeat superior claim against the City Defendant also survives."). The cross-motions are denied as to these claims because of the material issues of fact discussed above.

## X. DUE PROCESS

The FAC alleges that the DOE violated the Due Process Clause of the Fourteenth Amendment when it "wrongfully re-assign[ed] Mr. Oliver . . . without conducting a thorough investigation," thereby "depriv[ing] Mr. Oliver of his ability to work as a teacher and his interest in and right to work as a teacher." (FAC (Dkt. No. 195) ¶ 176)

Defendants have moved for summary judgment on Oliver's due process claim, arguing that to the extent Oliver pleads that he was deprived of a property interest without due process, a DOE employee who is administratively reassigned – but continues to be paid – "'cannot "sustain a claim for deprivation of property without due process" even if relieved from job duties.'" (Def. Sum. J. Br. (Dkt. No. 238) at 20 (quoting Adams v. N.Y. State Educ. Dep't, 752 F. Supp. 2d 420, 453 (S.D.N.Y. Aug. 23, 2010) (quoting Ramberran v. Dellacona, No. 07-

CV-304, 2008 WL 905217, at *1-2, *4 (E.D.N.Y. Mar. 31, 2008) (collecting cases), report and recommendation adopted, 752 F. Supp. 2d 420 (S.D.N.Y. Nov. 18, 2010))))

To the extent Oliver pleads that he was deprived of a liberty interest without due process, Defendants contend that his "'interest in his [] good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient'" to sustain a due process claim. (Def. Sum. J. Br. (Dkt. No. 238) at 21 (quoting Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir. 2004))) According to Defendants, a loss of reputation must be "'coupled with the deprivation of a more tangible interest, such as government employment,'" in order to sustain a deprivation of liberty due process claim. (Id. (quoting Patterson, 370 F.3d at 330))

Finally, Defendants argue that Oliver's due process claim fails because he did not file a N.Y. C.P.L.R. Article 78 action challenging his temporary reassignment. (Id. ("[P]laintiff cannot show that any deprivation was without due process of law because he 'could [– but did not –] avail himself of an Article 78 proceeding to challenge any deprivation he suffered.'" (quoting Dolcine v. Hanson, 17-CV-4835 (VEC), 2021 WL 949748, at *9-10 (S.D.N.Y. Mar. 12, 2021) and citing Johnston v. Town of Orangetown, 562 F. App'x 39, 40-41 (2d Cir. 2014)))

In response, Oliver states that his due process claim is premised on "a loss of his reputation" and the "deprivation of a more tangible interest" – namely, being reassigned "past the 60 days permitted under [the Collective Bargaining Agreement]." (Pltf. Opp. Br. (Dkt. No. 245) at 24 (citing Patterson, 370 F.3d at 330) Oliver further contends that he was not required to bring an Article 78 proceeding because there was no "final and binding" agency determination. (Id. at 23-24 (citing N.Y. C.P.L.R. § 217(1) and (2)))

### A. Applicable Law

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due

process." Bryant v. New York State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012) (citing Narumanchi v. Bd. of Trustees, 850 F.2d 70, 72 (2d Cir. 1988)).

"The Due Process Clause of the Fourteenth Amendment requires that, generally, a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest." Patterson, 370 F.3d at 329. "Due process does not, in all cases, require a hearing before the state interferes with a protected interest, [however,] so long as 'some form of hearing is [provided] before an individual is finally deprived of [the] property interest.'" Nnebe v. Daus, 644 F.3d 147, 158 (2d Cir. 2011) (quoting Brody v. Vill. of Port Chester, 434 F.3d 121, 134 (2d Cir. 2005)) (emphasis in Nnebe)); see Giglio v. Dunn, 732 F.2d 1133, 1135 (2d Cir. 1984) ("Where a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter."). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Nnebe, 644 F.3d at 158 (citation omitted).

> The appropriate process depends on the balancing of three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Panzella v. Sposato, 863 F.3d 210, 218 (2d Cir. 2017) (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

The liberty guaranteed by the Fourteenth Amendment includes the "'freedom from bodily restraint[,] . . . the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free

men.'" Bd. of Regents v. Roth, 408 U.S. 564, 572 (1972) (quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923)). Although "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause," the "[l]oss of one's reputation can [] invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." Patterson, 370 F.3d at 330-31 (citing Bd. of Regents, 408 U.S. at 569-70 & n.7; Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir. 1994)). A claim premised on such a hybrid injury "is commonly referred to as a 'stigma-plus' claim." Brown v. Town of Clarkstown, No. 7:24-cv-04761-NSR, 2025 WL 1939293, at *7 (S.D.N.Y. July 15, 2025) (citing Patterson, 370 F.3d at 330); see also Greenwood v. New York, 163 F.3d 119, 124 (2d Cir. 1998) (holding the "deprivation of a property interest satisfies the 'plus' prong of stigma plus.").

To establish a "stigma-plus" claim, a plaintiff must offer evidence of "(1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" Brown, 2025 WL 1939293, at *7 (quoting Vega v. Lantz, 596 F.3d 77, 81 (2d Cir. 2010) (citation omitted). "[T]he statement must [also have been] 'publicized.'" Id. (quoting Filteau, 161 F. Supp. 3d at 291 (citation omitted)).

Where a plaintiff alleges the deprivation of a stigma-plus liberty interest, the "'stigma' and 'plus'" must be "'sufficiently proximate.'" Id. (quoting Velez v. Levy, 401 F.3d 75, 89 (2d Cir. 2005)). "'This requirement will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected – for example, due to their order of occurrence or their origin – and (2) the actor imposing the plus adopted (explicitly or implicitly) those

statements in doing so.'" Id. (quoting Velez, 401 F.3d at 89)). "'There is no rigid requirement . . . that both the "stigma" and the "plus" must issue from the same government actor or at the same time.'" Id. (quoting Velez, 401 F.3d at 89).

**B. Analysis**

As an initial matter, Oliver does not respond to Defendants' argument that his temporary administrative reassignment with pay does not amount to a deprivation of property for purposes of a due process claim. Oliver's failure to address Defendants' argument "operates as an abandonment of [his due process claim to that extent]."[31] Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011); see also Duarte v. St. Barnabas Hosp., 265 F. Supp. 3d 325, 352-53 (S.D.N.Y. 2017) ("'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'") (quoting Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)); Plahutnik v. Daikin Am., Inc., 912 F. Supp. 2d 96, 104 (S.D.N.Y. 2012) ("[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned."); Menes v. City Univ. of N.Y. Hunter Coll., 578 F.Supp.2d 598, 612 n.14 (S.D.N.Y.

---

[31] In any event, any such claim would fail. "An employee who continues to be paid cannot 'sustain a claim for deprivation of property without due process' even if relieved from job duties." Adams, 752 F.Supp.2d. at 453-54 (holding that DOE had not deprived tenured teachers of a property interest when it reassigned them with pay, even though the teachers were "prohibit[ted] from teaching and [from] 'associating with teaching colleagues who [were] performing classroom duties'") (collecting cases); see also Farooq v. N.Y.C. Health & Hosps. Corp., No. 19 Civ. 6294, 2020 WL 5018387, at *4 (S.D.N.Y. Aug. 25, 2020), aff'd sub nom. Farooq v. City of New York, No. 20-3185, 2022 WL 793117, at *4 (2d Cir. Mar. 16, 2022) ("The Second Circuit has intimated, and courts in this district routinely hold, that no property interest is implicated when a public employee is suspended with pay.").

2008) ("Because Plaintiff has not addressed this claim in his opposition papers, it is deemed abandoned.").[32]

As to Oliver's "stigma-plus" deprivation of liberty claim, he argues that "he suffered a loss of his reputation coupled with the 'deprivation of a more tangible interest'" when his reassignment continued ten days beyond the sixty-day limit imposed by the Collective Bargaining Agreement between the DOE and the United Federation of Teachers. (Pltf. Opp. Br. (Dkt. No. 245) at 24; see Foti Decl., Ex. Q (Collective Bargaining Agreement) (Dkt. No. 247-23) at 5)

As discussed above, to establish a "stigma-plus" claim, Oliver "must first show that the [DOE] made stigmatizing statements about him – statements that call into question [his] 'good name, reputation, honor, or integrity.'" Patterson, 370 F.3d at 330-31 (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir. 1980)). In his opposition brief, Oliver does not identify any such public statement made by the DOE or a DOE employee. To the extent Oliver's stigma-plus claim is premised on Estwick's email to School parents announcing his reassignment and the DOE investigation, "[c]ourts have consistently held that statements announcing personnel decisions, even when leaked to the press, and even when a

[32] Defendants have similarly abandoned their argument that Oliver's due process claim is barred by his failure to bring an Article 78 action. They have not responded to Oliver's argument that he was not required to pursue an Article 78 proceeding because there was no "final and binding" agency determination. (See Def. Reply Br. (Dkt. No. 240) at 11-12) As a general matter, a person challenging agency action in New York must bring an Article 78 action "within four months after the determination to be reviewed becomes final and binding." N.Y. C.P.L.R. § 217(1). Given that Defendants have not disputed Oliver's claim that there was no "final and binding" agency determination here, Defendants' assertion that Oliver was obligated to pursue an Article 78 proceeding is not persuasive. See Jeanty v. City of New York, 18 Civ. 5920 (KPF), 2019 WL 2343008, at *6 (S.D.N.Y. June 3, 2019) (plaintiff was not required to file an Article 78 proceeding because his state agency employer never issued a "final and binding" determination).

reader might infer something unfavorable about the employee, are not actionable." Weise v. Kelley, No. 08-CV-6348 (CS), 2009 WL 2902513, at *4 (S.D.N.Y. Sept. 10, 2009) (citing O'Connor v. Pierson, 426 F.3d 187, 195 (2d Cir. 2005); Pisani v. Westchester Cnty. Health Care Corp., 424 F.Supp.2d 710, 717 (S.D.N.Y. 2006); Esposito v. Metro-North Commuter R.R. Co., 856 F.Supp. 799, 805 (S.D.N.Y. 1994); Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 177 (2d Cir. 1991); Flood v. Cnty. of Suffolk, 820 F.Supp. 709, 715 (E.D.N.Y. 1993). "Nor are true public statements that a party is under investigation stigmatizing." Id. at *5.

Given that Oliver has not identified a statement made by Defendants that (1) injured his reputation; (2) "is capable of being proved false"; and (3) is claimed by Oliver to be false, see Brown, 2025 WL 1939293, at *7, he has not proffered sufficient evidence to create a material issue of fact as to his due process claim.[33]

Accordingly, Defendants' motion for summary judgment will be granted as to Plaintiff's due process claim (Count Two).

## XI. DAMAGES STEMMING FROM LOSS OF "PER SESSION" WAGES

The FAC alleges that, "due to his reassignment, Mr. Oliver was unable to participate in per session activities . . . , resulting in a loss of additional income that Mr. Oliver would have received and on which he relied." (FAC (Dkt. No. 195) ¶ 67) "Per session work is similar to overtime work for teachers." (Def. R. 56.1 Stmt. (Dkt. No. 237) ¶ 176)

---

[33] Oliver's "stigma-plus" deprivation of liberty claim also fails because he has not offered evidence of a "a material state-imposed burden or state-imposed alteration of [his] status or rights." Brown, 2025 WL 1939293, at *7. To the extent Oliver argues that he suffered a state-imposed burden or state-imposed alteration of his rights because the DOE's investigations exceeded the 60-day limit imposed by Article 21(4) of the Collective Bargaining Agreement (see Foti Decl., Ex. Q (Collective Bargaining Agreement) (Dkt. No. 247-23) at 5), for the reasons explained above, the DOE's investigations into Oliver's alleged misconduct did not violate the 60-day limit.

Defendants have moved for summary judgment "[t]o the extent plaintiff seeks damages for per session wages," arguing that Oliver "did not apply for per session work after [his] March 2019 [arrest and reassignment]." (Def. Sum. J. Br. (Dkt. No. 238) at 62-63) Oliver contends that his claim for lost per session wages should survive because he "was barred from even applying for per-session [work] as soon as he was reassigned on March 22, 2019." (Pltf. Opp. Br. (Dkt. No. 245)) at 38)

Oliver has not proffered evidence that he sought per-session work after his March 2019 reassignment, nor has he proffered evidence that he regularly performed per-session work prior to his reassignment. Given the absence of such evidence, Oliver's damage claim premised on the notion that he lost out on per-session work is speculative. See Shaheen v. Gonzales, No. 05 Civ. 8400 (LBS), 2006 WL 3164763, at *8 (S.D.N.Y. Nov. 1, 2006) (granting defendant summary judgment on plaintiff's lost wages claim based on employer's failure to promote him to a higher paying position where plaintiff had not offered evidence that he would have accepted the position); see also Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 22 (2d Cir. 1996) (finding that "district court abused its discretion in permitting [plaintiff's damages expert] to testify regarding [plaintiff's] past and future lost earnings capacity" where the "expert's projection [] was based on assumptions about [plaintiff's] employment prospects that represent[ed] a complete break with his work history of seasonal and intermittent employment").

Defendant's motion for summary judgment will be granted to the extent that Plaintiff's damage claims are premised on lost per-session wages.

## XII. PUNITIVE DAMAGES

Defendants DOE, Estwick, Chan, and Mustillo seek summary judgment on Oliver's claim for punitive damages. (Def. Sum. J. Br. (Dkt. No. 238) at 63) Oliver contends

that he is entitled to punitive damages "against the individual DOE Defendants" "under Title VII or [the] NYCHRL." (Pltf. Opp. Br. (Dkt. No. 245) at 38)

Given that Oliver does not contend that he is entitled to punitive damages as against the DOE, the DOE is entitled to summary judgment as to any such claim. Moreover, because the Court has granted Chan and Mustillo summary judgment on Oliver's claims against them, Oliver's punitive damages claim against these Defendants likewise fails. To the extent that Oliver seeks punitive damages against Estwick under Title VII, that statute does not provide for individual liability. See Tomka v. Seiler Corp., 66 F.3d 1295, 1313-14 (2d Cir. 1995). Accordingly, Estwick is entitled to summary judgment as to any punitive damage claim against him under Title VII. Oliver's punitive damage claim against Estwick under the NYCHRL is addressed below.

Punitive damages are available against individuals under the NYCHRL. Caravantes v. 53rd Street Partners, LLC, No. 09 Cv. 7821(RPP), 2012 WL 3631276, at *25 (S.D.N.Y. Aug. 23, 2012) ("[U]nder the NYCHRL, punitive damages are available against both the employer and the individual harasser"). "'[T]he standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" Edelman v. NYU Langone Health Sys., 141 F.4th 28, 43 (2d Cir. 2025) (quoting Chauca v. Abraham, 30 N.Y.3d 325, 334, (2017) (citations and quotation marks omitted)).

Oliver argues that "summary judgment on the issue of [punitive] damages is inappropriate" because he has "has raised a genuine issue of material fact regarding Estwick's intentional racial discrimination against Mr. Oliver." (Pltf. Opp. Br. (Dkt. No. 245) at 38)

Oliver further asserts that "'[e]vidence that the employer was generally familiar with antidiscrimination law when it committed the discriminatory act is sufficient to permit the inference that it acted with the requisite state of mind to justify an award of punitive damages.'" (Id. (quoting Johnson v. Strive E. Harlem Emp. Grp., 990 F. Supp. 2d 435, 450 (S.D.N.Y. 2014))) According to Oliver, in light of the "legal action Plaintiff took prior to March 2019 against Defendant Estwick for employment discrimination," there is evidence that "Estwick was 'generally familiar' with antidiscrimination law" when Estwick committed the allegedly discriminatory and retaliatory acts. (Id. (quoting Johnson, 990 F. Supp. 2d at 450))

As discussed above, there are material issues of fact as to whether (1) Oliver suffered certain adverse employment actions for purposes of his retaliation claims; and (2) Defendant Estwick acted with retaliatory animus. Assuming arguendo that Estwick acted with retaliatory animus, whether he acted "with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard," such that punitive damages are available under the NYCHRL, see Edelman, 141 F.4th at 43, is a jury question. See Randolph v. Metro. Transp. Auth., 17cv1433 (DLC), 2018 WL 2943744, at *9 (S.D.N.Y. June 12, 2018) ("The issue of whether defendants' conduct is sufficiently serious to warrant punitive damages is a question best left to the jury.") (citing Cooper v. City of New Rochelle, 925 F. Supp. 2d 588, 613 (S.D.N.Y. 2013) ("Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of the plaintiffs proof of sufficiently serious misconduct.")).

Accordingly, Defendants are not entitled to summary judgment on Oliver's claim for punitive damages against Estwick under the NYCHRL.

## CONCLUSION

For the reasons stated above, Oliver's motion for summary judgment is denied. Defendant's motion for summary judgment is granted as to Oliver's due process claim (Count Two); discrimination claims (Counts Five, Eight, Fourteen, and Seventeen); hostile work environment claims (Counts Six, Nine, Fifteen, and Eighteen); claims against Chan and Mustillo (Counts Eleven, Thirteen, and Twenty); and Monell claim against the DOE (Count Twelve). Defendant's motion for summary judgment is also granted (1) as to Plaintiff's respondeat superior claim (Count 21), except to the extent that claim is premised on Estwick's alleged violation of the NYSHRL and NYCHRL's retaliation provisions; (2) to the extent that Plaintiff's damages claims are premised on lost per-session wages; and (3) as to Plaintiff's punitive damages claim against the DOE, Chan, and Mustillo, and as against Estwick under Title VII. Defendant's motion is otherwise denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 235, 241).

This case will proceed to trial at 9:30 a.m. on **October 26, 2026,** in Courtroom 705 of the United States Courthouse, 40 Foley Square, New York, New York. The joint pretrial order, motions in limine, requested voir dire, and requests to charge are due on **September 21, 2026.** Responsive papers are due on **September 28, 2026**. The parties are directed to consult this Court's Individual Rules as to the contents of their pretrial filings.

Dated: New York, New York
August 6, 2026

SO ORDERED.

Paul G. Gardephe
United States District Judge